28-9052-00-3/PSR/PWD
Firm I.D. No. 90181

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| HOLLI JAKES, AS SPECIAL ADMINISTRATOR FOR THE ESTATE OF RICHARD J. RASMUSSEN, DECEASED, | ) ) ) ) | (Circuit Court Cook County Illinois Case No.: 08 L 7094) |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No.: 08 cv 4716 |
| MACARTHUR CO., AND SAFETY GROOVING AND GRINDING, LP, | ) ) ) | Judge Wayne R. Andersen Magistrate Judge Maria Valdez |
| Defendants. | ) ) | |

## DEFENDANTS' JOINT MOTION TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(A)

NOW COME Defendants, Safety Grooving and Grinding, LP ("Safety"), by and through

its attorneys, CLAUSEN MILLER, P.C., and MacArthur Co., by and through its attorneys, LAW

OFFICES OF BRUNO PARA, for their Motion To Transfer Pursuant to 28 U.S.C. § 1404(a)

request that this Court transfer this matter to the United States District for the Western District of

Wisconsin ("District Court in Wisconsin") pursuant to 28 U.S.C. § 1404(a).  In support of their

Motion, Defendants state as follows:

## FACTUAL AND PROCEDURAL BACKGROUND

1.      On June 30, 2008, Plaintiff, Holli Jakes, as Special Administrator For The Estate

Of Richard J. Rasmussen, Deceased, filed a Complaint at Law in the Circuit Court of Cook

County, Illinois, seeking recovery under theories of common law negligence and wrongful death

against co-defendant MacArthur Co. and Safety.  (A true and correct copy of Plaintiff's

complaint is attached hereto as Exhibit "A.")

1

2.     Plaintiff, Holli Jakes, is a citizen of Lake County, Illinois.   (See Answer to Request to Admit, attached hereto as Exhibit "B.")

3.     Plaintiff alleges that Defendant MacArthur Co. is a citizen of Minnesota.  (Exhibit A, paragraph 4.)

4.     Safety is a Pennsylvania corporation.  (See Transfer Order, paragraph 4, attached hereto as Exhibit "C.")

5.     On August 19, 2008, this matter was transferred from the Circuit Court of Cook County, Illinois to the United States District Court for the Northern District of Illinois, pursuant to 28 U.S.C. §1441(a). (Exhibit C.)

6.     Plaintiff's Complaint arises from a motor vehicle accident that occurred at U.S. Highway 53, State Road 54, in the Township of Galesville, County of Trempealeau, State of Wisconsin, on July 12, 2006.  (See Exhibit "A.")

7.     The accident was investigated by Officers David S. Gibbons, Roger Conrad, and Wayne Dahl of the Trempealeau County Wisconsin Sheriff's Office.  (See Wisconsin Motor Vehicle Accident Report, attached hereto as Exhibit "D.")

8.     The witnesses, and their respective residences, as listed in the Wisconsin Motor Vehicle Accident Report are:

Gary Nilson, Kaukauna, Wisconsin;

Paul Weber, Elkhorn Wisconsin;

Shannon H. Docken, Galesville, Wisconsin;

Thomas D. McCabe, Trempealeau, Wisconsin;

Daniel Bissen, Onalaska, Wisconsin;

Bonnie Kindshey, Whitehall, Wisconsin;

1198738.1

Tracy Dallman, Eau Claire, Wisconsin; and

Robert Priest, Honey Brook, Pennsylvania.

None of these witnesses are residents of Illinois.

(Exhibit D.)

9.    This accident was subsequently investigated by Inspector William J. Berger, of the Wisconsin State Patrol, Department of Transportation.  (See Wisconsin State Patrol Post Crash Inspection Packet, attached hereto as Exhibit "E.")

10.    As the necessary fact occurrence witnesses in this matter are citizens and residents of the state of Wisconsin, the scene of accident at issue is located in Wisconsin, all alleged negligent acts occurred in Wisconsin, and all police officers who investigated this accident are citizens and residents of Wisconsin, Safety petitions this Court to transfer venue to the District Court in Wisconsin pursuant to 28 U.S.C. § 1404(a).

**LEGAL STANDARD**

11.    28 U.S.C. § 1404(a) allows this Court to transfer this lawsuit to the District Court in Wisconsin if two conditions are met:  (1) this action "might have been brought" in the District Court in Wisconsin; and (2) transfer serves the convenience of the parties and witnesses in the interests of justice.

I.    **THE ACTION MIGHT HAVE BEEN BROUGHT IN THE WESTERN DISTRICT OF WISCONSIN.**

12.    An action "might have been brought" in a court that had jurisdiction and venue at the time the action was filed. *Hoffman v. Blaski*, 363 U.S. 335 (1960).  (Attached as Exhibit "G," Points and Authorities.)

3

13.     The District Court in Wisconsin has jurisdiction over this matter based on the complete diversity of the parties and based on Plaintiff's admission that she is seeking damages in excess of $75,000.  28 U.S.C. § 1332(a).

14.     The District Court in Wisconsin is a proper venue because the controversy giving rise to the litigation in this matter occurred within in the state of Wisconsin.  28 U.S.C. § 1391(a).

## II.     THE CONVENIENCE OF PARTIES AND WITNESSES AND INTEREST OF JUSTICE WARRANT TRANSFER TO THE DISTRICT COURT IN WISCONSIN.

15.     28 U.S.C. § 1404(a) allows the Court to transfer an action if it would serve "the convenience of parties and witnesses in the interests of justice."  A forum that provides for ease of access to sources of proof, availability of compulsory process for the attendance of unwilling witnesses, and the cost of obtaining attendance of willing witnesses are factors to be considered. *Holton v. Florida*, 2008 WL 1995128 (2008); citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).  (Exhibit G.)

16.     § 1404(a) modifies the common law doctrine of *forum non conveniens*, which allows courts to dismiss a case brought in an inconvenient forum.

17.     Although courts consider the same factors in determining whether an action should be transferred pursuant to 28 U.S.C. § 1404(a), or dismissed pursuant to *forum non conveniens*, courts have greater discretion to transfer an action than they do to dismiss it altogether.  28 U.S.C. § 1404(a).

### A.     *WITNESSES*

18.     In this case, Plaintiff has alleged wrongful acts consisting of operating a motor vehicle at U.S. Highway 53, State Road 54 in the Township of Galesville, Trempealeau County, Wisconsin.  (Exhibit A.)

4

19.     The alleged negligent acts involve a motor vehicle accident, wherein witnesses at the scene listed in the Wisconsin State Traffic Report, are citizens and residents of the State of Wisconsin. (Exhibit D.)

20.     As the incident occurred in Wisconsin at a construction site, the potential occurrence witnesses in this case are located in Wisconsin. (See *Engel v. CVS, Inc.*, 886 F.Supp. 728, 733 (C.D. CIL 1995), wherein New York rather than California was ruled as a more convenient venue because the defendants resided in New York and alleged that witnesses resided there.) Further, justice is best served where the jury is permitted to view the most material witnesses. *Catalano v. BRI, Inc.*, 724 F.Supp. 1580, 1584 (E.D. Mich. 1989). (Exhibit G.)

**B.      *SOURCES OF PROOF***

21.     As indicated above, this is an action involving a motor vehicle and a pedestrian. By its very nature, the location of the alleged accident is an important piece of evidence to all parties in this matter.

22.     It is much easier for all parties and potential jurors to view the related evidence concerning the scene of the alleged accident in Wisconsin, as this was the location of the accident. (See *Engel*, 886 F.Supp. at 732, wherein venue was proper where a substantial part of the events or omissions giving rise to the crime occurred.) (Exhibit G.)

23.     The accident was investigated by Wisconsin State Police and the Wisconsin Department of Transportation, and the officers who performed these investigations are citizens and residents of the state of Wisconsin. (Exhibits D and E.)

24.     The accident at issue was also investigated by the Occupational Safety and Health Administration by the area office located in Eau Claire, Wisconsin, and the individuals who performed this investigation are citizens and residents of the state of Wisconsin. (See OSHA investigation report, attached hereto as Exhibit "F.")

1198738.1

25.    The sources of proof in this case are the scene of the accident, as it was a motor vehicle accident, and the individuals who witnessed and investigated the accident.  As detailed, these are all located in Wisconsin, not Illinois, and therefore this matter should be transferred to Wisconsin.  *Engel v. CVS, Inc.*, 886 F.Supp. 728, 733 (C.D. CIL 1995), (venue is proper where a substantial part of the events or omissions giving rise to the claim occurred).  (Exhibit G.)

C.    *INTERESTS OF JUSTICE*

26.    Courts also consider the interests of justice in deciding whether to transfer a case. 28 U.S.C.  § 1404(a). Here, the accident at issue occurred in Wisconsin and all occurrence witnesses are located in Wisconsin.

27.    Further, Plaintiff alleges that there were statutory violations of Illinois law, even though the motor vehicle accident at issue occurred in Wisconsin, not Illinois.  (See Exhibit A, Count I, paragraph 15, subparagraphs a - f.)

28.    In a diversity of citizenship action, which state's substantive law governs is determined by applying the choice-of-law rules of the jurisdiction in which the court sits.  *Garcia v. Plaza Oldsmobile Ltd.*, 421 F.3d 216, (3rd Circuit 2005); citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S. Ct. 1020 (1941).  (Exhibit G.)

29.    In Illinois tort actions, the law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties.  *Esser v. McIntyre*, 169 Ill.2d 292 (1996).  (Exhibit G.)

30.    In the case at bar, the traffic accident and injury at issue occurred in Wisconsin, on a Wisconsin roadway, and therefore if there were, in fact, any traffic violations as alleged by Plaintiff, then the Motor Vehicle Code, traffic laws, and substantive laws of Wisconsin would apply.  Wisconsin Statute 346.02 (1).  (Exhibit G.)

6

1198738.1

31.     The foregoing facts clearly demonstrate that having this case heard in the Wisconsin District Court would be in the interests of justice as it would be easier to view the scene, it would be easier to have witnesses to the occurrence testify at trial in this matter as they are residents of Wisconsin, not Illinois, and it would be easier to apply the substantive and statutory law of Wisconsin in its forum state than in Illinois.

32.     All of these factors lend themselves to the conclusion that it is in the interests of justice that this case be transferred to a court located in Wisconsin, further there is no compelling reason not to transfer this case to Wisconsin.

## CONCLUSION

Based on the foregoing, Safety Grooving and Grinding, LP, and MacArthur, Co., respectfully request this Court transfer this litigation to the United States District Court for the Western District of Wisconsin.

1198738.1

*s/P. Scott Ritchie*
_____
One of the Attorneys for SAFETY
GROOVING AND GRINDING LLP

P. SCOTT RITCHIE
PAUL W. DAUGHERITY
CLAUSEN MILLER P.C.
Firm I.D. No. 90181
10 South LaSalle Street
Chicago, Illinois 60603-1098
312/855-1010

Attorneys for Defendant SAFETY GROOVING AND GRINDING LP

*s/John W. Potter*
_____
One of the Attorneys for MACARTHUR CO.

JOHN W. POTTER
LAW OFFICES OF BRUNO PARA
225 W. Washington St., Suite 1400
Chicago, Illinois 60606
312/827-2334

Attorneys for Defendant MACARTHUR CO.

1198738.1

## CERTIFICATE OF SERVICE

The undersigned, being first duly sworn upon oath, deposes and states that the attached

Defendants' Joint Motion to Transfer Pursuant to 28 U.S.C. § 1404(A) was mailed/delivered to

the Clerk of the United States District Court for the Northern District of Illinois Eastern Division

on the 22nd day of August, 2008, for filing on behalf of Safety Grooving and Grinding LP and a

copy was delivered by e-mail to the following parties:

| | |
|---|---|
| Jared B. Staver<br>Staver & Gainsberg PC<br>120 W. Madison St., Suite 520<br>Chicago, IL 60602<br>(312) 422-1130<br>(312) 422-1132 (fax)<br>Attorneys for Plaintiff | John W. Potter<br>Law Offices of Bruno G. Para<br>225 West Washington St., Suite 1400<br>Chicago, IL 60606<br>(312) 827-2334<br>(312) 827-2301 (fax)<br>Attorneys for MacArthur Co. |

Kathy A. Uram

Subscribed and sworn to before me

this 22nd day of August, 2008.

Notary Public

"OFFICIAL SEAL"
KATHLEEN A. MURRAY
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 03/03/11

1198738.1

# EXHIBIT A

*SERVED MON 3:30 JULY 7TH    137514*

| | | |
|---|---|---|
| 2120 – Served | 2121 – Served | |
| 2220 – Not Served | 2221 – Not Served | |
| 2320 – Served By Mail | 2321 – Served By Mail | |
| 2420 – Served By Publication | 2421 – Served By Publication | |
| **SUMMONS** | **ALIAS – SUMMONS** | CCG N001-10M-1-07-05 (          ) |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, _____LAW_____ DIVISION

**(Name all parties)**

Holli Jakes, as Special Administrator for the Estate of
Richard J. Rasmussen, deceased,

v.

Macarthur Co., and Safety Grooving and Grinding, LP,

}

2008L007094
CALENDAR/ROOM
TIME 00:00
PI Motor Vehicle

No. _____

PLEASE SERVE:
Safety Grooving and Grinding, LP
1510 County Club Parkway
Elkhorn, WI 53121

### SUMMONS

**To each Defendant:**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑  Richard J. Daley Center, 50 W. Washington, Room _____801_____, Chicago, Illinois 60602

❑  **District 2 - Skokie**
5600 Old Orchard Rd.
Skokie, IL 60077

❑  **District 3 - Rolling Meadows**
2121 Euclid
Rolling Meadows, IL 60008

❑  **District 4 - Maywood**
1500 Maybrook Ave.
Maywood, IL 60153

❑  **District 5 – Bridgeview**
10220 S. 76th Ave.
Bridgeview, IL 60455

❑  **District 6 - Markham**
16501 S. Kedzie Pkwy.
Markham, IL 60426

❑  **Child Support**
28 North Clark St., Room 200
Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

**To the officer:**

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: 38688

Name: Staver & Gainsberg, P.C.

Atty. for: Plaintiff

Address: 120 W. Madison Street, Suite 520

City/State/Zip: Chicago, IL 60602

Telephone: (312) 422-1130

WITNESS, _____, _____

*(SEAL)*

_____
Clerk of Court

Date of service: _____, _____
(To be inserted by officer on copy left with defendant or other person)

Service by Facsimile Transmission will be accepted at: _____

_____
(Area Code)    (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

HOLLI JAKES, as Special Administrator    )
for the Estate of RICHARD J. RASMUSSEN,   )
deceased,                                 )
                                          )
                Plaintiff,                )
                                          )    No.
vs.                                       )
                                          )
MACARTHUR CO., and SAFETY GROOVING )
AND GRINDING, LP,                         )
                                          )
                Defendants.               )

## COMPLAINT AT LAW

NOW COMES the Plaintiff, HOLLI JAKES, as Special Administrator for the

Estate of RICHARD J. RASMUSSEN, deceased, by and through her attorneys, STAVER

& GAINSBERG, P.C., complaining of the Defendants, MACARTHUR Co., and

SAFETY GROOVING AND GRINDING, LP, and states as follows:

1.  That Plaintiff, HOLLI JAKES, is a citizen of the state of Illinois, City of Lake Villa

    and oldest daughter of the deceased, RICHARD J. RASMUSSEN ("RICHARD").

2.  That RICHARD's surviving spouse, Marale Rasmussen, is a citizen of Illinois, City

    of Wilmette, County of Cook.

3.  That three additional surviving children of RICHARD, Regina Mathews, Aimee

    Rasmussen, and Mark Rasmussen, are citizens of the state of Illinois and reside in

    Cook County.

4.  That Defendant, MACARTHUR Co., ("MACARTHUR") is a Minnesota

    Corporation, and a nationwide manufacturer and seller of all insulation and related

    accessories.

2

5. That at all relevant times, MACARTHUR has a registered agent in the State of Illinois, County of Cook and continues to transpire and do business in the State of Illinois, County of Cook.

6. That Defendant, Safety Grooving and Grinding, LP ("SAFETY"), is a subsidiary of Swank Associated Companies, Inc., ("SWANK") a Pennsylvania Co., and provides grinding services.

7. That at all relevant times, SAFETY as a subsidiary of SWANK has and continues to transpire and do business in the State of Illinois, County of Cook.

8. That on or about July 12, 2006, SAFETY was a contractor providing grinding services at U.S. Highway 53 at and around State Road 54 in the State of Wisconsin, Township of Galesville.

9. That at said time and place, SAFETY, by and through its employees and/or agents, was in control of and in charge of the traffic management for the construction of U.S. Highway 53 near State Road 54, including but not limited to, providing direction for vehicular traffic, stopping traffic along the construction site, and assisting both pedestrian and vehicular traffic through the construction site.

COUNT I

*Holli Jakes, as Special Administrator v. Macarthur Co.*

10. That on or about July 12, 2006, RICHARD, was legally and lawfully standing in the construction zone for U.S. Highway 53 at the intersection of State Road 54 and U.S. Highways 53 in the State of Wisconsin, Township of Galesville.

3

11. That on July 12, 2006, Gary L. Nilson, as an employee and /or agent of MACARTHUR was operating a 2001 Mack Semi-Truck at the intersection of State Road 54 and U.S. Highway 53 in the State of Wisconsin, Township of Galesville.

12. That at all relevant times, Gary L. Nilson was a duly authorized agent of MACARTHUR and was operating the 2001 Mack Semi-Truck in the scope and course of his employment with MACARTHUR and on behalf of and for the benefit of MACARTHUR.

13. That at the aforesaid time and place, Nilson attempted to make a left-hand turn onto U.S. Highway 53 and, during the course of the turn, struck and ran over RICHARD, who was a pedestrian lawfully standing at or near State Road 54 and U.S. Highway 54.

14. That at all times material hereto, it was the duty of MACARTHUR and it agents/and or employees to exercise ordinary care for the safety of the person and property of others there and then upon said roadway and especially RICHARD.

15. That in violation of this duty, MACARTHUR and its duly authorized employee, Gary Nilson, acted or failed to act in one or more of the following ways, amounting to negligent conduct and violating the Motor Vehicle Laws of the State of Illinois and Federal Regulations under the Federal Motor Carrier Safety Act:

    a.  Operated said motor vehicle without keeping a proper and sufficient lookout for pedestrians in and about the area, and more particularly for RICHARD;

    b.  Proceeded at a speed which was greater than reasonable and proper with regard to traffic conditions in the use of the way, or which endangered the safety of RICHARD, in violation of the provisions of 625 ILCS 5/11-601;

4

   c.  Failed to decrease the speed of said motor vehicle so as to avoid colliding with RICHARD, a pedestrian standing at the roadway thereat, contrary to and in violation of the provisions of 625 ILCS 5/11-601;

   d.  Failed to equip said motor vehicle with proper brakes, contrary to and in violation of the provisions of 625 ILCS 5/12-301;

   e.  Failed to yield the right-of-way to RICHARD, a pedestrian standing in the roadway thereat, and failed to take proper precautions upon observing RICHARD thereat, in violation of the provisions of 625 ILCS 5/11-1003;

   f.  Failed to give audible warning with said motor vehicle's horn of the approach of said motor vehicle, although such warning was necessary to insure the safe operation of said vehicle, contrary to and in violation of the provisions of 625 ILCS 5/12-601;

   g.  Failed to keep said motor vehicle under proper control and failed to stop, slow down or otherwise alter the speed, movement or direction of said vehicle when danger of collision with RICHARD was imminent;

   h.  Operated said vehicle while under the influence of Cannabis;

   i.  Allowed the operation of said semi-trailer greater than 53 feet on State Road 54, a non-designated roadway;

   j.  Operated said semi-trailer after being on duty for greater than 14 hours in violation of the regulation 40 CFR 395.3(a)(2).

   k.  Allowed the operation of a semi-trailer without said driver recording his duty-status in violation of the regulation 40 CFR 395.8.

   l.  Hired or employed operators of Semi-Trucks, including, Gary Nilson herein that had driving records containing multiple convictions for operating Semi-Trailers in violation of Motor Vehicle Codes and previous suspensions of driving privileges.

   m.  Otherwise acted in a careless or negligent manner.

16.    That as a direct and proximate result of MACARTHUR and its agent,

Gary Nilson's aforesaid careless and negligent acts and/or omissions, RICHARD

was run over and killed, causing his spouse and children to lose RICHARD's

5

money, services, goods, support, companionship, and other economic and
emotional damages.

WHEREFORE, Plaintiff, HOLLI JAKES, as Special Administrator for the Estate
of RICHARD J. RASMUSSEN, prays for judgment against the Defendant,
MACARTHUR CO., in an amount in excess of $50,000.00 dollars, plus court costs,
attorney's fees, and for whatever other relief this court deems just and appropriate.

COUNT II

*Holli Jakes, as Special Administrator v. Safety Grooving and Grinding, LP*

1-16.    Plaintiff re-alleges paragraphs 1 thru 16 of Count I as paragraphs 1
        thru 16 herein of Count II.

17.    That on or about July 12, 2006, SAFETY's duly authorized agent and/or
       employee, Paul Weber, was providing traffic control, direction, and management
       at the intersection of State Highway Road 54 and U.S. Highway 53.

18.    That at said time and place, RICHARD was legally and lawfully standing at the
       intersection of State Highway Road 54 and U.S. Highway 53 and speaking with
       Weber.

19.    That at said time and place, Weber was notified of a problem with a grinding
       machine owned by SAFETY and operated by an employee/agent of SAFETY,
       and Weber decided to leave the intersection of State Highway 54 and U.S.
       Highway 53 to assist with the maintenance and operation of the grinding machine.

20.    That at said time and place, Weber instructed RICHARD to provide traffic
       control, management, and direction at the intersection of State Highway 54 and
       U.S. Highway 53 until Weber was able to return.

6

21.      That at all times material hereto, it was the duty of SAFETY and it agents and/or

employees to exercise ordinary care for the safety of the person and property of

others there and then upon said construction site and roadway and especially

RICHARD.

22.      That in violation of this duty, SAFETY and its duly authorized employees and or

agents acted or failed to act in one or more of the following ways, amounting to

negligent conduct:

     a.  Provided traffic management and control at a construction site without
the proper number of employees, equipment, and supplies;

     b.  Failed to have the proper equipment, materials, and clothing, to assist
the individuals that were instructed to provide traffic control and
management;

     c.  Failed to provide proper signage, flags, and cones, to prevent vehicular
traffic from striking pedestrians and others inside the construction
zone;

     d.  Instructed RICHARD to provide traffic management and control
without the proper training, equipment, and clothing for such duties;

     e.  Directed RICHARD to provide traffic management and control;

     f.  Failed to train its employees as to proper safety procedures in a
construction zone, including protecting the safety of pedestrians
lawfully within the construction zone;

     g.  Failed to maintain proper safety procedures and/or plans for managing
and controlling vehicular traffic in the area where construction was
being performed on U.S. Highway 53.

     h.  Otherwise acted in a careless or negligent manner.

23.      That as a direct and proximate result of SAFETY and its agents and employee's

aforesaid careless and negligent acts and/or omissions, RICHARD was run over

7

and killed, causing his spouse and children to lose RICHARD's money, services, goods, support, companionship, and other economic and emotional damages.

WHEREFORE, Plaintiff, HOLLI JAKES, as Special Administrator for the Estate of RICHARD J. RASMUSSEN, prays for judgment against the Defendant, SAFETY GROOVING AND GRINDING, LP, in an amount in excess of $50,000.00 dollars, plus court costs, attorney's fees, and for whatever other relief this court deems just and appropriate.

Respectfully submitted,

STAVER & GAINSBERG, P.C.

By: _____

Neal S. Gainsberg

Jared B. Staver
Neal S. Gainsberg
STAVER & GAINSBERG, P.C.
120 West Madison
Suite # 520
Chicago, Illinois 60602
(312) 422-1130
Attorney ID # 38688

EXHIBIT B

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| HOLLI JAKES, as Special Administrator )<br>for the Estate of RICHARD J. )<br>RASMUSSEN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MACARTHUR CO., and SAFETY )<br>GROOVING AND GRINDING, LP, )<br>)<br>Defendants. ) | No. 08 L 007094 |

### NOTICE OF FILING

To:     Scott Ritchie                    John W. Potter
        Clausen Miller P.C.              Law Office of Bruno G. Para
        10 South LaSalle Street          225 West Washington Street, Ste. 1400
        Chicago, IL 60603                Chicago, IL 60606

YOU ARE HEREBY NOTIFIED that pursuant to the provisions of the Rules of Court I have on the 8th day of August 2008, filed with the Clerk of the Court Plaintiff's Response to Defendants', MACARTHUR CO., and SAFETY GROOVING AND GRINDING, LP., Rule 216 Requests to Admit, copy is attached hereto.

_____
Neal Gainsberg

### CERTIFICATE OF DELIVERY (PERSONALLY OR BY MAIL)

The undersigned hereby certifies under penalties of perjury as provided by law pursuant to 735 ILCS 5/1-109, that the Notice and any attached pleadings were served upon counsel and/or party of record this 8th day of August 2008, by U.S. Mail.

_____
Neal Gainsberg

Staver & Gainsberg, P.C.
120 West Madison, Suite # 520
Chicago, Illinois 60602
(312) 422-1130
Attorney ID # 38688



## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

HOLLI JAKES, as Special Administrator )
for the Estate of RICHARD J. )
RASMUSSEN, DECEASED, )
                             )
          **Plaintiff,**      )     **No. 08 L 007086**
                             )
          **v.**                     )
                             )
MACARTHUR CO., and SAFETY )
GROOVING AND GRINDING, LP, )
                             )
          **Defendants.**    )

### PLAINTIFF'S RESPONSE TO DEFENDANT'S,
### SAFETY GROOVING AND GRINDING, LP, RULE 216 REQUEST TO ADMIT

      NOW COMES the Plaintiff, HOLLI JAKES, as Special Administrator for the
Estate of RICHARD J. RASMUSSEN, DECEASED, by and through her attorneys,
Staver & Gainsberg, P.C., with her Response to Defendant's, SAFETY GROOVING
AND GRINDING, LP, Request to admit:

1.     Admit that the damages that you (plaintiff) seek do not exceed the sum or value of
$75,000.00 (seventy-five thousand dollars 00/100), exclusive of interest,
attorney's fees and costs.

ANSWER:    Plaintiff denies.

2.     Admit that you (the Plaintiff, Holli Jakes) are a citizen of the County of Lake
State of Illinois.

ANSWER:    Plaintiff admits.

3.     Admit that the accident made the subject of Plaintiff's complaint occurred near
the intersection of U.S. Highway 53, State Road 54, township of Galesville,
Trempealeau County, State of Wisconsin.

ANSWER:    Plaintiff admits.

Under penalties as provided by law pursuant to 735 ILCS 5/1-109, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he/she verily believes the same to be true.

*Holli Jakes*

HOLLI JAKES, as Special Administrator for the
Estate of RICHARD J. RASMUSSEN, Deceased

Jared B. Staver
Neal S. Gainsberg
Staver & Gainsberg, P.C.
120 West Madison, Suite # 520
Chicago, Illinois 60602
(312) 422-1130
Attorney ID # 38688

EXHIBIT C

28-9052-00-3/PWD

### IN THE UNITED STATES DISTRICT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| HOLLI JAKES, AS SPECIAL ADMINISTRATOR FOR THE ESTATE OF RICHARD J. RASMUSSEN, DECEASED, | ) ) ) ) | Cook County Circuit Court |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 08 L 7094 |
| MACARTHUR CO., AND SAFETY GROOVING AND GRINDING, LP, | ) ) ) | |
| Defendants. | ) ) | |

FILED: AUGUST 19, 2008
08CV4716
JUDGE ANDERSEN
MAGISTRATE JUDGE VALDEZ

BR

### NOTICE OF REMOVAL

To:     The Honorable Judges of the United States District Court of the Northern District of Illinois, Eastern Division

Petitioner, SAFETY GROOVING AND GRINDING, LP, a Defendant in the above-entitled cause, by and through its attorneys, CLAUSEN MILLER P.C., seeks removal of this civil action from the Circuit Court of Cook County, to the United States District Court for the Northern District of Illinois, states as follows:

1.     On or about June 30, 2008, Plaintiff filed an action with the Circuit Court of Cook County, Illinois, under general no. 08 L 7094 against MACARTHUR CO., AND SAFETY GROOVING AND GRINDING, LP.

2.     This notice is filed pursuant to 28 U.S.C. §§ 1446 (b), within 30 days of the receipt of answers to requests to admit concerning the amount in controversy, and within one year of the commencement of the action. (See Plaintiff's Response to Defendant's MacArthur Co., Rule 216 Request to Admit and Complaint at Law, attached hereto as Group Exhibit "A").

1

3.      On information and belief, at the time the action was commenced, and since then, Plaintiff was and is a citizen of the State of Illinois.

4.      At the time the action was commenced, and since then, Defendant, SAFETY GROOVING AND GRINDING, LP, was and is a Pennsylvania corporation.

5.      Upon information and belief, at the time the action was commenced and since then, Defendant MACARTHUR CO., was and is a Minnesota corporation.

6.      By her Response to Request to Admit, Plaintiff seeks compensatory damages "in excess of $75,000.00." Defendant, SAFETY GROOVING AND GRINDING, LP states on information and belief that the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      This court has jurisdiction over this action pursuant to the provisions of 28 U.S.C. §1332, in that there exists complete diversity of citizenship between Plaintiff and all Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.      This action may be removed to this court pursuant to the provisions of 28 U.S.C. §§1441(a) - (b), in that it is a civil action of which this district court has original jurisdiction and the Defendants/Petitioners are not citizens of the State of Illinois.

9.      All Defendants who have been served consent to this Notice.

WHEREFORE, SAFETY GROOVING AND GRINDING, LP, prays that the above described cause of action pending in the Circuit Court of Cook County, Illinois be removed therefrom to the United States District Court for the Northern District of Illinois, Eastern Division, Chicago, Illinois, and that this cause proceed in this court as an action properly removed thereto.

2

*s/P. Scott Ritchie*

_____

One of the Attorneys for SAFETY
GROOVING AND GRINDING LLP

P. SCOTT RITCHIE
PAUL W. DAUGHERITY
CLAUSEN MILLER P.C.
Firm I.D. No. 90181
10 South LaSalle Street
Chicago, Illinois 60603-1098
312/855-1010

Attorneys for Defendant SAFETY GROOVING AND GRINDING LP

*s/John W. Potter*

_____

One of the Attorneys for MACARTHUR CO.

JOHN W. POTTER
LAW OFFICES OF BRUNO PARA
225 W. Washington St., Suite 1400
Chicago, Illinois 60606
312/827-2334

Attorneys for Defendant MACARTHUR CO.

1196303.1

## <u>CERTIFICATE OF SERVICE</u>

Please take notice that upon the 19th day of August, 2008, we have electronically filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the CM/VCF system, Safety Grooving and Grinding, LP's Notice of Removal, and notice of this filing will be sent to all parties by mail.

| | |
|---|---|
| Jared B. Staver<br>Staver & Gainsberg PC<br>120 W. Madison St., Suite 520<br>Chicago, IL 60602<br>(312) 422-1130<br>(312) 422-1132 (fax)<br>Attorneys for Plaintiff | John W. Potter<br>Law Offices of Bruno G. Para<br>225 West Washington St., Suite 1400<br>Chicago, IL 60606<br>(312) 827-2334<br>(312) 827-2301 (fax)<br>Attorneys for MacArthur Co. |

Subscribed and sworn to before me

this 19th day of August, 2008.

Notary Public

"OFFICIAL SEAL"
KATHLEEN A. MURRAY

P. SCOTT RITCHIE
PAUL W. DAUGHERITY
CLAUSEN MILLER P.C.
Firm I.D. No. 90181
10 South LaSalle Street
Chicago, Illinois 60603-1098
312/855-1010

4

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

|  |  |  |
|---|---|---|
| HOLLI JAKES, as Special Administrator for the Estate of RICHARD J. RASMUSSEN, DECEASED, | ) ) ) ) ) | |
| Plaintiff, | ) ) | No. 08 L 007086 |
| v. | ) ) ) | |
| MACARTHUR CO., and SAFETY GROOVING AND GRINDING, LP, | ) ) ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S, MACARTHUR CO., RULE 216 REQUEST TO ADMIT

NOW COMES the Plaintiff, HOLLI JAKES, as Special Administrator for the

Estate of RICHARD J. RASMUSSEN, DECEASED, by and through her attorneys,

Staver & Gainsberg, P.C., with her Response to Defendant's, MACARTHUR CO.,

Request to admit:

1.      Plaintiff is seeking damages in excess of $75,000.00.

ANSWER:      Plaintiff admits.



EXHIBIT

GROUP EXHIBIT

A

Under penalties as provided by law pursuant to 735 ILCS 5/1-109, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he/she verily believes the same to be true.

HOLLI JAKES, as Special Administrator for the
Estate of RICHARD J. RASMUSSEN, Deceased

Jared B. Staver
Neal S. Gainsberg
Staver & Gainsberg, P.C.
120 West Madison, Suite # 520
Chicago, Illinois 60602
(312) 422-1130
Attorney ID # 38688

*SERVED MON*
*3:30  JULY 7 TH* 137514

| 2120 – Served | 2121 – Served | |
|---|---|---|
| 2220 – Not Served | 2221 – Not Served | |
| 2320 – Served By Mail | 2321 – Served By Mail | |
| 2420 – Served By Publication | 2421 – Served By Publication | |
| **SUMMONS** | **ALIAS - SUMMONS** | **CCG N001-10M-1-07-05 (            )** |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, _____LAW_____ DIVISION

(Name all parties)

Holli Jakes, as Special Administrator for the Estate of
Richard J. Rasmussen, deceased,

v.

Macarthur Co., and Safety Grooving and Grinding, LP,

}

2008L007094
CALENDAR/ROOM
TIME 00:00
PI Motor Vehicle

No. _____

PLEASE SERVE:
Safety Grooving and Grinding, LP
1510 County Club Parkway
Elkhorn, WI 53121

### SUMMONS

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room _____801_____, Chicago, Illinois 60602

| ☐ District 2 - Skokie | ☐ District 3 - Rolling Meadows | ☐ District 4 - Maywood |
|---|---|---|
| 5600 Old Orchard Rd. | 2121 Euclid | 1500 Maybrook Ave. |
| Skokie, IL 60077 | Rolling Meadows, IL 60008 | Maywood, IL 60153 |
| ☐ District 5 - Bridgeview | ☐ District 6 - Markham | ☐ Child Support |
| 10220 S. 76th Ave. | 16501 S. Kedzie Pkwy. | 28 North Clark St., Room 200 |
| Bridgeview, IL 60455 | Markham, IL 60426 | Chicago, Illinois 60602 |

You must file within 30 days after service of this Summons, not counting the day of service.
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: 38688

Name: Staver & Gainsberg, P.C.

Atty. for: Plaintiff

Address: 120 W. Madison Street, Suite 520

City/State/Zip: Chicago, IL 60602

Telephone: (312) 422-1130

Service by Facsimile Transmission will be accepted at: _____

WITNESS, _____

_____
Clerk of Court

Date of service: _____, _____
(To be inserted by officer on copy left with defendant or other person)

(Area Code)    (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

HOLLI JAKES, as Special Administrator )
for the Estate of RICHARD J. RASMUSSEN, )
deceased, )
      )
      Plaintiff, )
      vs. )    No.
      )
MACARTHUR CO., and SAFETY GROOVING )
AND GRINDING, LP, )
      )
      Defendants. )

2008L007094
CALENDAR/ROOM
TIME 00:00
PI Motor Vehicle

## COMPLAINT AT LAW

NOW COMES the Plaintiff, HOLLI JAKES, as Special Administrator for the

Estate of RICHARD J. RASMUSSEN, deceased, by and through her attorneys, STAVER

& GAINSBERG, P.C., complaining of the Defendants, MACARTHUR Co., and

SAFETY GROOVING AND GRINDING, LP, and states as follows:

1.  That Plaintiff, HOLLI JAKES, is a citizen of the state of Illinois, City of Lake Villa

    and oldest daughter of the deceased, RICHARD J. RASMUSSEN ("RICHARD").

2.  That RICHARD's surviving spouse, Marale Rasmussen, is a citizen of Illinois, City

    of Wilmette, County of Cook.

3.  That three additional surviving children of RICHARD, Regina Mathews, Aimee

    Rasmussen, and Mark Rasmussen, are citizens of the state of Illinois and reside in

    Cook County.

4.  That Defendant, MACARTHUR Co., ("MACARTHUR") is a Minnesota

    Corporation, and a nationwide manufacturer and seller of all insulation and related

    accessories.

2

5.   That at all relevant times, MACARTHUR has a registered agent in the State of
     Illinois, County of Cook and continues to transpire and do business in the State of
     Illinois, County of Cook.

6.   That Defendant, Safety Grooving and Grinding, LP ("SAFETY"), is a subsidiary of
     Swank Associated Companies, Inc., ("SWANK") a Pennsylvania Co., and provides
     grinding services.

7.   That at all relevant times, SAFETY as a subsidiary of SWANK has and continues to
     transpire and do business in the State of Illinois, County of Cook.

8.   That on or about July 12, 2006, SAFETY was a contractor providing grinding
     services at U.S. Highway 53 at and around State Road 54 in the State of Wisconsin,
     Township of Galesville.

9.   That at said time and place, SAFETY, by and through its employees and/or agents,
     was in control of and in charge of the traffic management for the construction of U.S.
     Highway 53 near State Road 54, including but not limited to, providing direction for
     vehicular traffic, stopping traffic along the construction site, and assisting both
     pedestrian and vehicular traffic through the construction site.

COUNT I

*Holli Jakes, as Special Administrator v. Macarthur Co.*

10.  That on or about July 12, 2006, RICHARD, was legally and lawfully standing in the
     construction zone for U.S. Highway 53 at the intersection of State Road 54 and U.S.
     Highways 53 in the State of Wisconsin, Township of Galesville.

3

11. That on July 12, 2006, Gary L. Nilson, as an employee and /or agent of MACARTHUR was operating a 2001 Mack Semi-Truck at the intersection of State Road 54 and U.S. Highway 53 in the State of Wisconsin, Township of Galesville.

12. That at all relevant times, Gary L. Nilson was a duly authorized agent of MACARTHUR and was operating the 2001 Mack Semi-Truck in the scope and course of his employment with MACARTHUR and on behalf of and for the benefit of MACARTHUR.

13. That at the aforesaid time and place, Nilson attempted to make a left-hand turn onto U.S. Highway 53 and, during the course of the turn, struck and ran over RICHARD, who was a pedestrian lawfully standing at or near State Road 54 and U.S. Highway 54.

14. That at all times material hereto, it was the duty of MACARTHUR and it agents/and or employees to exercise ordinary care for the safety of the person and property of others there and then upon said roadway and especially RICHARD.

15. That in violation of this duty, MACARTHUR and its duly authorized employee, Gary Nilson, acted or failed to act in one or more of the following ways, amounting to negligent conduct and violating the Motor Vehicle Laws of the State of Illinois and Federal Regulations under the Federal Motor Carrier Safety Act:

   a. Operated said motor vehicle without keeping a proper and sufficient lookout for pedestrians in and about the area, and more particularly for RICHARD;

   b. Proceeded at a speed which was greater than reasonable and proper with regard to traffic conditions in the use of the way, or which endangered the safety of RICHARD, in violation of the provisions of 625 ILCS 5/11-601;

4

   c.  Failed to decrease the speed of said motor vehicle so as to avoid colliding with RICHARD, a pedestrian standing at the roadway thereat, contrary to and in violation of the provisions of 625 ILCS 5/11-601;

   d.  Failed to equip said motor vehicle with proper brakes, contrary to and in violation of the provisions of 625 ILCS 5/12-301;

   e.  Failed to yield the right-of-way to RICHARD, a pedestrian standing in the roadway thereat, and failed to take proper precautions upon observing RICHARD thereat, in violation of the provisions of 625 ILCS 5/11-1003;

   f.  Failed to give audible warning with said motor vehicle's horn of the approach of said motor vehicle, although such warning was necessary to insure the safe operation of said vehicle, contrary to and in violation of the provisions of 625 ILCS 5/12-601;

   g.  Failed to keep said motor vehicle under proper control and failed to stop, slow down or otherwise alter the speed, movement or direction of said vehicle when danger of collision with RICHARD was imminent;

   h.  Operated said vehicle while under the influence of Cannabis;

   i.  Allowed the operation of said semi-trailer greater than 53 feet on State Road 54, a non-designated roadway;

   j.  Operated said semi-trailer after being on duty for greater than 14 hours in violation of the regulation 40 CFR 395.3(a)(2).

   k.  Allowed the operation of a semi-trailer without said driver recording his duty-status in violation of the regulation 40 CFR 395.8.

   l.  Hired or employed operators of Semi-Trucks, including, Gary Nilson herein that had driving records containing multiple convictions for operating Semi-Trailers in violation of Motor Vehicle Codes and previous suspensions of driving privileges.

   m.  Otherwise acted in a careless or negligent manner.

16.   That as a direct and proximate result of MACARTHUR and its agent,

Gary Nilson's aforesaid careless and negligent acts and/or omissions, RICHARD

was run over and killed, causing his spouse and children to lose RICHARD's

5

money, services, goods, support, companionship, and other economic and emotional damages.

WHEREFORE, Plaintiff, HOLLI JAKES, as Special Administrator for the Estate of RICHARD J. RASMUSSEN, prays for judgment against the Defendant, MACARTHUR CO., in an amount in excess of $50,000.00 dollars, plus court costs, attorney's fees, and for whatever other relief this court deems just and appropriate.

COUNT II

*Holli Jakes, as Special Administrator v. Safety Grooving and Grinding, LP*

1-16.   Plaintiff re-alleges paragraphs 1 thru 16 of Count I as paragraphs 1 thru 16 herein of Count II.

17.   That on or about July 12, 2006, SAFETY's duly authorized agent and/or employee, Paul Weber, was providing traffic control, direction, and management at the intersection of State Highway Road 54 and U.S. Highway 53.

18.   That at said time and place, RICHARD was legally and lawfully standing at the intersection of State Highway Road 54 and U.S. Highway 53 and speaking with Weber.

19.   That at said time and place, Weber was notified of a problem with a grinding machine owned by SAFETY and operated by an employee/agent of SAFETY, and Weber decided to leave the intersection of State Highway 54 and U.S. Highway 53 to assist with the maintenance and operation of the grinding machine.

20.   That at said time and place, Weber instructed RICHARD to provide traffic control, management, and direction at the intersection of State Highway 54 and U.S. Highway 53 until Weber was able to return.

6

21.   That at all times material hereto, it was the duty of SAFETY and it agents and/or employees to exercise ordinary care for the safety of the person and property of others there and then upon said construction site and roadway and especially RICHARD.

22.   That in violation of this duty, SAFETY and its duly authorized employees and or agents acted or failed to act in one or more of the following ways, amounting to negligent conduct:

    a.   Provided traffic management and control at a construction site without the proper number of employees, equipment, and supplies;

    b.   Failed to have the proper equipment, materials, and clothing, to assist the individuals that were instructed to provide traffic control and management;

    c.   Failed to provide proper signage, flags, and cones, to prevent vehicular traffic from striking pedestrians and others inside the construction zone;

    d.   Instructed RICHARD to provide traffic management and control without the proper training, equipment, and clothing for such duties;

    e.   Directed RICHARD to provide traffic management and control;

    f.   Failed to train its employees as to proper safety procedures in a construction zone, including protecting the safety of pedestrians lawfully within the construction zone;

    g.   Failed to maintain proper safety procedures and/or plans for managing and controlling vehicular traffic in the area where construction was being performed on U.S. Highway 53.

    h.   Otherwise acted in a careless or negligent manner.

23.   That as a direct and proximate result of SAFETY and its agents and employee's aforesaid careless and negligent acts and/or omissions, RICHARD was run over

7

and killed, causing his spouse and children to lose RICHARD's money, services,

goods, support, companionship, and other economic and emotional damages.

WHEREFORE, Plaintiff, HOLLI JAKES, as Special Administrator for the Estate

of RICHARD J. RASMUSSEN, prays for judgment against the Defendant, SAFETY

GROOVING AND GRINDING, LP, in an amount in excess of $50,000.00 dollars, plus

court costs, attorney's fees, and for whatever other relief this court deems just and

appropriate.

Respectfully submitted,

STAVER & GAINSBERG, P.C.

By: _____

Neal S. Gainsberg

Jared B. Staver
Neal S. Gainsberg
STAVER & GAINSBERG, P.C.
120 West Madison
Suite # 520
Chicago, Illinois 60602
(312) 422-1130
Attorney ID # 38688

# EXHIBIT D

FROM :                    FAX NO. :                    Sep. 29 2006 01:27PM  P3

○ Amended Document    ○ On Emergency

# Wisconsin Motor Vehicle Accident Report

**8640100**

Document Number Override

| INSTRUCTIONS | County | MUN/TWP | Accident Date | | | Time of Accident (Military Time) | | Total Number | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | MONTH | DAY | YEAR | HOUR | MIN | UNITS | INJURED | KILLED |

Please use a Black Ink Pen or #2 Pencil

Mark Areas as shown:
Correct Mark
Incorrect Marks

**Reportable Accident**

Hit & Run
Government Property
Fire (Narrative)
Photos Taken (Narrative)
Trailer or Towed (Narrative)
Truck or Bus (Last Page)
Load Spillage
Construction Zone
Names Exchanged

Sheet No. Of

### ACCIDENT LOCATION
Public Highway, Intersection/Related
Public Highway, Non-Intersection
Parking Lot
Private Property or Road

LATITUDE (GPS)  Degrees    Minutes    Seconds    LONGITUDE (GPS)  Degrees    Minutes    Seconds

ON  Hwy No. and / Street Name  **STH 54**    Estimated    FT MI  N S E W    FROM/AT  Hwy No. and / Street Name  **USH 53**

House #  Fire #  Other
Utility #  Railroad #    Agency Space    Special Study

| Unit Number | Unit Type | Total Number of Occupants | Direction of Travel (Before the Accident) | | Unit Number | Unit Type | Total Number of Occupants | Direction of Travel (Before the Accident) |
|---|---|---|---|---|---|---|---|---|

**Speed Limit**  OPERATOR Last Name **NELSON**  First **GARY**  M.I.
ADDRESS Street & Number **605 LINCOLN AVE**
City & State **KAUKAUNA  WI** ZIP **549**  Phone Number **920 766-1800**
Driver's License Number **N425 2847 7210-00**  State **WI**  Exp. Year **06**
Date of Birth **083072**

**Speed Limit**  OPERATOR Last Name **RASMUSSAN**  First **RICHARD**  M.I.
ADDRESS Street & Number **140 MAPLE AVE**
City & State **WILMETTE IL 6007**  ZIP  Phone Number
Driver's License Number **R252-7504-0138**  State  Exp. Year
Date of Birth **051440**

| On Duty Accident | Sex M F | Operating (Mark Only One) Classified: | Class (Mark All That Apply) | Endorse (Mark All That Apply) | On Duty Accident | Sex M F | Operating (Mark Only One) Classified: | Class (Mark All That Apply) | Endorse (Mark All That Apply) |
|---|---|---|---|---|---|---|---|---|---|
| | | Police / EMT First Responder / Fire Fighter / Winter Hwy Maintenance  CMV | | | | 15  8 | Police / EMT First Responder / Fire Fighter / Winter Hwy Maintenance  CMV | | |

| Severity | SEAT Position | SAFETY Equipment | AIRBAG | EJECTED | Severity | SEAT Position | SAFETY Equipment | AIRBAG | EJECTED |
|---|---|---|---|---|---|---|---|---|---|
| | | | 1 Deployed / 2 Not Deployed / 3 Not Applicable / 4 Unknown | 1 Not Applicable / 2 Not Ejected / 3 Totally Ejected / 4 Partially Ejected / 5 Unknown | | 15 | 8 | 1 Deployed / 2 Not Deployed / 3 Not Applicable / 4 Unknown | 1 Not Applicable / 2 Not Ejected / 3 Totally Ejected / 4 Partially Ejected / 5 Unknown |

TRAPPED/EXTRICATED  1 Not Applicable  2 Not Trapped  3 Trapped/Extricated  4 Trapped/Not Extricated  5 Unknown  Medical Transport Y N

TRAPPED/EXTRICATED  1 Not Applicable  2 Not Trapped  3 Trapped/Extricated  4 Trapped/Not Extricated  5 Unknown  Medical Transport

Vehicle Owner  Same Y N  Last Name **RYDER TRUCK RENTAL**  First  M.I.
Street Address **6402 INDUSTRIAL DR**
City & State **MADISON  WI 53713**  ZIP  Phone Number
Year of Vehicle **2001**  Make **MACK**  Model  Body Style **TOR**  Color **WHI**
Vehicle ID Number **1M1AA13441W141242**
License Plate Number **85119**  Plate Type **TRD**  State **WI**  Exp. Year **07**
Policy Holder's Name  Same Y N  **MILWAUKEE (?)**
Liability Insurance Company **SAFECO INS. CO**  Stat #

Vehicle Owner  Same Y N  Last Name  First  M.I.
Street Address
City & State  ZIP  Phone Number
Year of Vehicle  Make  Model  Body Style  Color
Vehicle ID Number
License Plate Number  Plate Type  State  Exp. Year
Policy Holder's Name  Same Y N
Liability Insurance Company  Stat #

**Occupant**  NAME Last  First  M.I.  Date of Birth  Sex M F  Severity K N  SEAT Position  SAFETY Equipment  AIRBAG 1 Deployed / 2 Not Deployed / 3 Not Applicable / 4 Unknown
Unit Number  ADDRESS Street & Number  City & State  Stat #

Address Same as Operator  Yes No  EJECTED 1 Not Applicable 2 Not Ejected 3 Totally Ejected 4 Partially Ejected 5 Unknown  TRAPPED/EXTRICATED 1 Not Applicable 2 Not Trapped 3 Trapped/Extricated 4 Trapped/Not Extricated 5 Unknown  Medical Transport Y N  Agency Space

MV4000 899    EMS Number

FROM :                           FAX NO. :                    Sep. 29 2006 01:28PM  P4

## Pictorial Representation of Narrative

Draw Diagram of Accident & Indicate North with an arrow in the circle

Supplemental Reports  (1) ● (8) N   Witness Statements (1) ● (8) N   Measurements Taken  (Y) ● (N)

Skidmarks to Impact
Unit 1 ___ 100 ___ Unit 2 ___
FEET

Surface Type: _____



USH 53

GAURO #1

NOT TO SCALE

### NARRATIVE

DRIVER OF #1 HAD BEEN SPEAKING TO VICTIM #2 ABOUT DIRECTION OF TRAFFIC FLOW. DRIVER INFORMED VICTIM OF LEFT TURN.

VICTIM WAS DIRECTING TRAFFIC DUE TO CONSTRUCTION.

VICTIM WAS RUN OVER BY UNIT #1 TRANSCRAFT ___ ITTF53204 285124 A84595 TEMP ___

Photos By: ___ PII ENT

### What Drivers Were Doing

| Unit Number | Unit Number | |
|---|---|---|
| ① ② ③ ④ ⑤ :19: ① ● ③ ④ ⑤ | | |
| ⑥ ⑦ ⑧ ⑨ ⑥ ⑦ ⑧ ⑨ | | |

| | |
|---|---|
| Going Straight | (1) |
| Making Left Turn | (2) |
| Making Right Turn | (3) |
| Skewing or Stopping | (4) |
| Stopped in Traffic | (5) |
| Legally Parked | (6) |
| Violating No Passing Zone | (7) |
| Illegally Parked | (8) |
| Parking Maneuver | (9) |
| Backing Maneuver | (10) |
| Changing Lanes | (11) |
| Overtaking on Left | (12) |
| Overtaking on Right | (13) |
| Making U Turn | (14) |
| Turning on Red | (15) |
| Merging | (16) |
| Negotiating Curve | (17) |
| Other | (18) |

### WITNESS

NAME: WEBER   First: PAUL   M.I.: D

ADDRESS Street & Number: 810 POTTERS RD   Date of Birth: 012444

City & State: ELKHORN WI   ZIP: 53121   Phone Number: (262) 723 7201

#### ACCESS CONTROL
1) No Control (Unlimited Access)
2) Full Control (Only Ramp Entry/Exit)
3) Partial Control

#### TRAFFIC WAY
1) Not Physically Divided (2-Way Traffic)
2) Divided Highway, Median Strip, without Traffic Barrier
3) Divided Highway, Median Strip, with Traffic Barrier
4) One-Way Traffic
5) Parking Lot or Private Property

#### ROAD TERRAIN
Part A
1) Straight
2) Curve
Part B
3) Level/Flat
4) Hill

#### ROAD SURFACE CONDITION
1) Dry
2) Wet
3) Snow/Slush
4) Ice
5) Sand, Mud, Dirt, Oil
6) Other
7) Unknown

#### LIGHT CONDITION
1) Daylight
2) Dark—Not Lighted
3) Dark—Lighted
4) Dawn
5) Dusk
6) Unknown

#### WEATHER
1) Clear
2) Cloudy
3) Rain
4) Snow
5) Fog, Smog, Smoke
6) Sleet, Hail (Freezing Rain or Drizzle)
7) Blowing Sand, Soil, Dirt, Snow
8) Severe Crosswinds
9) Other
10) Unknown

#### RELATION TO ROADWAY
1) On Roadway
2) Parking Lot or Private Property
3) Shoulder (Other Than Shoulder within Median or Gore)
4) Median (Other Than Median within Gore)
5) Outside Shoulder—Left
6) Outside Shoulder—Right
7) Off Roadway—Location Unknown
8) Gore (Area between Ramp & Highway)
9) On Ramp
10) Unknown

### Traffic Control

| Unit Number | Unit Number | |
|---|---|---|
| (1) (2) (3) (4) (5) | (1) (2) (3) (4) (5) | |
| (6) (7) (8) (9) (10) | (6) (7) (8) (9) (10) | |

| | |
|---|---|
| No Control | (1) |
| Traffic Signal Operating | (2) |
| Traffic Signal Flashing | (3) |
| Stop Sign | (4) |
| Stop Sign with Flasher | (5) |
| Warning | (6) |
| Warn Sign with Flasher | (7) |
| Yield Sign | (8) |
| Traffic Control Person | (9) |
| RR-Xing Signal | (10) |
| Other | (11) |

FROM :                              FAX NO. :                        Sep. 29 2006 01:29PM  P5

| Occupant Unit Number | NAME | Last | | First | M.I | Date of Birth | | Sex | Severity | SEAT Position | SAFETY Equipment | AIRBAG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 2 3 4 5 6 7 8 9 10 | ADDRESS | Street & Number | | | City & State | | ZIP | | K N A B C | | | 1 Deployed 2 Non Deployed 3 Not Applicable 4 Unknown |
| Address Same as Operator  Yes No | EJECTED | 1 Not Applicable  3 Totally Ejected 2 Not Ejected  4 Partially Ejected  5 Unknown | | TRAPPED EXTRICATED | | 1 Not Applicable 2 Not Trapped | 3 Trapped Extricated 4 Trapped Not Extricated 5 Unknown | | Medical Transport  Y N | | Agency Space | |

| Occupant Unit Number | NAME | Last | | First | M.I. | Date of Birth | | Sex M F | Severity | SEAT Position | SAFETY Equipment | AIRBAG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 2 3 4 5 6 7 8 9 10 | ADDRESS | Street & Number | | | City & State | | ZIP | | K N A B C | | | 1 Deployed 2 Non Deployed 3 Not Applicable 4 Unknown |
| Address Same as Operator  Yes No | EJECTED | 1 Not Applicable  3 Totally Ejected 2 Not Ejected  4 Partially Ejected  5 Unknown | | TRAPPED EXTRICATED | | 1 Not Applicable 2 Not Trapped | 3 Trapped Extricated 4 Trapped Not Extricated 5 Unknown | | Medical Transport  Y N | | Agency Space | |

## Type of Accident

05 First Harmful Event

Most Harmful Event

| Unit Number | Unit Number |
|---|---|
| 1 2 3 4 5 6 7 8 9 10 | 1 2 3 4 5 6 7 8 9 10 |

(select one per vehicle)

### Collision With Object Not Fixed

| | |
|---|---|
| 1 | Motor Vehicle in Transport |
| 2 | Parked Motor Vehicle |
| 3 | Deer |
| 4 | Pedalcycle |
| 5 | Pedestrian |
| 6 | Railway Train |
| 7 | Other Animal |
| 8 | Motor Vehicle in Transport In Other Roadway |
| 9 | Other Object (Not Fixed) |

### Collision With Object Fixed

| | |
|---|---|
| 10 | Traffic Sign Post |
| 11 | Traffic Signal |
| 12 | Utility Pole |
| 13 | Lum. Light Support |
| 14 | Other Post |
| 15 | Tree |
| 16 | Mailbox |
| 17 | Guardrail Face |
| 18 | Guardrail End |
| 19 | Median Barrier |
| 20 | Bridge Parapet End |
| 21 | Bridge/Pier Abut. |
| 22 | Impact Attenuator |
| 23 | Overhead Sign Post |
| 24 | Bridge Rail |
| 25 | Culvert |
| 26 | Ditch |
| 27 | Curb |
| 28 | Embankment |
| 29 | Fence |
| 30 | Other Fixed Object |
| 31 | Unknown |

### Non-Collision

| | |
|---|---|
| 32 | Overturn |
| 33 | Fire/Explosion |
| 34 | Immersion |
| 35 | Jackknife |
| 36 | Other Non-Collision |

| Fixed Object Struck | | | |
|---|---|---|---|
| Unit # | Unit # | Unit # | Unit # |

Govt. Damage Tag #

## Driver Condition

| Unit Number | Unit Number |
|---|---|
| 1 2 3 4 5 6 7 8 9 10 | 1 2 3 4 5 6 7 8 9 10 |

### Driver Factors (Or Pedestrians)

| | |
|---|---|
| 1 | Appeared Normal |
| 2 | Reduced Alertness |
| 3 | Ability Impaired |
| 4 | Not Observed |

### Presence

Neither Alcohol nor Drugs Present

| | |
|---|---|
| 6 | Yes—Alcohol Present |
| 7 | Yes—Drugs Present |
| 8 | Yes—Alcohol & Drugs Present |
| 9 | Unknown |

### Alcohol

| AC Value | AC Value |
|---|---|

| | |
|---|---|
| 10 | Test Not Given |
| 11 | Test Refused |
| 12 | Test Given, Alcohol Unknown |
| 13 | Test Given, No Alcohol Reported |

### Drugs

| | |
|---|---|
| 14 | Test Not Given |
| 15 | Test Refused |
| 16 | Test Given, Drugs Unknown |
| 17 | Test Given, No Drugs Reported |
| 18 | Drugs Reported (Specify Below) |

| | |
|---|---|
| 19 | Marijuana |
| 20 | Cocaine |
| 21 | Opiates |
| 22 | Amphetamines |
| 23 | PCP |
| 24 | Other Drug Medication |
| 25 | Type Unknown |

| PROPERTY Last OWNER | | First | M.I |
|---|---|---|---|
| ADDRESS | Street & Number | | |
| City & State | | ZIP | Phone Number |

### Unit #  1 2 3 4 5 6 7 8 9 10

**Pedestrian**

| Location | | Action | |
|---|---|---|---|
| 1 | In Crosswalk | 1 | Walking not Facing Traffic |
| 2 | In Roadway | 2 | Disregarded Signal |
| 3 | Not in Roadway | 3 | Darting into Road |
| 4 | On Sidewalk | 4 | Dark Clothing |
| | | 5 | Walking Facing Traffic |

### Manner of Collision

| | |
|---|---|
| 1 | No Collision with Motor Vehicle in Transport |
| 2 | Rear-end |
| 3 | Head On |
| 4 | Rear to Rear |
| 5 | Angle |
| 6 | Sideswipe, Same Direction |
| 7 | Sideswipe  Opposite Direction |
| 8 | Unknown |

### Unit #  1 2 3 4 5 6 7 8 9 10

Darken Numbered Area(s) of Vehicle Damage

| | | | Extent of Damage | |
|---|---|---|---|---|
| 0 | None | 0 | None | 4 Severe |
| 10 | Undercarriage | 1 | Very Minor | 5 Very Severe |
| 11 | Total Damage in All Areas) | 2 | Minor | 6 Unknown |
| 12 | Other | 3 | Moderate | |
| 13 | Unknown | | | |

Vehicle Towed Due to Damage  Y N    Vehicle Removed By:

### Unit #  1 2 3 4 5 6 7 8 9 10

Darken Numbered Area(s) of Vehicle Damage

| | | | Extent of Damage | |
|---|---|---|---|---|
| 0 | None | 0 | None | 4 Severe |
| 10 | Undercarriage | 1 | Very Minor | 5 Very Severe |
| 11 | Total Damage to All Areas) | 2 | Minor | 6 Unknown |
| 12 | Other | 3 | Moderate | |
| 13 | Unknown | | | |

Vehicle Towed Due to Damage  Y N    Vehicle Removed By:

FROM :                    FAX NO. :                    Sep. 29 2006 01:29PM P6

8640100

# Officer's Opinion of Possible Contributing Circumstances

Document Number Override
[?]

## Driver Factors

| Unit Number | Unit Number |
|---|---|
| 1 2 3 4 5 | 1 2 3 4 5 |
| 6 7 8 9 10 | 6 7 8 9 10 |
| N/A | N/A |

| | |
|---|---|
| Exceeding Speed Limit | 1 |
| Speed Too Fast/Condition | 2 |
| Fail to Yield Right of Way | 3 |
| Inattentive Driving | 4 |
| Following Too Close | 5 |
| Improper Turn | 6 |
| Left of Center | 7 |
| Disregarded Traffic Control | 8 |
| Improper Overtaking | 9 |
| Unsafe Backing | 10 |
| Failure to Have Control | 11 |
| Driver Condition | 12 |
| Physically Disabled | 13 |
| Other | 14 |

## Vehicle Factors

| Unit Number | Unit Number |
|---|---|
| 1 2 3 4 5 | 1 2 3 4 5 |
| 6 7 8 9 10 | 6 7 8 9 10 |
| N/A | N/A |

| | |
|---|---|
| Brake System | 1 |
| Tires | 2 |
| Steering System | 3 |
| Turn Signals | 4 |
| Head Lamps | 5 |
| Stop Lamps | 6 |
| Tail Lamps | 7 |
| Disabled in Prior Accident | 8 |
| Other Disabled | 9 |
| Mirrors | 10 |
| Suspension System | 11 |
| Other | 12 |

## Highway Factors

| Unit Number | Unit Number |
|---|---|
| 1 2 3 4 5 | 1 2 3 4 5 |
| 6 7 8 9 10 | 6 7 8 9 10 |
| N/A | N/A |

| | |
|---|---|
| Snow, Ice or Wet | 1 |
| Narrow Shoulder | 2 |
| Low Shoulder | 3 |
| Soft Shoulder | 4 |
| Loose Gravel | 5 |
| Rough Pavement | 6 |
| Debris From Prior Accident | 7 |
| Other Debris | 8 |
| Sign Obscured or Missing | 9 |
| Narrow Bridge | 10 |
| Construction Zone | 11 |
| Visibility Obscured | 12 |
| Other | |

## OFFICER INFORMATION

Last: GIBBONS   First: DAVID   M.I. S

Law Enforcement Agency Address: 36245 MAIN ST PO BOX 67

City & State: WHITEHALL WI   ZIP: 54773

Phone Number: (715) 538-4509

Agency #: 6200   Enforcement Agency: TREMPEALEAU SO   Officer ID #: 32

| | Date Notified | | | Time Notified (Military Time) | | Time Arrived (Military Time) | | Date of Report | | |
|---|---|---|---|---|---|---|---|---|---|---|
| MONTH | DAY | YEAR | HOUR | MIN. | HOUR | MIN. | MONTH | DAY | YEAR |
| | 12 | 06 | 1256 | 1308 | | | 1 | 30 | 06 |

## Truck & Bus Accident Information (This Section Must Be Completed for Each Truck or Bus Involved in this Accident.)

**When To Use This Section:**      **Did the accident involve:**

**Part A**
A truck with at least two axles and six tires?  Y N
A truck with a hazardous materials placard?  Y N
A bus designed to carry 16 or more persons, including the driver?  Y N

STOP! If all the responses to Part A are "NO" do not complete this Truck & Bus Accident Information Section. If there are any "YES" answers, continue to Part B.

**Part B**
Any person who was fatally injured?  Y N
Any injured person who required transport for immediate medical treatment?  Y N
One or more vehicles that had to be towed from the scene as a result of the accident?  Y N

STOP! If all the responses to Part B are "NO" do not continue. If there are any "YES" answers, please complete this Truck & Bus Accident Information Section

## Hazardous Material Information

• Hazardous Material Class Numbers (1-2 digit):

• Hazardous Material "UN" Numbers (4 digit):

• Hazardous Material Placard Displayed?  Y N
• Hazardous Cargo was Released?  Y N

List the Hazardous Material(s) by Name in this Load:

List the Name(s) of Released Hazardous Material(s):

## Carrier Information

• Interstate Carrier?  Y N

Carrier Name: MILWAUKEE INSULATION CO

## Carrier Identification Numbers                    Source:

US DOT: 169160   ICC:
ICC/MC:

Carrier Address: LITTLE CHUTE WI

Source: Vehicle Side / Shipping Papers / Trip Manifest / Driver / Log Book

## Vehicle Information

**Vehicle Configuration**

Gross Vehicle Weight Rating: 80000 LBS   Total # of Axles: 5

**Cargo Body Type**

**SEQUENCE OF EVENTS FOR THIS VEHICLE**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Ran off Road | 1 | 2 | 3 | 4 Collision Involving Motor Vehicle in Transp. |
| 1 | 2 | 3 | 4 | Jackknife | 1 | 2 | 3 | 4 Collision Involving Parked Motor Vehicle |
| 1 | 2 | 3 | 4 | Overturn (Rollover) | 1 | 2 | 3 | 4 Collision Involving Train |
| 1 | 2 | 3 | 4 | Downhill Runaway | 1 | 2 | 3 | 4 Collision Involving Pedalcycle |
| 1 | 2 | 3 | 4 | Cargo Loss or Shift | 1 | 2 | 3 | 4 Collision Involving Animal |
| 1 | 2 | 3 | 4 | Explosion or Fire | 1 | 2 | 3 | 4 Collision Involving Fixed Object |
| 1 | 2 | 3 | 4 | Separation of Units | 1 | 2 | 3 | 4 Collision Involving Other Object |
| 1 | 2 | 3 | 4 | Collision Involving Pedestrian | 1 | 2 | 3 | 4 Other |

FROM :                          FAX NO. :                          Sep. 29 2006 01:30PM  P7

| Case Name: Rasmussan Fatality |
|---|
| Case No: 06-4622 |
| County: Trempealeau |
| Drawn by: Bret Semingson |
| Date Drawn: 07-18-06 |
| Accident Date 07-12-06 |

# TREMPEALEAU COUNTY SHERIFF'S OFFICE

Page 1

36245 MAIN ST     WHITEHALL, WI 54773     715-538-4509

## ACCIDENT REPORT

06-4822

| Offenses | Description | Fel/Misd | Date Occurred | Time Occurred | Area | Date Printed |
|---|---|---|---|---|---|---|
| 1050F | | | | | 1 | 07/20/2006 |
| | | | Date Reported 07/12/2006 | Time Reported 1256 | Beat S | Time Printed 13:16:25 |
| | | | Disposition Date 07/19/2006 | Disposition | | Incident Number 060712031 |

Location: Us Highway 53/STATE Rd 54, Galesville, WI

Location Type / Point of Entry

Means of Attack / Location of Entry / Method of Entry / Alarm System

Victim Name: Rassmussan, Richard J

| Residence Address | Residence Phone | DOB 05/14/1940 | Age | Sex M | Race |
|---|---|---|---|---|---|
| 140 Maple Ave, Wilmette, IL 60091 | | | | | |
| Business Name and Address | Business Phone | Height | Weight | Hair | Eyes |

Assistance Rendered/Victim Disposition / Transporting Agency

Description of Injuries / Other Information

Reporting Party: Docken, Shannon H

| Residence Address | Residence Phone 608-582-4171 | DOB 05/26/1968 | Age | Sex M | Race W |
|---|---|---|---|---|---|
| N16985 Dick Ln, Galesville, WI 54630 | | | | | |
| Business Name and Address | Business Phone | Height 5'7" | Weight 185 | Hair BLK | Eyes BLU |

Suspect Name / Action Taken / Charges

| Residence Address | Residence Phone | DOB | Age | Sex | Race |
|---|---|---|---|---|---|
| Business Name and Address | Business Phone | Height | Weight | Hair | Eyes |

Identifying Features / Arrest Number / Drivers License / SSN

Status / Vehicle Make and Model / License/State / Vehicle Type

| No. | Status | Item Description | Value | Val Recovrd | Val Damaged |
|---|---|---|---|---|---|

Solvability Factors

| Prepared By 37 - Gibbons, David | Date 07/12/2006 | Assisted By 57 - Semingson, Brett | Approved By | Date |
|---|---|---|---|---|

Route To / Date / Notes

FROM :                          FAX NO. :                    Sep. 29 2006 01:30PM  P9

## TREMPEALEAU COUNTY SHERIFF'S OFFICE

| | | |
|---|---|---|
| | 36245 MAIN ST     WHITEHALL, WI 54773     715-538-4509 | Page 2 |
| | ACCIDENT REPORT | 06-4822 |

| | | | | | |
|---|---|---|---|---|---|
| Driver<br>Nilson, Gary D | | | | | |
| Residence Address<br>605 Lincoln Ave, Kaukauna, WI 54130 | Residence Phone<br>920-766-1000 | DOB<br>08/30/1972 | Age | Sex<br>M | Race<br>W |
| Business Name and Address | Business Phone | Height | Weight | Hair<br>BLN | Eyes |
| Witness<br>Weber, Paul D | | | | | |
| Residence Address<br>210 Potters Rd, Elkhorn, WI | Residence Phone<br>262-723-7201 | DOB<br>01/24/1944 | Age | Sex<br>M | Race |
| Business Name and Address | Business Phone | Height | Weight | Hair | Eyes |
| Witness<br>McCabe, Thomas D | | | | | |
| Residence Address<br>N13448 W Prairie Rd, Trempealeau, WI 54661 | Residence Phone<br>608-534-5131 | DOB<br>03/03/1985 | Age | Sex<br>M | Race<br>W |
| Business Name and Address | Business Phone | Height<br>6'4" | Weight<br>165 | Hair<br>BRO | Eyes<br>BLU |
| Mentioned<br>Bissen, Daniel | | | | | |
| Residence Address<br>Mathy Construction, Onalaska, WI | Residence Phone<br>608-783-6411 | DOB | Age | Sex<br>M | Race<br>W |
| Business Name and Address | Business Phone | Height | Weight | Hair<br>BLN | Eyes |
| Mentioned<br>Dallman, Tracy | | | | | |
| Residence Address<br>Osha | Residence Phone<br>715-832-9019 | DOB | Age | Sex<br>F | Race |
| Business Name and Address | Business Phone | Height | Weight | Hair | Eyes |
| Other<br>Galesville First Responders | | | | | |
| Residence Address<br>20347 West Mill Rd, Galesville, WI 54630 | Residence Phone<br>608-582 | DOB | Age | Sex | Race |
| Business Name and Address | Business Phone | Height | Weight | Hair | Eyes |
| Other<br>Johnson, Ronald | | | | | |
| Residence Address<br>713 Grove St, Onalaska, WI | Residence Phone<br>608-782-8880 | DOB | Age | Sex<br>M | Race |
| Business Name and Address | Business Phone | Height | Weight | Hair | Eyes |
| Other<br>Kindshey, Bonnie(coroner) | | | | | |
| Residence Address<br>Tremp Co Courthouse, Whitehall | Residence Phone<br>715-538-4351 | DOB | Age | Sex | Race |
| Business Name and Address | Business Phone | Height | Weight | Hair | Eyes |

FROM :                              FAX NO. :                    Sep. 29 2006 01:30PM P10

## TREMPEALEAU COUNTY SHERIFF'S OFFICE

| | | Page 3 |
|---|---|---|
| 36245 MAIN ST     WHITEHALL, WI 54773     715-538-4509 | | |
| **ACCIDENT REPORT** | | 06-4822 |

| Veh Owner | | | | | |
|---|---|---|---|---|---|
| Milwaukee Insulation Co | | | | | |
| **Residence Address** 1920 Nixon St, Little Chute, WI | **Residence Phone** 800-676-0770 | **DOB** | **Age** | **Sex** | **Race** |
| **Business Name and Address** | **Business Phone** | **Height** | **Weight** | **Hair** | **Eyes** |

| Other | | | | | |
|---|---|---|---|---|---|
| Priest, Robert B | | | | | |
| **Residence Address** 2470 Conestoga Ave, Honey Brook, PA 19344 | **Residence Phone** 800-486-0207 | **DOB** | **Age** | **Sex** M | **Race** |
| **Business Name and Address** | **Business Phone** | **Height** | **Weight** | **Hair** | **Eyes** |

| Mentioned | | | | | |
|---|---|---|---|---|---|
| Rasmussan, Mark | | | | | |
| **Residence Address** 140 Maple Ave, Wilmette, Il 60091 | **Residence Phone** 847-256-2028 | **DOB** | **Age** | **Sex** M | **Race** |
| **Business Name and Address** | **Business Phone** | **Height** | **Weight** | **Hair** | **Eyes** |

| Other | | | | | |
|---|---|---|---|---|---|
| Safety Grooving And Grinding | | | | | |
| **Residence Address** 1510 Country Club Pkwy, Elkhorn, WI | **Residence Phone** 262-237-1966 | **DOB** | **Age** | **Sex** | **Race** |
| **Business Name and Address** | **Business Phone** | **Height** | **Weight** | **Hair** | **Eyes** |

| Other | | | | | |
|---|---|---|---|---|---|
| Sanders Saws And Blades | | | | | |
| **Residence Address** 2470 Conestoga Ave, Honey Brook, PA 19344 | **Residence Phone** 800-486-0207 | **DOB** | **Age** | **Sex** | **Race** |
| **Business Name and Address** | **Business Phone** | **Height** | **Weight** | **Hair** | **Eyes** |

FROM :                          FAX NO.  :                    Sep. 29 2006 01:31PM P11



## TREMPEALEAU COUNTY SHERIFF'S OFFICE

| | Page 4 |
| 36245 MAIN ST    WHITEHALL, WI 54773    715-538-4509 | |
| NARRATIVE | 06-4822 |

On Wednesday, July 12, 2006 at approximately 12:56 p.m., while on duty for the Trempealeau County Sheriffs Department, I was assigned to investigate the report of a person that was struck by a semi near the intersections of US Highway 53 and State Highway 54, in the Township of Gale WI.

I arrived on scene at approximately 1:03 p.m. at which time I observed an elderly man laying in the intersection of State Highway 54 who was obviously deceased. This gentleman was wearing light colored dress pants and a white colored dress shirt. Due to the severe injuries he had sustained it was very obvious he was deceased. I was informed by a construction worker, identified as Paul D. Weber, that he had observed everything that happened. Weber briefly described to me that the deceased victim was his friend of 25 years and his name was Richard J. Rassmussan. Paul stated that Richard had been conversing with the driver of the semi who was later identified as Gary D. Nilson. Paul states that Richard and the semi driver were apparently discussing the traffic flow and direction of the traffic Richard advised that it appeared the conversation was normal and that Richard was just trying to help the driver. Paul stated that the driver began to drive away from the stop sign when he observed Richard fall to the ground. Paul stated his first impression was that Richard had a heart attack. He stated the speed of the semi driver at the time was approximately ½ mile per hour. Paul stated he signaled the driver to pull over and the driver exited his cab. The driver then stated that he thought he ran a cone over and was going to go over and set it back up. Paul informed the driver that he had just run over Richard. Both the semi driver and Paul ran to Richard to attempt to assist him however they observed that he was obviously deceased. Paul stated to me he does not think the semi driver did anything wrong and that Richard was aware of the driver making a left hand turn however Paul is not aware if the semi trailer knocked Richard to the ground or if Richard fell to the ground prior to the semi trailer.

I also spoke to the semi driver Gary Nilson and he informed me that he was at the intersection of Highway 54 waiting for traffic to clear on US Highway 53. He also stated that he had previously turned onto State Highway 54 and made a wrong turn, continuing on Highway 54 for approximately ½ mile. He then came to a 90 degree corner where he backed into a driveway and turned around, coming back out to State Highway 54. While there a yellow GMC sport utility vehicle pulled up the left side of the semi driver and began speaking to Richard. Gary informed me it appeared that Richard was giving the driver of the yellow SUV directions on the traffic flow and which way to drive. The traffic flow was congested because of the road construction and it would only flow one direction at a time because it was down to one lane of traffic. Gary stated that Richard was approximately 20-feet away from the semi at this time. Gary advised once the traffic finished going to the right the yellow SUV also continued to the right and made a right turn in front of the semi. Gary stated that while he was talking to Richard, Richard was approximately 20-feet away from the cab of the semi standing near the guardrail. After the traffic had cleared Gary informed Richard that he was going to make a left turn and Richard indicated that he understood, stating that it was good for him to go. Gary said he did not see any flag person working in the area and only observed Richard in the area. Gary advised he then began to drive ahead when he felt a bump on the trailer wheels and he began to pull over as he was also being signaled to pull over by a construction worker. Gary stated he felt he had just run over a cone or bale and was going to go back and set it up. When he exited his truck the construction worker, Paul Weber, advised that he had just run over Richard. Gary and Paul went to assist Richard however Gary stated that he was obviously deceased. I informed Gary to wait in his vehicle and I would contact him for a written statement. After approximately ten minutes I re-approached Gary and asked him if I could enter his truck at which time he invited me. At this time Gary and I sat in the cab of his semi. I informed him he

| Prepared By: | Date: |
| 37    GIBBONS, DAVID | 07/12/2006 |

FROM :                           FAX NO. :                    Sep. 29 2006 01:31PM P12



| **TREMPEALEAU COUNTY SHERIFF'S OFFICE** | Page 5 |
|---|---|
| 36245 MAIN ST    WHITEHALL, WI 54773    715-538-4509 **NARRATIVE** | 06-4822 |

was not under arrest and I was just trying to figure out what was going on. I then requested that he give me a written statement. Gary requested that I write the statement as he spoke to me.

While speaking to Gary I did not observe any intoxicating beverages or illegal drugs. Gary appeared alert and was very truthful and direct when speaking to him.

Gary's written statement will be attached to this report.

A statement was taken from Paul Weber, approximately one hour after the accident and is attached to this report.

Wisconsin State Patrol Inspector William Berger inspected the semi and indicated to me he did not find any equipment defects or problems with the log book.

I was informed that the original 9-1-1 caller for this accident was Shannon Docken. I called his residence and left a message for him to call me back. Shannon did call me on July 13 2006 at about 6:10 a.m. Shannon said he was driving the yellow GMC SUV on STH 54 and he was the person who called 9-1-1. Shannon said he was traveling west on STH 54 when he came to the intersection of USH 53. He observed two semi's parked at this intersection and that the traffic was one way going north on USH 53. One semi went right (north) and the other was waiting to go left (south). Shannon said he drove to the right of the semi so he could speak to the man directing traffic to tell him that he, Shannon, wanted to go right. The man said go ahead. Shannon said about 3 minutes later he returned and saw the same man he had been talking to laying on the road and could see that he had been run over. Shannon then called 9-1-1 to report this. Shannon's written statement is attached.

At approximately 3:35 p.m. on July 12, 2006 I called and spoke with Thomas E McCabe. Thomas said he did not see the crash but he had been at the intersection of USH 53 and STH 54 and he saw Richard directing traffic. Thomas said he did not see any other person at the intersection directing traffic.

Deputy Brett Semingson measured the scene and Lt Brian Puent photographed the scene.

This is all of the information I have at this time.

Deputy David S Gibbons

| Prepared By: | Date: |
|---|---|
| 37    GIBBONS, DAVID | 07/12/2006 |

FROM :                      FAX NO. :                Sep. 29 2006 01:32PM P13



| TREMPEALEAU COUNTY SHERIFF'S OFFICE | Page 12 |
|---|---|
| 36245 MAIN ST   WHITEHALL, WI 54773   715-538-4509<br>SUPPLEMENT 4 | 06-4822 |

On Wednesday, July 12, 2006 at approximately 12:30 p.m. I came up to the intersection of State Highway 54 with US Highway 53, going to turn north on US Highway 53. Because of the construction in that area I had to sit by the stop sign. There was other vehicle in front of me at the time. There was also an elderly gentleman talking to the driver of the vehicle in front of me. This gentleman was dressed in street clothes and not wearing a safety vest. When he completed speaking with that driver, the elderly gentleman walked back to my squad car and told me that the traffic had just gone one way and I would have to wait for a while as the traffic would be coming the other way now and then I could probably follow the traffic when it went in that direction (north). I informed the gentleman that was fine and I would just wait here. At this time the gentleman walked away and was just hanging around in the intersection.

Once the traffic had gone north again the vehicle in front of me and I proceeded on, following the traffic traveling north on US Highway 53. This was the last time I saw the elderly gentleman.

Approximately twenty-five minutes later dispatch advised there was a report of subject that was struck at that intersection. At this time I responded to that area from the Village of Trempealeau as that was the area I was in at the time.

When I arrived on scene I began to assist with traffic control. It was at this time that I discovered that the subject that had been struck at this intersection was the elderly gentleman that I had spoken to at approximately 12:30 p.m. on this same date.

Even though he was not wearing a vest, when I initially spoke with the elderly gentlemen it was my belief that he was part of the construction crew as he was providing directions and hanging around in the intersection. There was not another individual (flagman) in the intersection when I was there at approximately 12:30 p.m.

This is all the information I can recall at this time.

Deputy Roger Conrad

Entered by Rebecca M. Suchla - 07/13/06

| Prepared By: | Date: |
|---|---|
| 45    CONRAD, ROGER | 07/13/2006 |

FROM :                          FAX NO. :                    Sep. 29 2006 01:32PM P14



| **TREMPEALEAU COUNTY SHERIFF'S OFFICE** | Page 13 |
|---|---|
| 36245 MAIN ST    WHITEHALL, WI 54773    715-538-4509 **SUPPLEMENT 5** | 06-4822 |

On July 12, 2006, at about 3:20 p.m., while on duty for the Trempealeau County Sheriff's Dept , I was requested to go to the scene of a fatal crash near the intersection of Hwy. 54 and Hwy. 53 in the Township of Gale, County of Trempealeau, State of Wisconsin  Upon my arrival at the crash scene at about 3:28 p.m., I spoke with Lt. Puent  Lt. Puent directed me to follow the driver of the semi to a place of business on French Island, where he was going to drop off the semi-tractor trailer and then we were going to Gundersen Lutheran Medical Center, where the driver was going to voluntarily submit to a legal blood draw.

I received the information on the driver, who was identified as Gary D. Nilson, D.O.B. of 8/30/72  While I was waiting for Mr. Nilson to get ready to go, I spoke with Inspector Berger, of the Wisconsin State Patrol. Inspector Berger advised me that he had inspected the semi-tractor trailer and had not found anything of significance.  Inspector Berger advised that he had to go over a couple of more things to do with the driver log book, but did not anticipate that there would be any violations.

At about 3:59 p.m., I followed Mr. Nilson in his tractor trailer to the LaCrosse Insulation Company on French Island.  We then went en route to Gundersen Lutheran Medical Center in LaCrosse. At about 4:50 p.m., we arrived at the hospital. At approximately 5 p.m., I obtained a signed "consent to search form" from Mr. Nilson. At approximately 6:04 p.m , blood was drawn from Mr. Nilson's left arm by Mary Lusk, who was a medical technician at Gundersen Lutheran  After the proper paperwork was completed, I watched Mary Lusk seal the vials of blood in the evidence kit and seal the kit. The kit was then turned over to me. At approximately 6:16 p.m. I cleared from the medical center.

At about 8:30 p.m. on the same date, I dropped the blood test kit in the post office box at the Whitehall Post Office.

This is all the information I have at this time.


Wayne Dahl
Trempealeau County Sheriff's Dept.

| Prepared By: | Date: |
|---|---|
| 64        DAHL, WAYNE | 07/14/2006 |

1

PAUL D WEBER    1-24-44
210 POTTERS RD                    7201
ELKHORN WI. 53121 HOME 262-723-~~8101~~
                        CELL 262-237-1966
SAFETY ~~GROVE~~ GROOVING & GRINDING
1510 COUNTRY CLUB PKWY
ELKHORN WI.


    I WAS WALKING NORTH IN THE
NORTH BOUND SHOULDER NEAR STH 54
INTERSECTION. I WAS GOING TO RICHARD
TO TELL HIM LET'S GET A POP TO DRINK
    I SAW RICHARD SPEAKING TO THE
SEMI DRIVER. IT APPEARED RICHARD
WAS HELPING THE DRIVER WITH
GETTING INTO TRAFFIC DUE TO
ROAD CONSTRUCTION. RICHARD APPEARED
CALM AT THIS TIME.
    THE SEMI DRIVER ALSO APPEARED CALM
AND WAS WAITING FOR TRAFFIC TO
CLEAR.
    I SAW THE DRIVER TURNING LEFT
TO GO SOUTH ON 53. I ALSO SAW
RICHARD WALKING AWAY FROM THE
TRUCK. THE TRUCK WAS GOING VERY
SLOW AND DRIVING NORMAL.
    I SAW RICHARD FALL DOWN. I
STARTED RUNNING TO RICHARD
I TOLD THE DRIVER I THINK.

RAN OVER THAT GUY. THE DRIVER SAID I THOUGHT I JUST RAN OVER A CONE.

MY FIRST IMPRESSION WHEN RICKARD WENT DOWN WAS THAT HE HAD A HEART ATTACK.

I BELIEVE THE DRIVER TRULY THOUGHT HE HAD DROVE OVER A CONE THE DRIVER CAME TO ASSIST ME WITH HELPING RICKARD. I COULD SEE RICHARD WAS DECEASED.

I HAVE KNOWN RICHARD FOR AT LEAST 20 YEARS. HE IS EMPLOYED BY SANDERS SAWS COMPANY.

Paul Weber

7/12/06
14:52

1

GARY D NILSON    083DT0
605 LINCOLN AVE
KAUKAUNA WI 54130        706-920-766-1001

MILWAUKEE INSUCATION CO.
1920 NIXON ST. LITTLE CHUTE WI
              1800-676-0770


I WAS SOUTH BOUND ON 53 NEAR 54.
I TURNED LEFT ON 54. I WENT TO
THE 90 DEGREE CORNER AND I NOTICED I
WAS GOING THE WRONG WAY. I
TURNED AROUND BY BACKING INTO A
DRIVE WAY AND WENT BACK TO 53.
I STOPPED BEHIND A YELLOW GMC BLAZER
AND THERE WAS A SEMI IN FRONT OF
IT STOPPED AT THE STOP SIGN.
  THE TRAFFIC ON 53 IS ONE WAY
AT A TIME DUE TO ROAD CONSTRUCTION
I COULD SEE THE SEMI DRIVER
IN FRONT OF ME TALKING TO
THE VICTIM. WHEN TRAFFIC CLEARED
THAT DRIVER WENT WEST ON 53.
  THE GMC DRIVER SPOKE TO THE VICTIM
ALSO.
  I THEN DROVE FORWARD TO THE STOP
SIGN THE GMC WAS PARKED ON MY LEFT
SIDE NEXT TO ME. THE VICTIM WAS
ON THE LEFT SIDE OF THE GMC

FROM :                     FAX NO. :                      Sep. 29 2006 01:33PM P18

3

SPEAKING TO THE GMC DRIVER.
THE VICTIM WAS 15-20 FEET
AWAY FROM ME. THE GMC THEN
MADE A RIGHT TURN IN FRONT OF
ME AND WENT WEST ON 53.
    I SPED TO THE VICTIM, THE
TRAFFIC HAS CLEARED AND I'M GOING
TO GO. HE KNEW I WAS TURNING
AS LEFT AS I HAD SPOKEN TO HIM
AND HE TOLD ME HE HAD BEEN
VOLUNTEERED FOR THIS JOB.
    AS I WAS TURNING LEFT THE
VICTIM WAS STANDING 16-18 FEET
AWAY FROM ME NEAR THE GAURD
RAIL.
    WHEN I WAS ON 53 WITH
THE TRACTOR AND I FELT A BUMP
BUMP FROM THE TRAILER AND I THOUGHT
I HAD RUN OVER A CONE. I LOOKED
IN THE MIRROR I SAW THE VICTIM
ON THE GROUND LAYING DOWN. I
LOOKED AHEAD AND A CONSTRUCTION
WORKER WAS POINTING AT ME TO
PULL OVER, THE TOLD ME HE
SAW THE VICTIM WALK INTO
THE TRAILER.
    WE WALKED TO THE VICTIM AND
THE WORKER ASKED ME FOR A CELL
PHONE. I TOLD HIM I DID NOT

Prior GN

2/

A PHONE THAT WAS WORKING.
ON THE WORKER WENT TO A RED TRUCK
Drove Away THE YELLOW SUV (GMC) ALSO
CAME BACK. THAT DRIVER WAS
CALLING 911.
     IT APPEARED TO ME THE VICTIM
WAS DECEASED.

7-12-06

Deputy D.A.                    3?



SKETCH BY DEPUTY D.S. GIBBONS

# EXHIBIT E



# POST CRASH INSPECTION PACKET

## STATE PATROL CRASH #                06-33149

## IN ASSISTANCE TO:

Trempealeau County Sheriff's Department

## CONTENTS:

| DOCUMENTS | NUMER OF PAGES |
|---|---|
| INCIDENT REPORT 06-33169 | 4 |
| POST CRASH DATA SHEETS | 6 |
| MCSAP REPORT WI1675000347 | 2 |
| CITATION M451592-1 | 1 |
| Record of Duty Status/Time Records | 14 |

Inspector William J. Berger #1675

# OFFENSE / INCIDENT REPORT

SP4500    8/2003    s.110.07(2m) Wis. Stats.

Wisconsin Department of Transportation

Distribution: 1-Court Officer; 2-District Headquarters; 3-Local Agency
The social security number is used for identification purposes.

| Court Date 8/22/06 | Court Time 0830 | Traffic Charges – If yes, attach photocopies ☒ Yes ☐ No | Report # 06-33169 |
|---|---|---|---|

| | OFFENSE / INCIDENT | SECTION # | BOND AMOUNT | DATE | TIME |
|---|---|---|---|---|---|
| 1 | ASSIST OTHER AGENCY-FATAL-POST CRASH MCSAP INSP. | | | | |
| 2 | | | | 7/12/06 | 1303 |
| 3 | | | | | |

| Offender/Suspect– Last, First, MI; Street Address, City, State, ZIP Code TREMPEALEAU COUNTY SHERIFF'S DEPARTMENT | Alias |
|---|---|

| | Social Security # | Area Code – Telephone # |
|---|---|---|
| | FBI # | CIB # |

| Sex | Race | Height | Weight | Hair | Eyes | Birth Date | Driver License # | State | Expires |
|---|---|---|---|---|---|---|---|---|---|
| Custody ☐ | Custody Location | | | | | | Referred To | | |

Offense Location
USH 53 AT STH 54 EAST

| City / Town / Village TOWN OF GALE | County TREMPEALEAU |
|---|---|

| Veh Year 2001 | Make MACK | Type TRAC | Body Style CONV | Color | VIN 1M1AA13Y41W141242 | Plate # 63117 | Type TOR | State WI |
|---|---|---|---|---|---|---|---|---|

Vehicle Location
RELEASED TO DRIVER/COMPANY FROM SCENE.  NO DAMAGE.

Narrative

**Dispatch:** On Wednesday, July 12, 2006, at about 1:03 PM, PCO Grangaard contacted me via State Patrol Radio.  She advised me of fatality crash that had just occurred on USH 53 near STH 54 near Galesville in the construction zone.  I was advised that a semi unit was involved and that the Trempealeau County Sheriff's Department was requested an Inspector to conduct a Post Crash Inspection of the vehicle and driver.

**Arrival:**  I arrived on scene at about 2:03 PM.  I met with Deputy Gibbons and Trooper Walsch.  They explained briefly that the semi unit was westbound on STH 54 when the driver stopped at the intersection of USH 53 at the stop sign.  This intersection was located in a construction zone for repaving USH 53.  There were flag persons controlling traffic allowing for only single directional traffic through the work zone. I was told that the person directing traffic at the intersection of USH 53 and STH 54 was struck and fatally injured when a semi unit made a left turn from STH 54 WB onto USH 53 SB.

As I walked through the crash scene I observed a covered body lying on the roadway in the area of the intersection of STH 54 and USH 53.  I also observed the semi unit that was involved in the crash.  It was parked in the SB lane/shoulder area on USH 53 south of the intersection.  There was no apparent damage visible to the semi unit.

I advised Gibbon that I would conduct a full Level 1 MCSAP Inspection of the driver and vehicle.

**Inspection of Driver:** I then made contact with the semi driver who was identified as Gary D. Nilson.   A thorough review of the driver's hours of service shows that he was operating within the regulations at the time of the crash. There were several manner and form violations discovered but nothing that would have been a contributing factor in this crash.  See MCSAP Inspection Report WI1675000346. The driver was operating in violation of the hours of service regulations pertaining to the 14 Hour Rule on 7/6/06.

It should be noted that there was no evidence of impairment when I was speaking to Nilson.  Nilson also had a Post Crash Drug Test performed at the direction of his company in the afternoon hours after he left the scene.  He also gave voluntary consent to the Trempealeau County Sheriff's Department for their own analysis.

Nilson told me that he was traveling from Eau Claire to La Crosse when he took a wrong turn onto STH 54.  He said he continued a few miles and then turned around after he realized that he had taken the wrong turn.  He said he received directions from someone but misunderstood where he was supposed to go.  He then returned to the intersection of STH 54 and USH 53 where he again spoke with the victim, Richard J. Rasmussan.  Nilson stated that when Rasmussan told him he could precede he turned onto USH 53 South.  After turning a construction worker for Safety Grooving and Grinding, Paul Weber flagged the Nilson over and asked the driver if he had just struck that guy referring to Rasmussan who was lying in the roadway.  Nilson stated the felt something but said he ran over a traffic cone.  Nilson and Weber then went to Rasmssan's location and realized from the injuries that he had in fact been ran over by the semi unit.

**Inspection of Vehicle:**  A complete Level 1 inspection of the tractor and trailer was completed. There were no defects located during the inspection

**Over Length Vehicle:**  The semi trailer that was being pulled by Nilson was a 53" semi trailer and the total length of the tractor and trailer was 66"6".  STH 54 is not a designated highway and the semi unit should not have been on that section of roadway.  No 53' semi trailers or combinations of vehicles in excess of 65' are allowed to travel on STH 54 from USH 53 to STH 71 at Melrose, WI.  There are some exceptions to the statute for deliveries or obtaining fuel but none that applied to Nilson or Milwaukee Insulation Co.

I made a follow up call to Nilson on Friday, 7/21/06.  He stated that he was traveling from Eau Claire to La Crosse.  He said a co-worker by the name of Brian Sobe (he believed this was his name) gave him directions as to what road to take.  Nilson said he misunderstood the directions and turned onto STH 54 when he should have continued on USH 53 and then made a left turn when he got to a different construction zone near I-90.

**Enforcement Action Taken:**  I completed MCSAP ASPEN Inspection Report WI1675000346.

Citation M451592-1 was issued to Milwaukee Insulation Co Inc for operating an over length semi trailer on a Non-Designated Highway.  An August 22, 2006, court date was assigned.

The semi tractor was released to the carrier at the crash site at about 5:00 PM.

**Interviews with Construction Flag Workers:**  Prior to leaving the area I make contact with the construction flag persons working in the area of the crash.  USH 53 from Galesville south toward the La Crosse county line is under construction.  The roadway was restricted to one lane with flagging operations allowing for alternating northbound and southbound traffic in the one remaining lane.

I spoke to the following construction personnel:

Jeffrey Lyle Buchanan (M/W, DOB 12/12/80, 103 S. Bentley St. Marion, IL, (C) 618-751-0202). He is employed by Safety Grinding and Grooving. He stated that at the time of the crash he was at the south end of the construction zone on USH 53 stopping NB traffic as needed. He said he was using a cell phone to communicate with Debbie Fabion, the flag person on the north end of the construction zone. He stated he was not aware of anyone being at the intersection of STH 54 E and USH 53 directing traffic. He also said he was far enough away that he had no information about the crash. Debbie A. Fabion (F/W, DOB 3/29/69, 805 N. University Avenue, Beaver Dam, WI, (C) 920-517-4659 (H) 920-887-9462). She is employed by Safety Grinding and Grooving. She stated that at the time of the crash she was at the north end of the construction zone on USH 53 stopping SB traffic. She confirmed that she was communicating with Buchanan via cell phone to coordinate traffic direction and that she did not have any communication with anyone at the intersection where the crash occurred. She also said she was far enough away that she had no information about the crash.

**Paul D. Weber** (M/W, DOB 1/24/44, (C) 262-455-1983) He is employed by Safety Grinding and Grooving. He stated that he is the **Area Manager for Safety Grinding and Grooving**. He said that there were two separate work zone joining each other. Mathy Construction, the general contractor, was paving on one end of the construction area and Safety Grinding and Grooving was grinding concrete on the other end. Weber stated he spoke with Tyler Jones, the Mathy Construction site foreman. They decided that they would combine the work zones into one flagging operation and that Weber would take care setting it up.

Weber stated that he directed Buchanan and Fabion to their positions and then realized that they needed someone to control vehicles at the STH 54 E and USH 53 intersection. He stated that he took up this position at about 7:15 AM and performed the traffic control function. He said he did not have any communication with the other two flaggers. He stated that it was low traffic volume coming into the zone from STH 54 and that he would wait for a new group of cars traveling though the work zone and then allow his to jump in immediately before or immediately after so his cars would stay with the main group.

He stated that the victim, Richard J. Rasmussan (M/W, DOB 05/14/40) was a salesman for the company that sells Safety Grinding and Grooving the parts that cut the concrete. Weber said he had been 25 year long friends with Rasmussan. Weber stated that he and Rasmussan had been talking to each other while Weber was flagging. At some point the grinding machine was nearby working and appeared to be having problems. Weber stated that he asked Rasmussan to watch traffic for him for a couple of minutes because he wanted to check out what was happening with the machine. Weber stated he had left a truck with flashing lights on and a "Prepare to Stop" traffic sign set up in the area.

Weber stated he saw Rasmussan talking to the semi driver and the next time he looked Rasmussan was lying on the pavement. Weber said he yelled to the semi driver asking, "did you just hit that guy". Weber said Nilson stated that he had felt a bump but ran over a traffic cone. The semi unit stopped and Weber ran to Rasmussan thinking that he may have had a heart attack or heat related illness. Once at Rasmussan's location he said it was obvious that he had been hit by the semi and was deceased.

Weber stated that when he first talked to Nilson, Nilson's expression made him (Weber) believe that Nilson did in fact think he originally struck a traffic cone.

**Milwaukee Insulation Company Contract:** I have been in contact with Dwayne Earnhart (262-790-2000). He supplied me with any documents that I had requested to complete the investigation.

He was contacted on 7/21/06 and was explained that a citation was being issued for the over length violation to his company along with the court information pertaining to the crash.

He was also mailed a copy of the MCSAP Inspection Report WI1675000346.

**Contact with OSHA:**  I had telephone contact with OSHA Investigator Tracy Dallman from the Eau Claire Office (715-832-9019).  She requested that I send her a faxed copy of my report surrounding this incident.  This was done on 7/21/06.

| YES | NO | Evidence Control Number | | | |
|---|---|---|---|---|---|
| ☒ | ☐ | Report Supplement | 7/18/06 | | On Duty |
| ☐ | ☒ | Controlled Substance Asset Forfeiture | (Report Date) | | ☒ Yes |
| ☐ | ☒ | Witness / Victim | | | ☐ No |
| ☐ | ☒ | Subject Management | | | |
| ☐ | ☒ | Juvenile | Inspector William J. Berger | | 1675 |
| ☐ | ☒ | Domestic Violence | (Reporting Officer Name) | | (WSP #) |
| ☐ | ☒ | Video Taped | | | |
| ☐ | ☒ | Photos Taken | (Reviewed By) | | (Review Date) |

Court Officer Section

| Disposition Date | Amended Charge | Section Number |
|---|---|---|
| Final Disposition | | Evidence Disposition |
| Remarks | | |

| Reported By – Print Last Name, First Name | WSP # | Date |
|---|---|---|
| | | |

THIS PAGE LEFT
INTENTTIONALLY
BLANK

| CRASH #<br>06-33149 | **WISCONSIN STATE PATROL**<br>POST CRASH DATA COLLECTION SHEETS | MCSAP #<br>WI1675000346 |

## GENERAL INFORMATION

| CRASH LOCATION | | |
|---|---|---|
| ON Hwy/Street    USH 53N | AT | STh 54E |
| County    Trempealeau | Town | Gale |
| DATE    July 12, 2006 | TIME    1:03 PM | |

| Investigating Agency | Trempealeau County Sheriff's Department | |
|---|---|---|
| Investigating Officer | Deputy David Gibbons | Badge # 37 |
| Reconstructionist | Deputy Brett Semingson | Badge # 57 |
| MCSAP Inspector | Berger | Badge # 1675 |

| Number of Vehicles Involved<br>1 | Number of CMV's Involved<br>1 |
|---|---|
| CMV Type<br>Tractor & Trailer | Carrier Type<br>Interstate Private |
| District<br>NW | Carrier Authority Number<br>USDOT 169166 |



| Crash Type |
|---|
| Change Trafficway, Truck turned across path |

| Fatalities<br>1 | Fatality Position<br>Non-Motorist | Injuries | Injury Postion |
|---|---|---|---|

| Highway Type |
|---|
| State Highway |

| Contributing Factor |
|---|
| Other |

ver 4.4

PC-01/03

| CRASH #<br>06-33149 |
|---|

# WISCONSIN STATE PATROL
# POST CRASH DATA SHEETS

## CARRIER AND DRIVER INFORMATION



| CARRIER<br>**MILWAUKEE INSULATION CO INC** | USDOT#<br>**169166** | MC# |
|---|---|---|
| ADDRESS<br>**PO BOX 650** | LC# | IC# |
| CITY<br>**BUTLER** | STATE<br>**WI** | ZIP<br>**53007** |

| DRIVER'S LAST NAME<br>**NILSON, GARY D** | FIRST | MI | D.O.B<br>August 30, 1972 | SEX<br>Male |
|---|---|---|---|---|
| DRIVER'S LICENSE #<br>**N425-2847-2310-00** | | | STATE<br>WI | EXPIRATION<br>08/30/06 |

| HEIGHT<br>507 | | WEIGHT<br>180 | | HAIR<br>Blonde | | EYES<br>Blue | | CLASS/END<br>A |
|---|---|---|---|---|---|---|---|---|

| FED Med Card Required | Yes | Expiration | August 11, 2007 |
|---|---|---|---|

| VEH TYPE<br>TT | MAKE<br>Mack | YEAR<br>2001 | UNIT #<br>938561 | VIN<br>1M1AA13Y41W141242 | LIC #<br>63117 | STATE<br>WI |
|---|---|---|---|---|---|---|
| VEH TYPE<br>STL | MAKE<br>TRAO | YEAR<br>2006 | UNIT # | VIN<br>1TTF5320462016911  TEMP REG | LIC #<br>A84595 | STATE<br>WI |
| VEH TYPE | MAKE | YEAR | UNIT # | VIN | LIC # | STATE |

| COMMODITY DESCRIPTION<br>EMPTY | | BILLING/SHIPPING # |
|---|---|---|
| CONSIGNOR | ORIGIN<br>EAU CLAIRE WI | PLACARDS REQUIRED |
| CONSIGNEE | DESTINATION<br>LA CROSSE, WI | INTER OR INSTRA STATE<br>INTERSTATE |

| CRASH #
06-33149 |
|---|

# WISCONSIN STATE PATROL
# POST CRASH DATA SHEETS



## VEHICLE IDENTIFICATION AND INFORMATION

COMPANY: **MILWAUKEE INSULATION CO INC**

### POWER UNIT INFORMATION

PLATE :    **63117**    STATE:    **WI**    EXPIRES:    **03/31/07**

VIN:    **1M1AA13Y41W141242**

FLEET:    **938561**

ODOMETER:    　　　　　　　　HUB READING:

MAKE:    **Mack**    YEAR:    **2001**

TRANS. TYPE:    **EATON 10 SPEED**    GEAR POSITION:    **3RD  Driver's statement**

ENGINE:

SUSPENSION TYPE:

BUMPER HEIGHT (top):    **15"-32"**    front    _____ rear

DRIVER DATA RECORDER : **NO**

ENGINE CONTROL MODULE:

ENGINE BRAKE RETARDER:

SLEEPER BERTH:

AIR TANKS WET:    IF YES HOW MUCH LIQUID IN TANKS:

POWER STEERING: YES

### TRAILER INFORMATION

PLATE : **A84595**    STATE:    **WI**    EXPIRES:  **Non Ex;piring**

VIN: **1TTF5320462016911 TEMP REG**

FLEET:

MAKE:    **TRAO**    YEAR:    **2006**

TYPE:    **Flatbed**

BUMPER HEIGHT (top):    _____ front    **15"**    rear

### TRAILER INFORMATION

PLATE :    STATE:    EXPIRES:

VIN:

FLEET:

MAKE:    YEAR:

TYPE:

BUMPER HEIGHT (top):    _____ front    _____ rear

ver4.4

| CRASH # |
|---|
| 06-33149 |

# WISCONSIN STATE PATROL
## POST CRASH DATA SHEETS



### TRACTOR AIR BRAKE INFORMATION
COMPANY : MILWAUKEE INSULATION CO INC

| LEFT | | RIGHT |
|---|---|---|

**AXLE 1**

| LEFT | | RIGHT | |
|---|---|---|---|
| Applied | 5/8 | 1 | Applied |
| Released | | | Released |
| Travel | 5/8 | 1 | Travel |
| Size | C20 | C20 | Size |
| Type | SINGLE | SINGLE | Type |
| Drum Diam. | | | Drum Diam. |
| Slack Adj. | | | Slack Adj. |
| Lining Thick | 1/2"+ | 1/2+ | Lining Thick |

**AXLE 2**

| LEFT | | RIGHT | |
|---|---|---|---|
| Applied | 7/8 | 7/8 | Applied |
| Released | | | Released |
| Travel | 7/8 | 7/8 | Travel |
| Size | C30 | C30 | Size |
| Type | | | Type |
| Drum Diam. | | | Drum Diam. |
| Slack Adj. | | | Slack Adj. |
| Lining Thick | 1/2'+ | 1/2"+ | Lining Thick |

**AXLE 3**

| LEFT | | RIGHT | |
|---|---|---|---|
| Applied | 7/8 | 7/8 | Applied |
| Released | | | Released |
| Travel | 7/8 | 7/8 | Travel |
| Size | C30 | C30 | Size |
| Type | | | Type |
| Drum Diam. | | | Drum Diam. |
| Slack Adj. | | | Slack Adj. |
| Lining Thick | 1/2"+ | 1/2"+ | Lining Thick |

**AXLE 4**

| LEFT | | RIGHT | |
|---|---|---|---|
| Applied | | | Applied |
| Released | | | Released |
| Travel | | | Travel |
| Size | | | Size |
| Type | | | Type |
| Drum Diam. | | | Drum Diam. |
| Slack Adj. | | | Slack Adj. |
| Lining Thick | | | Lining Thick |

**AXLE 5**

| LEFT | | RIGHT | |
|---|---|---|---|
| Applied | | | Applied |
| Released | | | Released |
| Travel | | | Travel |
| Size | | | Size |
| Type | | | Type |
| Drum Diam. | | | Drum Diam. |
| Slack Adj. | | | Slack Adj. |
| Lining Thick | | | Lining Thick |

PC-01/03

| CRASH # |
| --- |
| 06-33149 |

# WISCONSIN STATE PATROL
# POST CRASH DATA SHEETS



## TRAILER AIR BRAKE INFORMATION

COMPANY : **MILWAUKEE INSULATION CO INC**

| LEFT | | RIGHT |
| --- | --- | --- |

| | LEFT | AXLE | RIGHT | |
| --- | --- | --- | --- | --- |
| Applied | 1 1/4 | | 1 1/4 | Applied |
| Released | | | | Released |
| Travel | 1 1/4 | AXLE 1 | 1 1/4 | Travel |
| Size | | | | Size |
| Type | C30 | | C30 | Type |
| Drum Diam. | DUAL | | DUAL | Drum Diam. |
| Slack Adj. | | | | Slack Adj. |
| Lining Thick | 3/4"+ | | 3/4"+ | Lining Thick |

| | LEFT | AXLE | RIGHT | |
| --- | --- | --- | --- | --- |
| Applied | 1 1/4 | | 1 1/4 | Applied |
| Released | | | | Released |
| Travel | 1 1/4 | AXLE 2 | 1 1/4 | Travel |
| Size | C30 | | C30 | Size |
| Type | DUAL | | DUAL | Type |
| Drum Diam. | | | | Drum Diam. |
| Slack Adj. | | | | Slack Adj. |
| Lining Thick | 3/4"+ | | 3/4"+ | Lining Thick |

| | LEFT | AXLE | RIGHT | |
| --- | --- | --- | --- | --- |
| Applied | | | | Applied |
| Released | | | | Released |
| Travel | | AXLE 3 | | Travel |
| Size | | | | Size |
| Type | | | | Type |
| Drum Diam. | | | | Drum Diam. |
| Slack Adj. | | | | Slack Adj. |
| Lining Thick | | | | Lining Thick |

| | LEFT | AXLE | RIGHT | |
| --- | --- | --- | --- | --- |
| Applied | | | | Applied |
| Released | | | | Released |
| Travel | | AXLE 4 | | Travel |
| Size | | | | Size |
| Type | | | | Type |
| Drum Diam. | | | | Drum Diam. |
| Slack Adj. | | | | Slack Adj. |
| Lining Thick | | | | Lining Thick |

| | LEFT | AXLE | RIGHT | |
| --- | --- | --- | --- | --- |
| Applied | | | | Applied |
| Released | | | | Released |
| Travel | | AXLE 5 | | Travel |
| Size | | | | Size |
| Type | | | | Type |
| Drum Diam. | | | | Drum Diam. |
| Slack Adj. | | | | Slack Adj. |
| Lining Thick | | | | Lining Thick |

PC-01/03

| CRASH # |
| --- |
| 06-33149 |

# WISCONSIN STATE PATROL
# POST CRASH DATA SHEETS

## DRIVER HOURS OF SERVICE

COMPANY : MILWAUKEE INSULATION CO INC



| DRIVER: NILSON, GARY D |
| --- |

| DATE | DRIVING | ON DUTY | TOTAL |
| --- | --- | --- | --- |
| 07/12/06 | 5.75 | 7.75 | 13.50 |
| 07/11/06 | 10.25 | 3.00 | 13.25 |
| 07/10/06 | | 10.75 | 10.75 |
| 07/09/06 | | | |
| 07/08/06 | | | |
| 07/07/06 | | 11.50 | 11.50 |
| 07/06/06 | 7.25 | 7.75 | 15.00 |
| 07/05/06 | 9.50 | 5.50 | 15.00 |
| TOTAL | 32.75 | 46.25 | 79.00 |

| TOTAL MILES DRIVEN |
| --- |
| 301 |
| 538 |
| 219 |
| |
| |
| 257 |
| 412 |
| 565 |
| 2292 |

| Last Entry | 7/12/06 AT 1215 |
| --- | --- |
| Last Stop (arrived) | |
| Last Stop (departed) | EAU CLAIRE WI |
| Destination | LA CROSSE WI |

| DATE | VIOLATION DETECTED |
| --- | --- |
| July 6, 2006 | DROVE IN VIOLATION OF 14 HOUR FROM 18:15-19:15 HRS. DRIVER IS ALLOWED AN EXEMPTION TO THIS ONCE EVERY 6 DAYS. DRIVER USED HIS EXEMPTION ON 7/5/06 FROM 1715-1815 HRS. |
| July 11, 2006 | FORM AND MANNER VIOLATION. NO BILL OF LADING OR COMMODITY/SHIPPER INFORMATION. |
| July 11, 2006 | FORM AND MANNER VIOLATION. NO LOCATIONS ENTERED IN RODS. |

# THIS PAGE LEFT INTENTTIONALLY BLANK



**Wisconsin Department of Transportation**
**Division of State Patrol**
**4802 Sheboygan Avenue, PO Box 7912**
**Madison WI 53707-7912    Fax: 608-267-9600**
**Data Challenges: http://dataqs.fmcsa.dot.gov**

**DRIVER/VEHICLE EXAMINATION REPORT**
Report Number:  WI1675000346
Inspection Date: 07/12/2006
Start Time:  02:03 PM   End Time:  05:00 PM
Insp. Level: 1-Full, No HM Insp.

MILWAUKEE INSULATION CO INC
PO BOX 650
BUTLER, WI 53007
USDOT#: 00169166
MC/MX#:
State#:

Phone#: (262)790-2000
Fax#:

Driver: NILSON, GARY D
License#: N425-2847-2310-00                    State: WI
Date of Birth: 08/30/1972
CoDriver:
License#:                                        State:
Date of Birth:

Location: GALE (TOWN)
Highway: USH 53S AT STH 54E
County: TREMPEALEAU, WI

MilePost:
Origin:
Destination:

Shipper:
Bill of Lading:
Cargo:

## VEHICLE IDENTIFICATION

| Unit | Type | Make | Year | State | License # | Company # | Vin # | GVWR | CVSA # | OOS# |
|------|------|------|------|-------|-----------|-----------|-------|------|--------|------|
| 1 | TT | MACK | 2001 | WI | 63117 | 938561 | 1M1AA13Y41W141242 | 48,000 | | |
| 2 | ST | TRAO | 2006 | WI | A84595 | TEMP REG PLATE | 1TTF5320462016911 | 80,000 | | |

## BRAKE ADJUSTMENTS

| Axle # | 1 | 2 | 3 | 4 | 5 |
|--------|---|---|---|---|---|
| Right | 1 | 7/8 | 7/8 | 1 1/4 | 1 1/4 |
| Left | 5/8 | 7/8 | 7/8 | 1 1/4 | 1 1/4 |
| Chamber | C-20 | C-30 | C-30 | C-30 | C-30 |

## VIOLATIONS

| Section Code | St | Unit | OOS | Citation # | Verify | Crash | Violations Discovered |
|--------------|----|----|----|----|----|----|----|
| 395.8 | | D | N | | N | N | Log violation (general/form and manner)  on 7/11/06 No Locations were entered into RODS. |
| 395.8 | | D | N | | N | N | Log violation (general/form and manner)  on 7/11/06 No Shipper/Commodity info or BOL/Manifest numbers entered |
| 393.95(a) | | 1 | N | | N | N | Fire extinguisher not secured |
| 396.5 | | 1 | N | | N | N | Excessive oil leaks  Axle 1 |
| 348.07(2)(GR) | X | 1 | N | M451592-1 | N | N | Operating overlength 53' semitrailer.  Sth 54E from USH 53 to STH 71 at Melrose is not a designated hwy.  No 53' Semi Trailers are allowed. |
| 348.07(1) | X | 1 | N | | N | N | Operating in excess of length limit.  Sth 54E from USH 53 to STH 71 at Melrose is not a designated hwy.  No vehicles >65' are allowed.  Actual was 66'6". |
| 395.3(a)(2) | | D | N | | N | N | 14 hour rule violation (Property) ON 7/6/05 DVR DROVE AFTER BEING ON DUTY >14 HRS. DVR DROVE FROM 1815 HRS -1915 HRS.  DRIVER USED HIS EXEMPT ON 7/5/06 1715-1815 |

**HazMat:** No HM Transported.

**Special Checks:** Alcohol Substance Check; Post Crash

Placard: No        Cargo Tank:

**State Information:**
PROGRAM #: 103;

The undersigned certifies that all violations noted on this report have been corrected and action taken to assure compliance with the Federal Moror Carrier Safety and Hazardous Material Regulations insofar as they are applicable to motor carriers and drivers.  All mechanical defects must be repaired before vehicle is re-dispatched.  This certification must be signed by the MOTOR CARRIER and returned to the Wisconsin State Patrol at the address noted above within 15 days.

Signature Of Motor Carrier X:_____  Title:_____  Date:_____

| Report Prepared By: | Badge #: | Copy Received By: | Page 1 of 1 | |
|---|---|---|---|---|
| W. BERGER | 1675 | NILSON, GARY D | | |

X _Wm Berger_ 1675

X _unavailable_



WI1675000346



**Wisconsin Department of Transportation**
**Division of State Patrol**
**4802 Sheboygan Avenue, PO Box 7912**
**Madison WI 53707-7912    Fax: 608-267-9600**
**Data Challenges: http://dataqs.fmcsa.dot.gov**

**DRIVER/VEHICLE EXAMINATION REPORT**
**Report #:** WI1675000346
**Date:** 07/12/2006
**Start Time:** 02:03 PM    **End Time:** 05:00 PM
**Insp. Level:** 1-Full, No HM Insp.

MILWAUKEE INSULATION CO INC
PO BOX 650
BUTLER, WI 53007
**Phone#:** (262)790-2000       **Fax#:**
**USDOT#:** 00169166            **MC/MX#:**
**State#:**

**Driver:** NILSON, GARY D
**License#:** N425-2847-2310-00         **State:** WI
**Date of Birth:** 08/30/1972
**CoDriver:**
**License#:**                            **State:**
**Date of Birth:**

## Inspection Notes

Fatal Post Crash Inspection.  Semi trailer tracked over while making a left hand turn fatally injuring a person directing traffic in a construction zone.  Not an employed flag person.

See CAD EVENT 06-33149

Assisting Trempealeau SO.

# THIS PAGE LEFT INTENTTIONALLY BLANK

You Are Notified to Appear

Appearance Required:     NO

| | | |
|---|---|---|
| Date AUG-22-2006 | Time 08:30 AM | Form No. and Version CTL MV4017   0901 — CITATION NO. M451592 - 1 |

TREMPEALEAU COUNTY CIRCUIT COURT
36245 MAIN STREET
WHITEHALL, WI 54773

| Estimated Points | DEPOSIT | Cash - Card |
|---|---|---|
| 0 | $194.00 | N     N |

Court Use

**Defendant** (Last Name, First, Middle), Street Address, P.O. Box, City, State, Zip

MILWAUKEE INSULATION CO INC
P.O. BOX 650
BUTLER, WI 53007

| Birth Date | Sex | Race |
|---|---|---|
| HT | WT | Hair | Eyes |
| | lbs | | |

Driver License/Identification Card Number     State     Exp. Yr.     License Class     License Endorsements

| License Plate Number 63117 | Plate Type APO | State WI | Exp. Yr. 2007 | OPERATING AS: NON DRIVER |
|---|---|---|---|---|

| Vehicle Identification Number 1M1AA13Y411242 | US DOT No. 169166 | Hazmat No. | Vehicle Class O | Vehicle Endorsements |
|---|---|---|---|---|

| Vehicle Year 2001 | Make MACK | Type TT | Color WHI | CMV N | CDL Waiver |
|---|---|---|---|---|---|

**Plaintiff**                                              Ordinance Violated

STATE OF WISCONSIN

**Violation Description**                     BAC     Overweight

Adopting State Statute
348.07 (2) (g)

OVERLENGTH SEMI TRAILER

| Week Day WEDNESDAY | Date JUL-12-2006 | Time 12:55 PM | Actual Speed | Legal | Over | Agency Space ASPEN WI1675000346 |
|---|---|---|---|---|---|---|

| County TREMPEAULEAU - 61 | City/Village/Town GALE - 08, TOWN |
|---|---|

ON Hwy No. and/or Street Name
HIGHWAY 054 EAST

Estimate Distance

From/AT Hwy No. and/or Street Name
HIGHWAY 53 SOUTH

GPS Coordinates

Minor Passenger
N

| Officer Name INSP W BERGER | Zone: RR - Utility - School - Const   N     N     N | Accident Severity FATAL | 8640100 |
|---|---|---|---|

| Officer ID 1675 | Department WI STATE PATROL NWR/EAU | Date Citation Served, JUL-12-2006 | Method MAILED |
|---|---|---|---|

| Lanes 2 | Road Condition DRY | POLICE RECORD | Traffic M - MEDIUM | Light Condition DAYLIGHT |
|---|---|---|---|---|

| Highway NOT-PHYSICALLY-DIVIDED-(2-WAY TRAFFIC) | Weather Condition CLEAR | | |
|---|---|---|---|

THIS UNIT WAS INVOLVED IN A FATAL CRASH WHEN 53' TRLR TRACKED OVER DURING A LEFT HAND TURN IN A CONST ZONE AND STRUCK A FLAG PERSON.  DRVR STATED HE MISINTERPRETED DIRECTIONS AND TURNED ONTO STH 54 WHICH IS NOT A DESIGNATED HWY.  DRVR CONT A FEW MILES AND TURNED AROUND AND THEN WAS INVOLVED IN CRASH AS HE WAS TRYING TO TURN BACK ONTO USH 53.  MYSELF AND DRVR MEASURED TRLT AT 53' AND TOTAL UNIT AT 66'6".  SEE ASPEN WI1675000346.

TREMP SO INV CRASH   06-4822
WSP 06-33149



T331  9/2001 WDOT
s345.11 Wis. Stats

**WISCONSIN UNIFORM CITATION**

THIS PAGE LEFT
INTENTTIONALLY
BLANK

NAME _Corry Miller_

| EXTRA TIME | | REGULAR TIME | |
|---|---|---|---|
| | MONDAY | A.M. IN | JUL 10 AM6:07 |
| | | NOON OUT IN | JUL 10 PM5:33 |
| | | P.M. OUT | |
| | TUESDAY | A.M. IN | JUL 11 AM4:03 |
| | | NOON OUT IN | |
| | | P.M. OUT | JUL 11 PM5:30 |
| | WEDNESDAY | A.M. IN | JUL 12 AM5:01 |
| | | NOON OUT IN | 630 pm M52 |
| | | P.M. OUT | |
| | THURSDAY | A.M. IN | M52 630 am |
| JUL 5 AM8:11 | | NOON OUT IN | JUL 13 PM3:04 |
| JUL 5 PM6:15 | | P.M. OUT | |
| JUL 6 AM4:13 | FRIDAY | A.M. IN | JUL 14 AM6:13 |
| JUL 6 PM7:15 | | NOON OUT IN | |
| | | P.M. OUT | |
| 5:30 RAU | SATURDAY | A.M. IN | |
| JUL 7 PM5:05 | | NOON OUT IN | |
| | | P.M. OUT | |
| JUL 8 AM5:58 | SUNDAY | A.M. IN | |
| | | NOON OUT IN | |
| JUL 9 PM10:01 | | P.M. OUT | |
| TOTAL | | TOTAL | |

4th of July

9
H
14 50
14 50
11
4
61

THIS SIDE OUT

TOPS FORM 1259 (M-33)     MADE IN U.S.A.

# Milwaukee Insulation Daily Trip Report

Branch _____ #37 _____
Date _____ 7-3-06 _____
Start Time _____ 630 _____    Quit Time _____ 400 _____
Driver's Name (Please Print) _____
Vehicle Number _____ 938521 963414 _____

**Vehicle Condition**    OK [X]           NOT OK [ ]
**List Problem If "Not OK"** _____
**Problem Fixed By** _____ Date Fixed _____
Driver's Signature _____

| Destination | Arrival Time | Odometer Reading | Departure Time | Pick Ticket Number(s) |
|---|---|---|---|---|
| # 37 | | 279439 | 700 | |
| # 38 | 815 | 279518 | 850 | |
| Performance Ins | 920 | 279576 | 925 | 18973 |
| Kampo | 945 | 279576 | | 17114 |
| Thermo Tech | | | 1010 | 18975 |
| # 37 | 1215 | 279698 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |





# Milwaukee Insulation Daily Trip Report

Branch _#37_

Date _7-5-06_

Start Time _315_    Quit Time _615_

Driver's Name (Please Print) _Gary Nelson_

Vehicle Number _938561   963414_

Vehicle Condition    OK ☒         NOT OK ☐

List Problem If "Not OK" _____

Problem Fixed By _____    Date Fixed _____

Driver's Signature _____

| Destination | Arrival Time | Odometer Reading | Departure Time | Pick Ticket Number(s) |
|---|---|---|---|---|
| # 37 | | 279698 | 330 | |
| Lake state | 545 | 279815 | 600 | 18365 |
| Dan Perkins | 745 | 279884 | 815 | 17642 |
| Bell Roofing | 845 | 279899 | 915 | 19153 |
| Protherm | 930 | 279901 | 945 | 16681 |
| Luster | 1000 | 279905 | 1030 | 19384 |
| Iverson Home Center | 1130 | 279962 | 1145 | 19120 |
| ACC Plumbing | 1200 | 279968 | 1210 | 16563 |
| Independent | 1215 | 279971 | 1230 | 17484 |
| Northern Plumbing | 1240 | 279971 | 1245 | 15378  19600 |
| Berger Likeng | 1250 | 279972 | 1255 | 19480 |
| Hutchinson | 115 | 279987 | 130 | 18288 |
| Great Lakes | 245 | 280041 | 300 | 18451 |
| Menards | 305 | 280043 | 320 | 19269 |
| Markell WSC | 330 | 280044 | 345 | 18823 |
| Mortan Hardware | 445 | 280091 | 450 | 18765 |
| # 37 | 615 | 280163 | | |





# Milwaukee Insulation Daily Trip Report

Branch _____ _cc 37_ _____

Date _____ 7 - 60 - c5cc _____

Start Time _415_ Quit Time _715_

Driver's Name (Please Print) _Gary Nilsn_

Vehicle Number _938561   963418_

**Vehicle Condition**  OK  ☒  NOT OK ☐

**List Problem If "Not OK"** _____

**Problem Fixed By** _____ **Date Fixed** _____

Driver's Signature _____

| Destination | Arrival Time | Odometer Reading | Departure Time | Pick Ticket Number(s) |
|---|---|---|---|---|
| # 37 | | 280163 | 430 | |
| #30 | 600 | 280271 | 650 | PN 13016 18635 1966 |
| Osborn | 830 | 280385 | 910 | 19014 |
| Ryder  CB | 930 | 280402 | 1000 | Tighten back end / Fuel |
| OW CB | 1030 | 280421 | 12.10 | Replace Elemts on stack |
| Ryder  CB | 1245 | 280459 | 115 | 17317  19030 |
| Walsdorf | 215 | 280485 | 345 | 19230 |
| Karscher | 415 | 280506 | 515 | |
| | 545 | 280536 | 615 | |
| #37 | 715 | 280575 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |



# Milwaukee Insulation Daily Trip Report

Branch _____ _H_2_7___

Date _____ _7-7-06_

Start Time ___530___    Quit Time ___500___

Driver's Name (Please Print) ___Gary Nilson___

Vehicle Number ___9 385 61    96 34 18___

**Vehicle Condition**    OK [X]        NOT OK [ ]

**List Problem If "Not OK"** _____

**Problem Fixed By** _____    Date Fixed _____

Driver's Signature _____

| Destination | Arrival Time | Odometer Reading | Departure Time | Pick Ticket Number(s) |
|---|---|---|---|---|
| # 37 | | 280576 | 750 | |
| Ed Chase | 820 | 280600 | 830 | 20279 |
| Hokman | 840 | 280605 | 900 | 20450  20447 |
| Buster | 915 | 280614 | | 20468 |
| Dirty Dick's | | 280614 | 930 | 19834 |
| Cartman | 1000 | 280619 | 1015 | 2 DV |
| Tower | 1020 | 280621 | 1030 | |
| Mad # 30 | 115 | 280706 | 215 | |
| Hackman | 345 | 280805 | 353 | 20865 |
| # 37 | 430 | 280833 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |



# Milwaukee Insulation Daily Trip Report

Branch _____ #37 _____

Date _____ 1-10-06 _____

Start Time _615_    Quit Time _500_

Driver's Name (Please Print) _____ Craig Nelson _____

Vehicle Number _____ 935661    16911 _____

Vehicle Condition    OK [✓]    NOT OK [ ]

List Problem If "Not OK" _____

Problem Fixed By _____    Date Fixed _____

Driver's Signature _____

| Destination | Arrival Time | Odometer Reading | Departure Time | Pick Ticket Number(s) |
|---|---|---|---|---|
| #37 | | 280834 | 800 | |
| #30 | 945 | 280937 | 100 | 2871  2078 |
| ~~#2~~ Ryder | 245 | 281036 | 300 | Fuel/Check |
| #37 | 320 | 281053 | | 20977  21257 |
| | | | | 20672  21198 |
| | | | | 20757  21162 |
| | | | | 21094  20985 |
| | | | | 21031 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |





# Milwaukee Insulation Daily Trip Report

Branch _____

Date _____ 7-11-06 _____

Start Time _400_     Quit Time _515_

Driver's Name (Please Print) _Gary Miller_

Vehicle Number _938521_  _965414_

Vehicle Condition    OK ☒        NOT OK ☐

List Problem If "Not OK" _____

Problem Fixed By _____  Date Fixed _____

Driver's Signature _____

| Destination | Arrival Time | Odometer Reading | Departure Time | Pick Ticket Number(s) |
|---|---|---|---|---|
| # 37 | | 281053 | 400 | |
| Lake state | 615 | 281169 | 630 | 21286 |
| Markell Co | 645 | 281172 | 710 | 20935 20751 19722 20075 |
| Prime Supply | 715 | 281174 | 730 | 20691 16993 21338 |
| VP Ins | 845 | 281219 | 900 | 21281 |
| Custer | 915 | 281253 | 930 | 20880 21204 |
| Barnes Bros | 1000 | 281268 | 1010 | 21069 |
| Dan Perkins | 1015 | 281269 | 1038 | 20157 |
| McGrath | 1215 | 281356 | 1245 | 20007 |
| #37 | 515 | 281591 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |





# Milwaukee Insulation Daily Trip Report

Branch _____ #37 _____

Date _____ 7-12-06 _____

Start Time _____ 500 _____  Quit Time _____ 630 _____

Driver's Name (Please Print) _____ Cory Nelson _____

Vehicle Number _____ 938526 / 16911 _____

Vehicle Condition    OK [X]    NOT OK [ ]

List Problem If "Not OK" _____

Problem Fixed By _____  Date Fixed _____

Driver's Signature _____

| Destination | Arrival Time | Odometer Reading | Departure Time | Pick Ticket Number(s) |
|---|---|---|---|---|
| #37 | | 281591 | 530 | |
| Walsdorf | 930 | 281804 | 1160 | 16914  21595  20973  21591 |
| A Crosse | 415 | 281890 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |





# Milwaukee Insulation Daily Trip Report

Branch _____ #37_____

Date _____ 7-13-06_____

Start Time ___630___    Quit Time ___300___

Driver's Name (Please Print) ___Gary Nelson___

Vehicle Number ___938561 · 16911___

Vehicle Condition    OK [✓]    NOT OK [ ]

List Problem If "Not OK" _____

Problem Fixed By _____    Date Fixed _____

Driver's Signature _____

| Destination | Arrival Time | Odometer Reading | Departure Time | Pick Ticket Number(s) |
|---|---|---|---|---|
| Pretrip / Warehouse | 630 | 281890 | 815 | 21607 22370 21460 3324 |
| # 38 | 1045 | 282028 | 1130 | 22497 21774 22726 32088 22329 21611 |
| # 37 | 100 | 282106 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

# EXHIBIT F



# U.S. Department of Labor
**Occupational Safety & Health Administration**

**www.osha.gov**

Search    GO  Advanced Search | A-Z Index



Search Results
## Inspection Detail

[Find It! in DOL]

### Inspection: 307041293 - Safety Grooving And Grinding Lp

| Inspection Information - Office: Eau Clair | | |
|---|---|---|
| Nr: 307041293 | Report ID:0523900 | Open Date: 07/14/2006 |

Safety Grooving And Grinding Lp
State Hwy 53 And State Hwy 54 (East)
Intersection
Galesville, WI 54630                                              Union Status: NonUnion
SIC: 1611/Highway and Street Construction, Except Elevated Highways
NAICS: 237310/ Highway, Street, and Bridge Construction
Mailing: Po Box 431 (13226 County Rd R), Napoleon, OH 43545

Inspection Type: Unprog Rel
Scope: Partial
Ownership: Private                              Advanced Notice: N
Safety/Health: Safety
Emphasis: L:Roadcon                             Close Conference: 07/17/2006
                                                Close Case: 10/20/2006

Optional Information: Type    ID       Value
                      N       1        307041277

### Violation Summary

|  | Serious | Willful | Repeat | Other | Unclass | Total |
|---|---|---|---|---|---|---|
| Initial Violations | 1 | | | | | 1 |
| Current Violations | 1 | | | | | 1 |
| Initial Penalty | 1250 | | | | | 1250 |
| Current Penalty | 750 | | | | | 750 |
| FTA Amount | | | | | | |

### Violation Items

| # | ID | Type | Standard | Issuance | Abate | Curr$ | Init$ | Fta$ | Contest | LastEvent |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. | 01001 | Serious | 19260201 A | 09/25/2006 | 11/03/2006 | $750 | $1250 | $0 | | I - Informal Settlement |

Back to Top                          www.osha.gov

www.dol.gov

Contact Us | Freedom of Information Act | Customer Survey
Privacy and Security Statement | Disclaimers

Occupational Safety & Health Administration
200 Constitution Avenue, NW
Washington, DC 20210



**U.S. Department of Labor**
Occupational Safety & Health Administration

**www.osha.gov**       Search         Advanced Search | A-Z Index

Violation
## Safety Grooving And Grinding Lp

**Standard Cited:** 19260201 A *Signaling.*

| Violation Items | | |
|---|---|---|
| Nr: 307041293    Citation: 01001    Issuance: 09/25/2006    ReportingID: 0523900 | | |
| Viol Type: Serious | NrInstances: 1 | Contest Date: |
| Abatement Date: 11/03/2006 X | Nr Exposed: 8 | Final Order: |
| Initial Penalty: 1250.00 | REC: | Emphasis: |
| Current Penalty: 750.00 | Gravity: 03 | Haz Category: |

| Penalty and Failure to Abate Event History | | | | | | |
|---|---|---|---|---|---|---|
| Type | Event | Date | Penalty | abatement | Type | FTA Insp |
| Penalty | Z: Issued | 09/25/2006 | 1250.00 | 10/13/2006 | Serious | |
| Penalty | I: Informal Settlement | 10/05/2006 | 750.00 | 11/03/2006 | Serious | |

Back to Top                 www.osha.gov                                        www.dol.gov

Contact Us | Freedom of Information Act | Customer Survey
Privacy and Security Statement | Disclaimers

Occupational Safety & Health Administration
200 Constitution Avenue, NW
Washington, DC 20210



# U.S. Department of Labor
Occupational Safety & Health Administration

**www.osha.gov**                    Search



GO Advanced Search | A-Z Index

Search Results
## Inspection Detail

[Find It! in DOL]

### Inspection: 307041285 – Mathy Construction Company

| Inspection Information - Office: Eau Clair | | |
|---|---|---|
| Nr: 307041285 | Report ID:0523900 | Open Date: 07/14/2006 |

Mathy Construction Company
State Hwy 53 & State Hwy 54 (East)
Intersection
Galesville, WI 54630                                  Union Status: Union
SIC: 1611/Highway and Street Construction, Except Elevated Highways
NAICS: 237310/ Highway, Street, and Bridge Construction
Mailing: 920 10th Avenue N., Onalaska, WI 54650

Inspection Type: Unprog Rel
        Scope: Partial
    Ownership: Private                          Advanced Notice: N
Safety/Health: Safety
     Emphasis: L:Roadcon                      Close Conference: 08/09/2006
                                                 Close Case: 09/27/2006

Optional Information: Type   ID     Value
                      N      1      307041277

Back to Top

www.osha.gov

www.dol.gov



# U.S. Department of Labor
**Occupational Safety & Health Administration**

**www.osha.gov**      Search       Advanced Search | A-Z Index

Search Results
## Inspection Detail

[Find It! in DOL]

### Inspection: 307041277 - Multiquip, Inc (Dba Sanders Saw & Blade)

| Inspection Information - Office: Eau Clair | | |
|---|---|---|
| Nr: 307041277 | Report ID:0523900 | Open Date: 07/17/2006 |

| | |
|---|---|
| Multiquip, Inc (Dba Sanders Saw & Blade) Us Hwy 53 & State Hwy 54 (East) Galesville, WI 54630 SIC: 3531/Construction Machinery and Equipment NAICS: 333120/Construction Machinery Manufacturing Mailing: 18910 Wilmington Ave, Carson, CA 90746 | Union Status: NonUnion |

| | |
|---|---|
| Inspection Type: Accident Scope: Partial Ownership: Private Safety/Health: Safety Emphasis: L:Roadcon,S:Construction Fatalities | Advanced Notice: N Close Conference: 08/09/2006 Close Case: 10/13/2006 |

| Optional Information: Type | ID | Value |
|---|---|---|
| | N | 10 | IMMLANG-N |
| | N | 1 | 307041277 |

| Related Activity: Type | ID | Safety | Health |
|---|---|---|---|
| Accident | 100340520 | | |

| Violation Summary | | | | | | |
|---|---|---|---|---|---|---|
| | Serious | Willful | Repeat | Other | Unclass | Total |
| Initial Violations | 2 | | | | | 2 |
| Current Violations | 2 | | | | | 2 |
| Initial Penalty | 7500 | | | | | 7500 |
| Current Penalty | 5250 | | | | | 5250 |
| FTA Amount | | | | | | |

| Violation Items | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| # | ID | Type | Standard | Issuance | Abate | Curr$ | Init$ | Fta$ | Contest | LastEvent |
| 1. | **01001** | Serious | 5A0001 | 09/25/2006 | 11/13/2006 | $3500 | $5000 | $0 | | I - Informal Settlement |
| 2. | **01002** | Serious | 19100132 A | 09/25/2006 | 10/13/2006 | $1750 | $2500 | $0 | | I - Informal Settlement |

Back to Top                www.osha.gov

www.dol.gov

Occupational Safety & Health Administration
200 Constitution Avenue, NW
Washington, DC 20210



**U.S. Department of Labor**
Occupational Safety & Health Administration

*www.osha.gov*

 Search 

GO Advanced Search | A-Z Index

Violation
# Multiquip, Inc (Dba Sanders Saw & Blade)

**Standard Cited**: 5A0001

| Violation Items | | | |
|---|---|---|---|
| Nr: 307041277    Citation: 01001    Issuance: 09/25/2006 | | ReportingID: 0523900 | |
| Viol Type: Serious | NrInstances: 1 | Contest Date: | |
| Abatement Date: 11/13/2006 X | Nr Exposed: 3 | Final Order: | |
| Initial Penalty: 5000.00 | REC: A | Emphasis: | |
| Current Penalty: 3500.00 | Gravity: 10 | Haz Category: STRUCK BY | |

| Penalty and Failure to Abate Event History | | | | | | |
|---|---|---|---|---|---|---|
| Type | Event | Date | Penalty | abatement | Type | FTA Insp |
| Penalty | Z: Issued | 09/25/2006 | 5000.00 | 11/13/2006 | Serious | |
| Penalty | I: Informal Settlement | 10/11/2006 | 3500.00 | 11/13/2006 | Serious | |

**Text For Citation**: 01 **Item/Group**: 001 **Hazard**: STRUCK BY

Section 5(a)(1) of the Occupational Safety and Health Act of 1970: The employer did not furnish employment and a place of employment which were free from recognized hazards that were causing or likely to cause death or serious physical harm to employees in that employees were exposed to struck by hazards from directing traffic in a work zone without training or qualifications. (a)Multiquip Inc., at the intersection of highways 53 and 54E, near Galesville, WI: The employer did not ensure that an employee was trained to direct traffic in a work zone on a road construction project. An employee was struck by a semi-truck/trailer while directing traffic without being trained in safe procedures or qualified as a flagger. The employee was fatally struck by vehicle while directing traffic in a work zone. Among other methods, feasible and acceptable methods to correct this hazard are to comply with: 1) Section 104.6.1 of the Standard Specification Book for Highway and Structure Construction of the Wisconsin Department of Transportation, which states that contractors need to adequately train flaggers in the methods in the WisDOT Flaggers Handbook and associated videotape before they are allowed to control traffic. Abatement certification and documentation are required for this item.

Contact Us | Freedom of Information Act | Customer Survey
Privacy and Security Statement | Disclaimers

Occupational Safety & Health Administration
200 Constitution Avenue, NW
Washington, DC 20210



## U.S. Department of Labor
Occupational Safety & Health Administration

*www.osha.gov*     Search      Advanced Search | A-Z Index



Violation
## Multiquip, Inc (Dba Sanders Saw & Blade)

**Standard Cited:** 19100132 A *General requirements.*

| Violation Items | | |
|---|---|---|
| Nr: 307041277     Citation: 01002     Issuance: 09/25/2006     ReportingID: 0523900 | | |
| Viol Type: Serious | NrInstances: 3 | Contest Date: |
| Abatement Date: 10/13/2006 X | Nr Exposed: 3 | Final Order: |
| Initial Penalty: 2500.00 | REC: A | Emphasis: |
| Current Penalty: 1750.00 | Gravity: 03 | Haz Category: |

| Penalty and Failure to Abate Event History | | | | | | |
|---|---|---|---|---|---|---|
| Type | Event | Date | Penalty | abatement | Type | FTA Insp |
| Penalty | I: Informal Settlement | 10/11/2006 | 1750.00 | 10/13/2006 | Serious | |
| Penalty | Z: Issued | 09/25/2006 | 2500.00 | 10/13/2006 | Serious | |

Back to Top

Contact Us | Freedom of Information Act | Customer Survey
Privacy and Security Statement | Disclaimers

Occupational Safety & Health Administration
200 Constitution Avenue, NW
Washington, DC 20210

# EXHIBIT G

## POINTS AND AUTHORITIES CITED IN DEFENDANT SAFETY GROOVING AND GRINDING, LP TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(A)

Westlaw.

80 S.Ct. 1084

363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

Page 1

▷

HOFFMAN v. BLASKI

U.S. 1960.

Supreme Court of the United States
Honorable Julius J. HOFFMAN, Judge of the
United States District Court for the Northern District of Illinois, Eastern Division, Petitioner,
v.
John F. BLASKI et al.
Honorable Philip L. SULLIVAN, Chief Judge of
the United States District Court for the Northern
District of Illinois, Petitioner,
v.
Otto BEHIMER and John A. Roberts.
**Nos. 25, 26.**

Argued April 19 and 20, 1960.
Decided June 13, 1960.

Mandamus proceeding for order compelling judge of United States District Court for Northern District of Illinois to transfer action to United States District Court for Northern District of Texas. The United States Court of Appeals, Seventh Circuit, 260 F.2d 317, allowed writ. A second mandamus proceeding was brought with respect to another case for order directing judge of United States District Court for Northern District of Illinois to vacate order transferring case to United States District Court for the District of Utah. The Court of Appeals, Seventh Circuit, 261 F.2d 467, issued order of mandamus. To settle conflict that had arisen among circuits respecting proper interpretation and application of statute, the Supreme Court, 359 U.S. 904, 79 S.Ct. 583, granted certiorari. The United States Supreme Court, Mr. Justice Whittaker, held that under the statute which provided that for convenience of parties and witnesses, in interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought, power of district court to transfer action to another district depends not upon wish or waiver of defendant but upon whether transferee

district was one in which action might have been brought by plaintiffs and where plaintiffs did not have right to bring actions in district courts to which defendants sought to have cases transferred, transferee courts did not acquire jurisdiction even though defendants stated that if cases were transferred they would waive objections to venue of transferee courts over actions and would enter their appearance in transferee courts.

Affirmed.

Mr. Justice Frankfurter, Mr. Justice Harlan, and Mr. Justice Brennan dissented.

West Headnotes

**[1] Federal Courts 170B ⚖═457**

170B Federal Courts
  170BVII Supreme Court
    170BVII(B) Review of Decisions of Courts of Appeals
      170Bk455 Decisions Reviewable and Grounds for Issuance
        170Bk457 k. Conflicting Decisions of Courts of Appeals. Most Cited Cases
        (Formerly 106k383(1))
Where conflict had arisen among the circuits respecting the proper interpretation and application of federal statute with respect to transfer of civil actions, United States Supreme Court granted certiorari. 28 U.S.C.A. § 1404(a).

**[2] Federal Courts 170B ⚖═526.1**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(A) In General
      170Bk526 Mandamus
        170Bk526.1 k. In General. Most Cited Cases
        (Formerly 170Bk526, 106k404)
Where order of Court of Appeals of Fifth Circuit denying motion of defendants for leave to file peti-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

tion for writ of mandamus requiring United States District Court for Northern District of Texas to set aside order transferring action to United States District Court for Northern District of Illinois did not purport to determine jurisdiction of transferee court, it did not preclude judge of transferee court from exercising power to determine his own jurisdiction nor preclude Court of Appeals, Seventh Circuit, from reviewing his action.

**[3] Courts 106** 🌎**99(7)**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(G) Rules of Decision
            106k99 Previous Decisions in Same Case as Law of the Case
                106k99(7) k. Different Courts or Judges, Rulings By. Most Cited Cases
            (Formerly 106k99(1))

**Judgment 228** 🌎**562**

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(A) Judgments Operative as Bar
            228k562 k. Necessity for Decision on Merits. Most Cited Cases

**Judgment 228** 🌎**564(2)**

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(A) Judgments Operative as Bar
         228k564 Finality of Determination
            228k564(2) k. Interlocutory Judgment or Decree. Most Cited Cases
Where orders of United States District Court for Northern District of Texas and United States District Court for Northern District of Illinois on respective motions to transfer case from the District Court in Texas to the District Court in Illinois and to remand, and orders of United States Court of Ap-

peals for Fifth and Seventh Circuits on respective petitions for mandamus to require the District Court in Texas to set aside order transferring action and assailing jurisdiction of the District Court in Illinois were interlocutory, not upon merits, and were entered in same case by courts of coordinate jurisdiction, principles of res judicata were not applicable.

**[4] Federal Courts 170B** 🌎**526.1**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(A) In General
            170Bk526 Mandamus
                170Bk526.1 k. In General. Most Cited Cases
        (Formerly 170Bk526, 106k404)
Sole basis of right of Court of Appeals, Fifth Circuit, to entertain petition for writ of mandamus to require United States District Court for Northern District of Texas to set aside order transferring action to United States District Court for Northern District of Illinois was to protect its appellate jurisdiction and, by denying leave to file petition, it forsook such right, but it did not thereby determine that Illinois District Court had jurisdiction of action, and, when jurisdiction of Illinois District Court was assailed in Court of Appeals, Seventh Circuit, by petition for mandamus, that court had power to determine whether Illinois District Court had jurisdiction and, if not, to say so, and thus avoid delays and expenses of a futile trial. 28 U.S.C.A. § 1651(a).

**[5] Federal Courts 170B** 🌎**95**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk95 k. Objections, Waiver and Consent. Most Cited Cases
        (Formerly 106k276)
Venue, like jurisdiction over the person, may be waived.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

Page 3

**[6] Federal Courts 170B ⬦⬦95**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk95 k. Objections, Waiver and Consent. Most Cited Cases
      (Formerly 106k276)
A defendant, properly served with process by court having subject matter jurisdiction, waives venue by failing seasonably to assert it, or even simply by making default.

**[7] Federal Courts 170B ⬦⬦131**

170B Federal Courts
   170BII Venue
      170BII(B) Change of Venue
         170BII(B)3 To What District Action May Be Transferred
            170Bk131 k. In General. Most Cited Cases
      (Formerly 106k277.1)
Under statute providing that for convenience of parties and witnesses, in interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought, power of district court to transfer action to another district depends not upon wish or waiver of defendant but upon whether transferee district was one in which action might have been brought by plaintiffs and where plaintiffs did not have right to bring actions in district courts to which defendants sought to have cases transferred, transferee courts did not acquire jurisdiction even though defendants stated that if cases were transferred they would waive objections to venue of transferee courts over actions and would enter their appearance in transferee courts. 28 U.S.C.A. § 1404(a); Fed.Rules Civ.Proc. rule 4(f), 28 U.S.C.A.

**\*\*1085 \*335** Mr. Charles J. Merriam, Chicago, Ill., for petitioner Julius J. hoffman.
Mr. John C. Butler, Chicago, Ill., for petitioner Philip L. Sullivan.
Mr. Daniel V. O'Keeffe, Chicago, Ill., for respond-

ents Blaski and others.
Mr. Warren E. King, Chicago, Ill., for respondents Behimer and Roberts.

Mr. Justice WHITTAKER delivered the opinion of the Court.
To relieve against what was apparently thought to be the harshness of dismissal, under the doctrine of forum **\*336** non conveniens, of an action brought in an inconvenient one of two or more legally available forums, Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055, and concerned by the reach of Baltimore & Ohio R. Co. v. Kepner, 314 U.S. 44, 62 S.Ct. 6, 86 L.Ed. 28,[FN1] Congress, in 1948, enacted 28 U.S.C. s 1404(a), 28 U.S.C.A. s 1404(a), which provides:

     FN1. See the Reviser's Notes following 28 U.S.C. s 1404, 28 U.S.C.A. s 1404.

's 1404. Change of venue.

'(a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.'

The instant cases present the question whether a District Court, in which a civil **\*\*1086** action has been properly brought, is empowered by s 1404(a) to transfer the action, on the motion of the defendant, to a district in which the plaintiff did not have a right to bring it.

No. 25, Blaski.-Respondents, Blaski and others, residents of Illinois, brought this patent infringement action in the United States District Court for the Northern District of Texas against one Howell and a Texas corporation controlled by him, alleging that the defendants are residents of, and maintain their only place of business in, the City of Dallas, in the Northern District of Texas, where they are infringing respondents' patents. After being served with process and filing their answer, the defendants moved, under s 1404(a), to transfer the action to the United States District Court for the Northern Dis-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

Page 4

trict of Illinois.[FN2]Respondents objected to the *337 transfer on the ground that, inasmuch as the defendants did not reside, maintain a place of business, or infringe the patents in, and could not have been served with process in, the Illinois district, the courts of that district lacked venue over the action[FN3] and ability to command jurisdiction over the defendants;[FN4] that therefore that district was not a forum in which the respondents had a right to bring the action, and, hence, the court was without power to transfer it to that district. Without mentioning that objection or the question it raised, the District Court found that 'the motion should be granted for the convenience of the parties and witnesses in the interest of justice,' and ordered the case transferred to the Illinois district. Thereupon, respondents moved in the Fifth Circuit for leave to file a petition for a writ of mandamus directing the vacation of that order. That court, holding that '(t)he purposes for which s 1404(a) was enacted would be unduly circumscribed if a transfer could not be made 'in the interest of justice' to a district where the defendants not only waive venue but to which they seek the transfer,' denied the motion. Ex parte Blaski, 245 F.2d 737, 738.

FN2. The asserted basis of the motion was that trial of the action in the Illinois District Court would be more convenient to the parties and witnesses and in the interest of justice because several actions involving the validity of these patents were then pending in that court, and that pretrial and discovery steps taken in those actions had developed a substantial amount of evidence that would be relevant and useful in this action.
Defendants also stated in the motion that, if and when the case be so transferred, they would waive all objections to the venue of the Illinois District Court over the action and would enter their appearance in the action in that court.

FN3. See 28 U.S.C. s 1400(b), 28 U.S.C.A.

s 1400(b), quoted in note 10, infra.

FN4. See Rule 4(f) of the Fed.Rules Civ.Proc., 28 U.S.C.A., quoted in note 11, infra.

Upon receipt of a certified copy of the pleadings and record, the Illinois District Court assigned the action to Judge Hoffman's calendar. Respondents promptly moved for an order remanding the action on the ground that the Texas District Court did not have power to make the transfer order and, hence, the Illinois District Court was not thereby vested with jurisdiction of the action.*338 After expressing his view that the 'weight of reason and logic' favored 'retransfer of this case to Texas,' Judge Hoffman, with misgivings, denied the motion. Respondents then filed in the Seventh Circuit a petition for a writ of mandamus directing Judge Hoffman to reverse his order. After hearing and rehearing, the Seventh Circuit, holding that '(w)hen Congress provided (in s 1404(a)) for transfer (of a civil action) to a district 'where it might have been brought,' it is hardly open to doubt but that it referred to a district where the plaintiff * * * had a right to bring the case,' and that respondents did not have a right to bring this action in the Illinois district, granted the writ, one judge dissenting. 260 F.2d 317, 320.

**1087 No. 26, Behimer.-Diversity of citizenship then existing, respondents, Behimer and Roberts, residents of Illinois and New York, respectively, brought this stockholders' derivative action, as minority stockholders of Utah Oil Refining Corporation, a Utah corporation, on behalf of themselves and others similarly situated, in the United States District Court for the Northern District of Illinois against Standard Oil Company and Standard Oil Foundation, Inc., Indiana corporations but licensed to do and doing business in the Northern District of Illinois, for damages claimed to have been sustained through the alleged illegal acquisition by defendants of the assets of the Utah corporation at an inadequate price.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

Page 5

After being served with process and filing their an-swer, the defendants moved, under s 1404(a), to transfer the action to the United States District Court for the District of Utah.[FN5]Respondents ob-jected to the transfer on the *339 ground that, inas-much as the defendants were not incorporated in or licensed to do or doing business in, and could not be served with process in, the district of Utah, the courts of that district lacked venue over the action FN6 and ability to command jurisdiction over the defendants;[FN7] that therefore that district was not a forum in which the respondents had a right to bring the action, and, hence, the court was without power to transfer it to that district. Without mentioning the question raised by that objection, the court found that the proposed transfer would be 'for the con-venience of the parties and witnesses, and in the in-terest of justice,' and ordered the case transferred to the district of Utah.

> FN5. The motion asserted, and the court found, that trial of the action in the district of Utah would be more convenient to the parties and witnesses for the reasons, among others, that all of the officers and directors, and a majority of the minority stockholders, of the Utah corporation reside in that district; that the books and records of the corporation are located in that district; that the substantive law of Utah governs the action, and that the cal-endar of the Utah court was less congested than the Illinois one.
> As part of their motion, defendants stated that, in the event of the transfer of the ac-tion as requested, they would waive all ob-jections to the venue of the Utah court and enter appearances in the action in that court.

> FN6. See 28 U.S.C. s 1391(c), 28 U.S.C.A. s 1391(c), quoted in note 10, infra.

> FN7. See Rule 4(f) of the Fed.Rules Civ.Proc., quoted in note 11, infra.

Respondents then filed in the Seventh Circuit a pe-tition for a writ of mandamus directing the District Court to reverse its order.After hearing, the Seventh Circuit, following its decision in Blaski v. Hoff-man, supra, granted the writ. 261 F.2d 467.

[1] To settle the conflict that has arisen among the circuits respecting the proper interpretation and ap-plication of s 1404(a),[FN8] we granted certiorari. 359 U.S. 904, 79 S.Ct. 583, 3 L.Ed.2d 570; 361 U.S. 809, 80 S.Ct. 50.

> FN8. The decisions of the circuits are in great conflict and confusion. The Second Circuit has held one way on a plaintiff's motion and the other on a defendant's mo-tion. Compare Foster-Milburn Co. v. Knight, 181 F.2d 949, 952-953, with An-thony v. Kaufman, 193 F.2d 85, and Torres v. Walsh, 221 F.2d 319. The Fifth Circuit, too, has held both ways. Compare Black-mar v. Guerre, 190 F.2d 427, 429, with Ex parte Blaski, 245 F.2d 737. The Ninth Cir-cuit has held a District Court to be without power to transfer an action, on plaintiff's motion, to a district in which plaintiff did not have a legal right to bring it originally.Shapiro v. Bonanza Hotel Co., 185 F.2d 777, 780. The Third Circuit has held, two of the five judges dissenting, that a District Court has power to transfer an action, on defendant's motion, to a district in which the plaintiff did not have a legal right to bring it.Paramount Pictures, Inc. v. Rodney, 186 F.2d 111. The First Circuit has upheld transfer, on defendant's motion, to a district in which venue existed but where process could not be served on de-fendants (but defendants had been served in the transferor district).In re josephson, 218 F.2d 174.

**1088 *340 [2][3][4] Without sacrifice or slight of any tenable position, the parties have in this Court commendably narrowed their contentions to the scope of the only relevant inquiry. The points of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

contention may be sharpened by first observing what is not in contest. Discretion of the district judges concerned is not involved. Propriety of the remedy of mandamus is not assailed. No claim is made here that the order of the Fifth Circuit denying the motion of respondents in the Blaski case for leave to file a petition for writ of mandamus, 245 F.2d 737, precluded Judge Hoffman or the Seventh Circuit from remanding that case.[FN9] Petitioners concede that these actions were **341** properly brought in the respective transferor forums; that statutory venue did not exist over either of these actions in the respective transferee districts,[FN10] and that the respective defendants were not within the reach of the process of the respective transferee courts.[FN11] They concede, too, **342** that s 1404(a), being 'not unlimited,' 'may be utilized only to direct an action to any other district or division 'where it might have been brought,'' and **\*\*1089** that, like the superseded doctrine of forum non conveniens, Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055, the statute requires 'an alternative forum in which plaintiff might proceed.'

FN9. That order did not purport to determine the jurisdiction of the transferee court and therefore did not preclude Judge Hoffman of power to determine his own jurisdiction, nor did it preclude the power of the Seventh Circuit to review his action. Fettig Canning Co. v. Steckler, 7 Cir., 188 F.2d 715; Wilson v. Kansas City Southern R. Co., D.C.W.D.Mo., 101 F.Supp. 56; United States v. Reid, D.C.E.D.Ark., 104 F.Supp. 260, 266. Several reasons why principles of res judicata do not apply may be stated in a few sentences. The orders of the Texas and Illinois District Courts on the respective motions to transfer and to remand, like the orders of the Fifth and Seventh Circuits on the respective petitions for mandamus, were (1) interlocutory, (2) not upon the merits, and (3) were entered in the same case by courts

of coordinate jurisdiction. Here the sole basis of the right of the Fifth Circuit to entertain the petition for a writ of mandamus was to protect its appellate jurisdiction, 28 U.S.C. s 1651(a), 28 U.S.C.A. s 1651(a); Magnetic Engineering & Mfg. Co. v. Dings Mfg. Co., 2 Cir., 178 F.2d 866, 869-870; Foster-Milburn Co. v. Knight, 2 Cir., 181 F.2d 949, 951; In re Josephson, 1 Cir., 218 F.2d 174, 177; Torres v. Walsh, 2 Cir., 221 F.2d 319, 321 and, by denying leave to file the petition, it forsook such right, but it did not thereby determine that the Illinois District Court had jurisdiction of the action. The question of that court's jurisdiction still remained subject to attack as of right on appeal to the Seventh Circuit from any final judgment in the action. When, therefore, jurisdiction of the District Court was assailed in the Seventh Circuit, by the petition for mandamus, that court surely had power to determine whether it would hold, on such an appeal, that the Illinois District Court did or did not have jurisdiction of the action and, if not, to say so and thus avoid the delays and expense of a futile trial.

FN10. Venue over patent infringement actions is prescribed by 28 U.S.C. s 1400(b), 28 U.S.C.A. s 1400(b), which provides:
'(b) Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business.'
See Stonite Products Co. v. Melvin Lloyd Co., 315 U.S. 561, 62 S.Ct. 780, 86 L.Ed. 1026; Fourco Glass Co. v. Transmirra Products Corp., 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786.
General venue over actions against corporations is prescribed by 28 U.S.C. s 1391(c), 28 U.S.C.A. s 1391(c), which

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

Page 7

provides:

'(c) A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes.'

FN11. General provisions respecting service of the process of federal courts are prescribed by Rule 4(f) of the Fed.Rules Civ.Proc., which provides:

'(f) Territorial Limits of Effective Service.

'All process other than a subpoena may be served anywhere within the territorial limits of the state in which the district court is held and, when a statute of the United States so provides, beyond the territorial limits of that state. A subpoena may be served within the territorial limits provided in Rule 45.'

Petitioners' 'thesis' and sole claim is that s 1404(a), being remedial, Ex parte Collett, 337 U.S. 55, 71, 69 S.Ct. 944, 946, 93 L.Ed. 1207, should be broadly construed, and, when so construed, the phrase 'where it might have been brought' should be held to relate not only to the time of the bringing of the action, but also to the time of the transfer; and that 'if at such time the transferee forum has the power to adjudicate the issues of the action, it is a forum in which the action might then have been brought.'FN12(Emphasis added.) They argue that in the interim between the bringing of the action and the filing of a motion to transfer it, the defendants may move their residence to, or, if corporations, may begin the transaction of business in, some other district, and, if such is done, the phrase 'where it might have been brought' should be construed to empower the District Court to transfer the action, on motion of the defendants, to such other district; and that, similarly, if, as here, the defendants move to transfer the action to some other district and consent to submit to the jurisdiction of such other district, the latter district should be held one 'in which

the action might then have been brought.'(Emphasis added.)

FN12. A similar view was expressed in Paramount Pictures, Inc. v. Rodney, 3 Cir., 186 F.2d 111. The court there thought that the s 1404(a) phrase 'might have been brought' means 'could now be brought.' Id., at page 114.

We do not agree. We do not think the s 1404(a) phrase 'where it might have been brought' can be interpreted to mean, as petitioners' theory would required, *343 'where it may now be rebrought, with defendants' consent.'This Court has said, in a different context, that s 1404(a) is 'unambiguous, direct (and) clear,' Ex parte Collett, 337 U.S. at page 58, 69 S.Ct. at page 946, and that 'the unequivocal words of s 1404(a) and the legislative history * * * (establish) that Congress indeed meant what it said.'United States v. National City Lines, Inc., 337 U.S. 78, 84, 69 S.Ct. 955, 958, 93 L.Ed. 1226. Like the Seventh Circuit, 260 F.2d at page 322, we think the dissenting opinion of Judges Hastie and McLaughlin in Paramount Pictures, Inc. v. Rodney, 3 Cir., 186 F.2d 111, 119, correctly answered this contention:

'But we do not see how the conduct of a defendant after suit has been instituted can add to the forums where 'it might have been brought.' In the normal meaning of words this language of Section 1404(a) directs the attention of the judge who is considering a transfer to the situation which existed when suit was instituted.'

[5][6][7] It is not to be doubted that the transferee courts, like every District Court, had jurisdiction to entertain actions of the character involved, but it is obvious that they did not acquire jurisdiction over these particular actions when they were brought in the transferor courts. The transferee courts could have acquired jurisdiction over these actions only if properly brought in those courts, or if validly transferred thereto under s 1404(a). Of course, venue, like jurisdiction over the person, may be waived. A

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

Page 8

defendant, properly served with process by a court having subject matter jurisdiction, waives venue by failing seasonably to assert it, or even simply by making default.Commercial Casualty Ins. Co. v. Consolidated Stone Co., 278 U.S. 177, 179-180, 49 S.Ct. 98, 99, 73 L.Ed. 252:Neirbo Co. v. Bethlehem Shipbuilding Corp., Ltd., 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167. But the power of a District Court under s 1404(a) to transfer an action to another district is made to depend not upon the wish or waiver of the defendant **1090 but, rather, upon whether the transferee district was one *344 in which the action 'might have been brought' by the plaintiff.

The thesis urged by petitioners would not only do violence to the plain words of s 1404(a), but would also inject gross discrimination. That thesis, if adopted, would empower a District Court, upon a finding of convenience, to transfer an action to any district desired by the defendants and in which they were willing to waive their statutory defenses as to venue and jurisdiction over their persons, regardless of the fact that such transferee district was not one in which the action 'might have been brought' by the plaintiff. Conversely, that thesis would not permit the court, upon motion of the plaintiffs and a like showing of convenience, to transfer the action to the same district, without the consent and waiver of venue and personal jurisdiction defenses by the defendants. Nothing in s 1404(a), or in its legislative history, suggests such a unilateral objective and we should not, under the guise of interpretation, ascribe to Congress any such discriminatory purpose.

We agree with the Seventh Circuit that:

'If when a suit is commenced, plaintiff has a right to sue in that district, independently of the wishes of defendant, it is a district 'where (the action) might have been brought.'If he does not have that right, independently of the wishes of defendant, it is not a district 'where it might have been brought,' and it is immaterial that the defendant subsequently (makes himself subject, by consent, waiver of ven-

ue and personal jurisdiction defenses or otherwise, to the jurisdiction of some other forum).'260 F.2d at page 321, and 261 F.2d at page 469.

Inasmuch as the respondents (plaintiffs) did not have a right to bring these actions in the respective transferee districts, it follows that the judgments of the Court of Appeals were correct and must be affirmed.

Affirmed.
*345 Mr. Justice STEWART, concurring in No. 25.
Two Courts of Appeals disagreed about the meaning of a federal law, as conscientious federal courts sometimes do. From the point of view of efficient judicial administration the resulting history of this litigation is no subject for applause. But, as the Court points out, no claim was made here that the decision of the Fifth Circuit precluded Judge Hoffman or the Seventh Circuit from remanding the case, and on the merits of that question I agree with the Court that principles of res judicata were inapplicable. In any event, the conflict between the Circuits is now resolved, and what happened here will not happen again.

No. 25

Mr. Justice FRANKFURTER, whom Mr. Justice HARLAN and Mr. Justice BRENNAN join, dissenting.[FN*]

> FN* (This opinion applies only to No. 25, Hoffman v. Blaski. For opinion of Mr. Justice FRANKFURTER, joined by Mr. Justice HARLAN and Mr. Justice BRENNAN in No. 26, Sullivan v. Behimer, see 363 U.S. at page 351, 80 S.Ct. at page 1093.

My special disagreement with the Court in this case concerns a matter of judicial administration arising out of the fact that after the question on the merits had been considered by the Court of Appeals for the Fifth Circuit, the same question between the same parties was later independently again adjudic-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

Page 9

ated by the Court of Appeals for the Seventh Circuit. I cannot join the Court's approval of the right of the Seventh Circuit to make such a re-examination. It is true that in its opinion in this case and No. 26, Sullivan v. Behimer, decided today, the Court settles the question over which the two Courts **1091 of Appeals disagreed, so that it should not recur. This is not, however, an isolated case. A general principle of judicial administration in the federal courts is at stake. In addition, while the Court today settles one problem arising in the application of s 1404(a), other questions involving that section may readily give rise to conflicting *346 views among the eleven Courts of Appeals. Under the Court's opinion, for example, transfer always depends upon the meaning of the federal venue statutes, and upon the jurisdiction of the transferee court over the person of the defendant, which may be a problem of constitutional dimensions, and there is obviously a substantial opportunity for conflict between the Courts of Appeals over those matters. We ought to forestall in other situations of potential controversy the kind of judicial unseemliness which this case discloses.

Plaintiffs brought this action for patent infringement in the United States District Court for the Northern District of Texas. Defendants moved pursuant to 28 U.S.C. s 1404(a), 28 U.S.C.A. s 1404(a), to have it transferred to the Northern District of Illinois. Finding transfer to be 'for the convenience of parties and witnesses, in the interest of justice,' the Texas District Court granted the motion and transferred the action to Illinois. Plaintiffs sought a writ of mandamus in the Court of Appeals for the Fifth Circuit to require the Texas District Court to set aside the transfer. In plaintiffs' view the Northern District of Illinois was not a place where the action 'might have been brought,' and thus the Texas District Court had no power to transfer the action there under s 1404(a). The Fifth Circuit fully examined the merits of this claim and rejected it, holding that in the circumstances before the court the Northern District of Illinois was a jurisdiction where the action 'might have been brought.' Leave

to file a mandamus petition was therefore denied, and the action was duly transferred. 245 F.2d 737.

Upon the assignment of the action to the calendar of the United States District Court for the Northern District of Illinois, plaintiffs moved that court to disregard the explicit decision of another District Court in the same case, sustained by the appropriate Court of *347 Appeals, and to send the case back to Texas. Plaintiffs advanced precisely the claim already rejected by the Fifth Circuit, namely, that the Northern District of Illinois was not a place where the action 'might have been brought' within the proper meaning of s 1404(a). Transfer had, in their view, erroneously been ordered by the Texas District Court and the power to transfer erroneously approved by the Fifth Circuit. Plaintiffs' application was denied by the Illinois District Court. Still not accepting the decision against them, plaintiffs again sought an appellate remedy by way of mandamus, this time in the Court of Appeals for the Seventh Circuit. Initially, mandamus was denied. On rehearing, however, the Seventh Circuit held that the prior decision of the Fifth Circuit was wrong. It held that s 1404(a) did not authorize transfer to Illinois, and it ordered the action 'remanded' to the Texas District Court within the Fifth Circuit, from whence it had come, to go forward there. 260 F.2d 317. That 'remand' is the order which is here on certiorari. 359 U.S. 904, 79 S.Ct. 583, 3 L.Ed.2d 570.

The Court of Appeals for the Seventh Circuit has thus refused to permit an Illinois District Court to entertain an action transferred to it with the approval, after full consideration of the problem involved, of the Court of Appeals for the Fifth Circuit. The Seventh Circuit considered no evidence not before the Fifth Circuit in so deciding. It considered precisely the same issue and reached a contrary legal conclusion. This was after explicit prior adjudication of the question at the same level of the federal system in the same case and between the same parties. Because the question involved is the transferability of the action, **1092 the consequence of the Seventh Circuit's disregard of the Fifth Circuit's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

prior decision is not only that a question once de-cided has been reopened, with all the wasted mo-tion, delay and **\*348** expense which that normally entails. Unless and until this Court acts, the litig-ants have no forum in which trial may go forward. Each Court of Appeals involved has refused to have the District Court in its Circuit hear the case and has sent it to a District Court in the other.

This is the judicial conduct the Court now ap-proves. The Court does not suggest that the Court of Appeals for the Fifth Circuit was powerless, was without jurisdiction, to review, as it did, the ques-tion of the applicability of s 1404(a) to this case. The occasion for the Fifth Circuit's review by way of mandamus may have been, as the Court suggests, 'to protect its appellate jurisdiction,' but there can be no question that the Fifth Circuit undertook to and did resolve on its merits the controversy between the parties regarding the meaning of s 1404(a). Yet the Court decides that the review in the Fifth Circuit was so much wasted motion, prop-erly ignored by the Court of Appeals for the Sev-enth Circuit in arriving at a contrary result. The case is treated just as if the Fifth Circuit had never considered the questions involved in it. I am at a loss to appreciate why all the considerations bear-ing on the good administration of justice which un-derlie the technical doctrine of res judicata did not apply here to require the Court of Appeals for the Seventh Circuit to defer to the previous de-cision.'Public policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest; and that matters once tried shall be considered forever settled as between the parties. We see no reason why this doctrine should not apply in every case where one voluntarily appears, presents his case and is fully heard, and why he should not, in the ab-sence of fraud, be thereafter concluded by the judg-ment of the tribunal to which he has submitted his cause.'Baldwin v. Iowa Traveling Men's Ass'n, 283 U.S. 522, 525-526, 51 S.Ct. 517, 518, 75 L.Ed. 1244. One would suppose that these considerations would be **\*349** especially important in enforcing

comity among federal courts of equal authority.

The fact that the issue involved is the propriety of a transfer of the action only makes the case for defer-ence to the previous decision of a coordinate court in the same litigation that much stronger. The course of judicial action now approved by the Court allows transfer over a persisting objection only when concurred in by two sets of courts: those in the place where the case begins, and those in the place to which transfer is ordered. Not only does the place of trial thus remain unsettled for an unne-cessarily long time to accommodate double judicial consideration, but, as this case shows, the result of a disagreement between the courts involved is that the litigation cannot go forward at all unless this Court resolves the matter. Surely a seemly system of judicial remedies, especially appellate judicial remedies, regarding controverted transfer provi-sions of the United States Code should encourage, not discourage, quick settlement of questions of transfer and should preclude two Courts of Appeals from creating, through their disagreement in the same case, an impasse to the litigation which only this Court can remove.Section 1404(a) was meant to serve the ends of 'convenience' and 'justice' in the trial of actions. It perverts those ends to permit a question arising under s 1404(a), as here, to be lit-igated, in turn, before a District Court and Court of Appeals in one Circuit, and a District Court and Court of Appeals in another Circuit, one thousand miles distant, thereby delaying trial for a year and a half, only to have the result of all that preliminary litigation be that trial may not go forward at all un-til this Court shall settle the question of where it shall go forward, after at least another year's delay.

**\*\*1093** We are not vouchsafed claims of reason or of the due administration of justice that require the duplication of **\*350** appellate remedies approved by the Court in this case. Why is not a single judicial appellate remedy in a Court of Appeals entirely ad-equate for one aggrieved by a transfer? Once the Court of Appeals for the Fifth Circuit had decided, after due consideration, that the proper meaning of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

s 1404(a) included Illinois as a place where the action 'might have been brought,' this should have ended the matter, except of course for this Court's power of review of that decision through the writ of certiorari, a power which we declined to exercise in this case. Nor does such a view of right and wise judicial administration depend upon the nature of the procedural or even jurisdictional issue in controversy. Technically res judicata controls even a decision on a matter of true jurisdiction.'We see no reason why a court, in the absence of an allegation of fraud in obtaining the judgment, should examine again the question whether the court making the earlier determination on an actual contest over jurisdiction between the parties, did have jurisdiction of the subject matter of the litigation.'Stoll v. Gottlieb, 305 U.S. 165, at page 172, 59 S.Ct. 134, at page 138, 83 L.Ed. 104. See also Baldwin v. Iowa Traveling Men's Ass'n, supra, 283 U.S. 522, 51 S.Ct. 517, 75 L.Ed. 1244. Surely, a prior decision of a federal court on the unfundamental issue of venue ought to receive similar respect from a co-ordinate federal court when the parties and the facts are the same. The question is of the appropriate scheme of judicial remedies for enforcing rights under a federal remedial statute aimed at enhancing the fair administration of justice in the federal courts. It is not consonant with reason to permit a duplicate appellate procedure for questions under this statute, thereby forestalling final decision on a pre-trial matter which ought to be decided as expeditiously as possible, causing wasteful delay and expense, and thus depriving the statutory motion to transfer of effectiveness in achieving the ends of 'convenience' and 'justice' for which it was cre- ated.

No. 26

*351 Mr. Justice FRANKFURTER, whom Mr. Justice HARLAN and Mr. Justice BRENNAN join, dissenting.FN*

FN* (This opinion applies only to No. 26, Sullivan v. Behimer. For opinion of Mr.

Justice FRANKFURTER, joined by Mr. Justice HARLAN and Mr. Justice BRENNAN, in No. 25, Hoffman v. Blaski, see 363 U.S. at page 345, 80 S.Ct. at page 1090. The problem in this case is of important concern to the effective administration of justice in the federal courts. At issue is the scope of 28 U.S.C. s 1404(a), 28 U.S.C.A. s 1404(a), providing for the transfer of litigation from one Federal District Court to another. The main federal venue statutes necessarily deal with classes of cases, without regard to the occasional situation in which a normally appropriate venue may operate vexatiously.Section 1404(a) was devised to avoid needless hardship and even miscarriage of justice by empowering district judges to recognize special circumstances calling for special relief. It provides that an action, although begun in a place falling within the normally applicable venue rubric may be sent by the District Court to go forward in another district much more appropriate when judged by the criteria of judicial justice.

The terms of s 1404(a) are as follows:

'For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.'

The part of s 1404(a) the meaning of which is at issue here is its last phrase, 'any other district or division where it (the action) might have been brought.'The significance of this phrase is this: even though a place be found to be an overwhelmingly more appropriate forum **1094 from the standpoint of 'convenience' and 'justice,' the litigation may not be sent to go forward there unless it is a *352 place where the action 'might have been brought.' Upon the scope to be given this phrase thus depends almost entirely the effectiveness of s 1404(a) to insure an appropriate place of trial, when the action is begun in an oppressive forum.

One would have to be singularly unmindful of the treachery and versatility of our language to deny

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

that as a mere matter of English the words 'where it might have been brought' may carry more than one meaning. For example, under Rule 3 of the Federal Rules of Civil Procedure, civil actions are 'commenced' by filing a complaint with the court. As a matter of English there is no reason why 'commenced' so used should not be thought to be synonymous with 'brought' as used in s 1404(a), so that an action 'might have been brought' in any district where a complaint might have been filed, or perhaps only in districts with jurisdiction over the subject matter of the litigation. As a matter of English alone, the phrase might just as well be thought to refer either to those places where the defendant 'might have been' served with process, or to those places where the action 'might have been brought' in light of the applicable venue provision, for those provisions speak generally of there actions 'may be brought.' Or the phrase may be thought as a matter of English alone to refer to those places where the action 'might have been brought' in light of the applicable statute of limitations, or other provisions preventing a court from reaching the merits of the litigation. On the face of its words alone, the phrase may refer to any one of those considerations, i.e., venue, amenability to service, or period of limitations, to all of them or to none of them, or to others as well.[FN1] And to *353 the extent that these are matters which may or may not be raised at the defendant's election, the English of the phrase surely does not tell whether the defendant's actual or potential waiver or failure to raise such objections is to be taken into account in determining whether a district is one in which the action 'might have been brought,' or whether the phrase refers only to those districts where the plaintiff 'might have brought' the action even over a timely objection on the part of the defendant, that is, where he had 'a right' to bring it.

FN1. See, e.g., Felchlin v. American Smelting & Refining Co., D.C.S.D.Cal.1955, 136 F.Supp. 577 (transfer denied on defendant's motion because plaintiff was an executor not quali-

fied in transferee court); Masterpiece Productions, Inc. v. United Artists Corp., D.C.E.D.Pa.1950, 90 F.Supp. 750 (transfer denied on defendant's motion because, had the action originally been brought in the transferee court, the alignment of parties would have been different, there being one involuntary party, thereby destroying complete diversity of citizenship); Lucas v. New York Central R. Co., D.C.S.D.N.Y.1950, 88 F.Supp. 536 (because defendant's corporate status would have destroyed diversity of citizenship had the action been brought in the transferee court). In all of these cases transfer was denied because the transferee court was deemed not to be one where the action 'might have been brought.' See also Arvidson v. Reynolds Metals Co., D.C.W.D.Wash.1952, 107 F.Supp. 51 (denying the defendant's motion for transfer in part because the action was a local one, and state courts in the transferee district would not have taken jurisdiction over it).

The particular problem in the present case has been a relatively commonplace one in the application of s 1404(a), and it demonstrates the failure of the words of the section, considered merely as words, to define with precision those places where an action 'might have been brought.' The problem here is this. Action was brought by plaintiff in district A, a proper venue under the applicable venue statute. Defendant objected and moved for transfer to district B, submitting that in the interests of 'convenience' and 'justice' to all concerned the action should go forward there instead **1095 of in district A. District B, however, is one in which, had the complaint been *354 filed there, the plaintiff would have been unable without the defendant's consent to serve him with process. In addition, the defendant in district B, had the complaint been filed there, would have had an objection to the venue,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

under the applicable venue statute. In moving for transfer to B, the defendant stipulates to waiving all objections to venue there and to submitting his person to the jurisdiction of District Court B, should transfer be ordered. The District Court in A agrees that B, not A, is the appropriate place for trial and is disposed to transfer the action there, for in light of the defendant's stipulation there is no way in which the plaintiff can be prejudiced by the lack of venue in B or the impossibility, as an original matter, of serving defendant there. Is B a place where the action 'might have been brought' so that the transfer can be effected? The Court finds it 'plain,' from the words of the phrase themselves, that B is not such a place, and that, for it, is the end of the matter.

We would all agree that B would be a place where the action 'might have been brought' if it were a place of statutory venue, if the defendant had always been amenable to process there, and if B had no other special characteristics whereby the defendant could prevent consideration there of the merits of the cause of action. Almost every statute has a core of indisputable application, and this statute plainly applies to permit transfer to a place where there could never have been any objection to the maintenance of the action. But is it clear, as the Court would have it, that, as a mere matter of English, because potential objections peculiar to the forum would have been present in B, it is not to be deemed a place where the action 'might have been brought,' although defendant not only might but is prepared to waive, as he effectively may, such objections?

**\*355** I submit that it is not clear from the words themselves, and the experience in the lower courts gives compelling proof of it. At least 28 District Courts, located in all parts of the Nation, have had to give concrete meaning to the set of words in controversy. These are the judges who are, to use a familiar but appropriate phrase, on the firing line, who are in much more intimate, continuous touch with the needs for the effective functioning of the

federal judicial system at the trial level than is this Court. They have not found the last phrase of s 1404(a) unambiguous. There has been anything but the substantial uniformity of views to be expected in the application of a clear and unambiguous direction. There have been severe differences with regard to whether s 1404(a) is ever available as a remedy to a plaintiff forced into an inconvenient forum, and if so under what conditions.[FN2] With regard to defendants' motions to transfer, it has been held that 'brought' in s 1404(a) is synonymous with 'commenced' in Rule 3 so that transfer may be made to virtually any district dictated by 'convenience' and 'justice.'[FN3] It has been held that the phrase is to be applied as if it read 'where it might have been brought now,' thus giving full effect to a waiver of objections by defendant **\*356** in **\*\*1096** moving for transfer.[FN4] It has been said, on the other hand, that '(s)ection 1404(a) * * * contemplates statutory venue and not consent venue.'FN5

FN2. See, e.g., Dufek v. Roux Distrib. Co., D.C.S.D.N.Y.1954, 125 F.Supp. 716;Barnhart v. John B. Rogers Producing Co., D.C.N.D.Ohio 1949, 86 F.Supp. 595;Troy v. Poorvu, D.C.Mass.1955, 132 F.Supp. 864;United States v. Reid, D.C.E.D.Ark.1952, 104 F.Supp. 260;Otto v. Hirl, D.C.S.D.Iowa 1952, 89 F.Supp. 72;McGee v. Southern Pacific Co., D.C.S.D.N.Y.1957, 151 F.Supp. 338;Rogers v. Halford, D.C.E.D.Wisc.1952, 107 F.Supp. 295;Herzog v. Central Steel Tube Co., D.C.S.D.Iowa 1951, 98 F.Supp. 607;Mitchell v. Gundlach, D.C.Md.1955, 136 F.Supp. 169;McCarley v. Foster-Milburn Co., D.C.W.D.N.Y.1950, 89 F.Supp. 643.

FN3.Otto v. Hirl, D.C.S.D.Iowa 1952, 89 F.Supp. 72, 74.

FN4.Cain v. Bowater's Newfoundland Pulp & Paper Mills, Ltd., D.C.E.D.Pa.1954, 127 F.Supp. 949, 950.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

FN5.Johnson        v.        Harris, D.C.E.D.Tenn.1953, 112 F.Supp. 338, 341.

With regard to the particular problem in this case, which has arisen most often, a majority of the District Courts which have considered the problem have ruled against the Court's 'plain' meaning of the statute. At least seven District Courts have ruled that, because of the defendant's consent to have the action go forward there, a district is one where the action 'might have been brought,' even though it is a place where the defendant might either have objected to the venue, or avoided process, or both had the action been brought there originally.[FN6]At least three District Courts have held or implied to the contrary, that the defendant's consent is not relevant, and that such a district cannot be one where the action 'might have been brought.'[FN7] Two others have simply denied motions by the defendant on the ground that the transferee court was not one where the action 'might have been brought,' without discussing whether *357 in moving for transfer the defendant had consented to go forward in the transferee court, or what the effect of that consent would be.[FN8]Two District Courts have granted the defendant's motion to transfer, making the matter turn on the presence of a number of defendants and the fact that some of them were suable as of right in the transferee court.[FN9]Two others have found the amenability of the defendant to service of process in the place to which transfer is proposed to be wholly irrelevant to whether the action 'might have been brought' there, and have ordered transfer to such a place on the plaintiff's motion even though the defendant did not consent.[FN10] It simply cannot be said in the face of this experience that the words of the statute are so compellingly precise, so unambiguous, that s 1404(a) as a matter of 'plain words' does not apply in the present case.

FN6.Hill v. Upper Mississippi Towing Corp., D.C.Minn.1956, 141 F.Supp. 692;McGee v. Southern Pacific Co., D.C.S.D.N.Y.1957, 151 F.Supp. 338;Welch v. Esso Shipping Co.,

D.C.S.D.N.Y.1953, 112 F.Supp. 611;Mire v. Esso Shipping Co., D.C.S.D.N.Y.1953, 112 F.Supp. 612;Cain v. Bowater's Newfoundland Pulp & Paper Mills, Ltd., D.C.E.D.Pa.1954, 127 F.Supp. 949;Anthony v. RKO Radio Pictures, D.C.N.Y.1951, 103 F.Supp. 56; Blaski v. Howell, D.C.N.D.Ill., March 14, 1958.

FN7.General Electric Co. v. Central Transit Warehouse Co., D.C.W.D.Mo.1955, 127 F.Supp. 817;Tivoli Realty v. Paramount Pictures, D.C.Del.1950, 89 F.Supp. 278;Felchlin v. American Smelting & Refining Co., D.C.S.D.Cal.1955, 136 F.Supp. 577. See also Johnson v. Harris, D.C.E.D.Tenn.1953, 112 F.Supp. 338 (dictum).

FN8.Silbert v. Nu-Car Carriers, D.C.S.D.N.Y.1953, 111 F.Supp. 357;Hampton Theaters, Inc. v. Paramount Film Distributing Corp., D.C.D.C.1950, 90 F.Supp. 645. See also Arvidson v. Reynolds Metals Co., D.C.W.D.Wash.1952, 107 F.Supp. 51 (denying the defendants' motion to transfer in part because the plaintiff would not have been amenable to process in the transferee court).

FN9.Ferguson v. Ford Motor Co., D.C.S.D.N.Y.1950, 89 F.Supp. 45;Glassfloss Corp. v. Owens-Corning Fiberglas Corp., D.C.S.D.N.Y.1950, 90 F.Supp. 967.

FN10.McCarley v. Foster-Milburn Co., D.C.W.D.N.Y.1950, 89 F.Supp. 643;Troy v. Poorvu, D.C.Mass.1955, 132 F.Supp. 864.

The experience in the Courts of Appeals is also revealing. Of the six cases where defendants have moved for transfer, in only two has it been held that the defendant's consent to the transfer is not relevant in determining whether the place to which transfer is proposed is a place where the action

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553                     Page 15

'might have been brought,' and these are the two decisions of the Seventh Circuit now before us.Blaski v. Hoffman, 7 Cir., 1958, 260 F.2d 317;Behimer v. Sullivan, 7 Cir., 1958, 261 F.2d 467.*358 The Third Circuit has **1097 ruled in favor of transfer on the defendant's motion to a place where the defendant might have objected to the venue, Paramount Pictures, Inc. v. Rodney, 3 Cir., 1951, 186 F.2d 111. The First and Second Circuits have ruled in favor of transfer on defendant's motion to a place where the defendant could not have been served with process, Torres v. Walsh, 2 Cir., 1955, 221 F.2d 319;In re Josephson, 1 Cir., 1954, 218 F.2d 174. And the Second and Fifth Circuits have ruled in favor of transfer on defendant's motion to a place where there was neither statutory venue nor a chance to serve the defendant.Anthony v. Kaufman, 2 Cir., 1951, 193 F.2d 85; Ex parte Blaski, 5 Cir., 1957, 245 F.2d 737. All these courts have considered the meaning of the phrase in detail and have held that the place to which transfer was proposed was a place where the action 'might have been brought.' Thus the Court's view of the meaning of s 1404(a) is contrary to the rulings of every Court of Appeals but one which has considered the problem, and is contrary to the view of more than half the District Courts as well. Yet the Court maintains that the statute unambiguously means what it says it does.

Surely, the Court creates its own verbal prison in holding that 'the plain words' of s 1404(a) dictate that transfer may not be made in this case although transfer concededly was in the interest of 'convenience' and 'justice.' Moreover, the Court, while finding the statutory words 'plain,' decides the case by applying, not the statutory language, but a formula of words found nowhere in the statute, namely, whether plaintiffs had 'a right to bring these actions in the respective transferee districts.'This is the Court's language, not that of Congress. Although it is of course a grammatically plausible interpretation of the phrase 'where it might have been brought,' it has been, I submit, established that it is not *359 by any means the only

plausible interpretation. In fact, the Court's rephrasing, as distinguished from Congress' phrasing, gives the narrowest possible scope to the operation of s 1404(a). There can be expected to be very few, if any, alternative forums in a given case where the plaintiff has a 'right' to sue, considering that that means places of unobjectionable venue where the defendant is amenable to service of process and where there are no other impediments such as a statute of limitations which the defendant can rely on to defeat the action.

This case, then, cannot be decided, and is not decided, by the short way of a mechanical application of Congress' words to the situation. Indeed, it would be extraordinary if a case which could be so decided were deemed worthy of this Court's attention twelve years after the applicable statute was enacted. To conclude, as the Court does, that the transferee court is inexorably designated by the inherent force of the words 'where it might have been brought' is to state a conclusion that conceals the process by which the meaning is, as a matter of choice, extracted from the words.

The problem in this case is one of resolving an ambiguity by all the considerations relevant to resolving an ambiguity concerning the conduct of litigation, and more particularly the considerations that are relevant to resolving an ambiguous direction for the fair conduct of litigation in the federal judicial system. At the crux of the business, as I see it, is the realization that we are concerned here not with a question of a limitation upon the power of a federal court but with the place in which that court may exercise its power. We are dealing, that is, not with the jurisdiction of the federal courts, which is beyond the power of litigants to confer, but with the locality of a lawsuit, the rules regulating which are designed mainly for the convenience of the litigants. (T)he locality of a law suit-the place where judicial authority may be *360 exercised-though defined by legislation relates to the convenience **1098 of litigants and as such is subject to their disposition. * * * (A venue statute) 'merely accords

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

to the defendant a personal privilege respecting the venue, or place of suit, which he may assert, or may waive, at his election.'Commercial Ins. Co. v. Stone Co., 278 U.S. 177, 179, 49 S.Ct. 98, 99, 73 L.Ed. 252.' Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 168, 60 S.Ct. 153, 154, 84 L.Ed. 167. And in that case the Court was merely reiterating considerations already forcefully set out in General Investment Co. v. Lake Shore R. Co., 260 U.S. 261, 43 S.Ct. 106, 67 L.Ed. 244, and Lee v. Chesapeake & Ohio R. Co., 260 U.S. 653, 43 S.Ct. 230, 67 L.Ed. 443. This basic difference 'between the court's power and the litigant's convenience is historic in the federal courts.'308 U.S. at page 168, 60 S.Ct. at page 154.

Applying these considerations to a problem under a different statute but relevant to the present one, namely, whether removal from a state court to a federal court might be had upon the motion of the defendant when the federal court was one where the venue would have been subject to objection, had the action originally been brought there, this Court, speaking unanimously through Mr. Justice Van Devanter, discriminatingly reminded that '(i)t therefore cannot be affirmed broadly that this suit could not have been brought * * * (in the federal court) but only that it could not have been brought and maintained in that court over a seasonable objection by the company to being sued there.'This analysis has striking application to the present problem under s 1404(a), and it is also relevant here that the Court sanctioned removal in that case to a federal court with no statutory venue, partly because 'there could be no purpose in extending to removals the personal privilege accorded to defendants by (the venue statutes) since removals are had only at the instance of defendants.'General Investment Co. v. Lake Shore R. Co., 260 U.S. 261, 273, 275, 43 S.Ct. 106, 67 L.Ed. 244. See also, to the same effect, *361Lee v. Chesapeake & Ohio R. Co., 260 U.S. 653, 43 S.Ct. 230, 67 L.Ed. 443, overruling Ex parte Wisner, 203 U.S. 449, 27 S.Ct. 150, 51 L.Ed. 264, and qualifying In re Moore, 209 U.S. 490, 28 S.Ct. 585, 52 L.Ed. 904. The rule that

statutory venue rules governing the place of trial do not affect the power of a federal court to entertain an action, or of the plaintiff to bring it, but only afford the defendant a privilege to object to the place chosen, is now enacted as part of the Judicial Code. 28 U.S.C. s 1406(b), 28 U.S.C.A. s 1406(b). And of course it needs no discussion that a defendant is always free voluntarily to submit his person to the jurisdiction of a federal court.

In light of the nature of rules governing the place of trial in the federal system, as thus expounded and codified, as distinguished from limitation upon the power of the federal courts to adjudicate, what are the competing considerations here? The transferee court in this case plainly had and has jurisdiction to adjudicate this action with the defendant's acquiescence. As the defendant, whose privilege it is to object to the place of trial, has moved for transfer, and has acquiesced in going forward with the litigation in the transferee court, it would appear presumptively, unless there are strong considerations otherwise, that there is no impediment to effecting the transfer so long as 'convenience' and 'justice' dictate that it be made. It does not counsel otherwise that here the plaintiff is to be sent to a venue to which he objects, whereas ordinarily, when the defendant waives his privilege to object to the place of trial, it is to acquiesce in the plaintiff's choice of forum. This would be a powerful argument if, under s 1404(a), a transfer were to be made whenever requested by the defendant. Such is not the case, and this bears emphasis. A transfer can be made under s 1404(a) to a place where the action 'might have been brought' only when **1099 'convenience' and 'justice' so dictate, not whenever the defendant so moves. A legitimate objection by the plaintiff to proceeding in the transferee forum will presumably be reflected in a decision that *362 the interest of justice does not require the transfer, and so it becomes irrelevant that the proposed place of transfer is deemed one where the action 'might have been brought.' If the plaintiff's objection to proceedings in the transferee court is not consonant with the interests of justice, a good reason is wanting why the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

transfer should not be made.

On the other hand, the Court's view restricts transfer, when concededly warranted in the interest of justice, to protect no legitimate interest on the part of the plaintiff. And by making transfer turn on whether the defendant could have been served with process in the transferee district on the day the action was brought, the Court's view may create difficult problems in ascertaining that fact, especially in the case of non-corporate defendants. These are problems which have no conceivable relation to the proper administration of a provision meant to assure the most convenient and just place for trial.

Nor is it necessary to reach the Court's result in order to preserve an appropriate meaning for the phrase 'where it might have been brought.'I fully agree that the final words of s 1404(a) are words of limitation upon the scope of the provision. But to hold as I would that a district is one where the action 'might have been brought' when the defendant consents to going forward with the litigation there, does not remove the quality of those words as a limitation. The words compel the defendant in effect to waive any objections to going forward in the transferee district which he might have had if the action had been brought there, in order to obtain a transfer. The words therefore insure that transfer will not be a device for doing the plaintiff out of any forum in which to proceed, no matter how inconvenient. The words in any case, plainly limit the plaintiff's right to seek a transfer when the defendant does not consent to the change of venue. Moreover, the words may serve to prevent transfer to *363 courts with a lack of federal power to adjudicate the matter of the dispute which the defendant cannot confer with his consent.[FN11] In light of the fact that the venue statutes in Title 28 U.S.C., 28 U.S.C.A., are phrased in terms of where the action 'may be brought,' or in some cases where it 'shall' or 'must' be brought,[FN12] the most obvious limiting significance of the phrase 'where it might have been brought' is that it refers to places where, under the venue provisions, the action, 'may,' 'shall,' or

'must' be brought assuming the existence of federal jurisdiction.[FN13] In the meaning of federal venue provisions as expounded by this Court, and by Congress in s 1406(b), these, as has been said, are not only places where, under the applicable provision, no objection to the venue is available to the defendant. They are also places where the defendant consents to be sued.

FN11. See cases cited in note 1, supra.

FN12. See 28 U.S.C. ss 1391, 1392(a) and (b), 1393(a) and (b), 1396-1399, 1400(b), 1401 and 1403, 28 U.S.C.A. ss 1391, 1392(a, b), 1393(a, b), 1396-1399, 1400(b), 1401, 1403.

FN13. See Chief Judge Magruder's opinion for the Court of Appeals for the First Circuit in In re Josephson, 218 F.2d 174, 184.

The relevant legislative history of s 1404(a) is found in the statement in the Reviser's Notes, accompanying the 1948 Judicial Code, that s 1404(a)'was drafted in accordance with the doctrine of forum non conveniens.'[FN14]Under that **1100 doctrine, the remedy for an inconvenient *364 forum was not to transfer the action, but to dismiss it. In Gulf Oil Corp. v. Gilbert, 330 U.S 501, 506-507, 67 S.Ct. 839, 842, 91 L.Ed. 1055, we held that '(i)n all cases in which the doctrine of forum non conveniens comes into play, it presupposes at least two forums in which the defendant is amenable to process; the doctrine furnishes criteria for choice between them.'It is entirely 'in accordance' with this view of the doctrine of forum non conveniens to hold that transfer may be made at the instance of the defendant regardless of the plaintiff's right as an original matter to sue him in the transferee court, so long as the defendant stipulates to going forward with the litigation there. Indeed, to hold otherwise as the Court does is to limit s 1404(a) to a much narrower operation than the non-statutory doctrine of forum non conveniens. Investigation has disclosed several forum non conveniens cases, one of them in this Court, where dismissal of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

Page 18

the action on the defendant's motion was made upon the condition of the defendant's voluntary submission to the jurisdiction of another more convenient forum when that forum was not available to the plaintiff as of right over the defendant's objection. See Canada Malting Co. v. Paterson Steamships, Ltd., D.C., 49 F.2d 802, 804,affirmed, 285 U.S. 413, 424, 52 S.Ct. 413, 416, 76 L.Ed. 837;Giatilis v. The Darnie, D.C., 171 F.Supp. 751, 754;Bulkley, Dunton Paper Co. v. The Rio Salado, D.C., 67 F.Supp. 115, 116;Libby, McNeill & Libby v. Bristol City Line of Steamships, D.C., 41 F.Supp. 386, 389; The City of Agra, D.C., 35 F.Supp. 351;Strassburger v. Singer Mfg. Co., 263 App.Div. 518, 33 N.Y.S.2d 424;Wendel v. Hoffman, 258 App.Div. 1084, 259 App.Div. 732, 18 N.Y.S.2d 96. See also Cerro De Pasco Copper corp. v. Knut Knutsen, 2 Cir., 187 F.2d 990, and Swift & Co. Packers v. Compania Caribe, 339 U.S. 684, 697-698, 70 S.Ct. 861, 869, 94 L.Ed. 1206:'it was improper under the circumstances here shown to remit a United States citizen to the courts of a foreign country without assuring the citizen that respondents would appear in those courts and that security would be given *365 equal to what had been obtained by attachment in the District Court. The power of the District Court to give a libellant such assurance is shown by Canada Malting Co. v. Paterson Steamships, Ltd., 285 U.S. 413, 424, 52 S.Ct. 413, 416, 76 L.Ed. 837(supra).' In view of the familiarity of this device of dismissing for forum non conveniens when as of right no other forum was available to plaintiff, upon the defendant's agreement to appear in the more convenient forum, it is almost necessary to suppose, in light of the Reviser's description of s 1404(a) as 'in accordance with the doctrice of forum non conveniens,' that transfer under s 1404(a) may likewise be made where the defendant consents to going forward with the case in the transferee court.

FN14. The whole of the statement in the Reviser's Note dealing with subsection (a) of s 1404 is as follows:
'Subsection (a) was drafted in accordance with the doctrine of forum non conveniens, permitting transfer to a more convenient forum, even though the venue is proper. As an example of the need of such a provision, see Baltimore & Ohio R. Co. v. Kepner, * * * 314 U.S. 44, * * * which was prosecuted under the Federal Employer's Liability Act in New York, although the accident occurred and the employee resided in Ohio. The new subsection requires the court to determine that the transfer is necessary for convenience of the parties and witnesses, and further, that it is in the interest of justice to do so.'

The only consideration of the Court not resting on the 'plain meaning' of s 1404(a) is that it would constitute 'gross discrimination' to permit transfer to be made with the defendant's consent and over the plaintiff's objection to a district to which the plaintiff could not similarly obtain transfer over the defendant's objection. To speak of such a situation as regards this statute as 'discrimination' is a sterile use of the concept. Mutuality is not an empty or abstract doctrine; it summarizes the reality of fair dealing between litigants.**1101 Transfer cannot be made under this statute unless it is found to be in the interest of 'convenience' and in the interest of 'justice.' Whether a party is in any sense being 'discriminated' against through a transfer is certainly relevant to whether the interest of justice is being served. If the interest of justice is being served, as it must be for a transfer to be made, how can it be said that there is 'discrimination' in any meaningful sense? Moreover, the transfer provision cannot be viewed in isolation in finding 'discrimination.' It, after all, operates to temper only to a slight degree the enormous 'discrimination' inherent in our system of litigation, whereby the sole choice of forum, from among those where service is possible and venue unobjectionable, *366 is placed with the plaintiff. The plaintiff may choose from among these forums at will; under s 1404(a) the defendant must satisfy a very substantial burden of demonstrating where

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

Page 19

'justice' and 'convenience' lie, in order to have his objection to a forum of hardship, in the particular situation, respected.

In summary, then, the 'plain meaning' of s 1404(a) does not conclude the present case against the transfer, for the statute, as applied in this case, is not 'plain' in meaning one way or another, but contains ambiguities which must be resolved by considerations relevant to the problem with which the statute deals. Moreover, the most obvious significance for the set of words here in question, considered as self-contained words, is that they have regard for the limitations contained in the regular statutory rules of venue. Those rules, it is beyond dispute, take into account the consent of the defendant to proceed in the forum, even if it is not a forum designated by statute. And the doctrine of forum non conveniens 'in accordance with' which s 1404 (a) was drafted, also took into account the defendant's consent to proceed in another forum to which he was not obligated to submit. Nor can a decision against transfer be rested upon notions of 'discrimination' or of unfairness to the plaintiff in wrenching him out of the forum of his choice to go forward in a place to which he objects. In the proper administration of s 1404(a), such consequences cannot survive the necessity to find transfer to be in the interests of 'convenience' and 'justice,' before it can be made. On the other hand, to restrict transfer as the Court does to those very few places where the defendant was originally amenable to process and could have had no objection to the venue is drastically to restrict the number of situations in which s 1404(a) may serve the interests of justice by relieving the parties from a vexatious forum. And it is to restrict the operation of the section capriciously, for *367 such a drastic limitation is not counseled by any legitimate interest of the plaintiff, or by any interest of the federal courts in their jurisdiction. The defendant's interest of course is not involved because he is the movant for transfer.

The essence of this case is to give fair scope to the role of s 1404(a) in our system of venue regula-

tions, that is, a system whereby litigation may be brought in only a limited number of federal districts, which are chosen generally upon the basis of presumed convenience. Two extremes are possible in the administration of such a system, duly mindful of the fact that in our jurisprudence venue does not touch the power of the court. (1) All venue may be determined solely by rigid rules, which the defendant may invoke and which work for convenience in the generality of cases. In such an extreme situation there would be no means of responding to the special circumstances of particular cases when the rigid venue rules are inappropriate. (2) At the other extreme there may be no rigid venue provisions, but all venue may be determined, upon the defendant's objection to the plaintiff's choice of forum, by a finding of fact in each case of what is the most convenient forum from the point of view of the parties and the court.**1102 The element of undesirability in the second extreme is that it involves too much preliminary litigation; it is desirable in that it makes venue responsive to actual convenience. The first extreme is undesirable for according too little, in fact nothing, to actual convenience when the case is a special one; it is desirable in that it does away with preliminary litigation.

If anything is plain, from its history and from its words, it is that s 1404(a) means to afford a balance, a compromise, between these two extremes. It is in this spirit that its provisions must be read. In the ordinary course the regular venue rules are to prevail, with no preliminary litigation to determine the actual convenience. But the *368 statute means to allow for cases where the ordinary rules are found to work a great hardship; there, actual convenience is to prevail. We should therefore not, as the Court has done, impose limitations upon the operation of s 1404(a) which have no relation to ordinary considerations governing the place of trial in the federal system and which arbitrarily prevent actual convenience from determining the place of trial. The limitations upon the section should only be those which recognize legitimate countervailing considerations to the free reign of actual conveni-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

80 S.Ct. 1084
363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

ence, namely limitations regarding the power of the federal courts to adjudicate, and limitation recognizing the historic privilege of the defendant, should be choose to exercise it, to object to the place of trial unless it is affirmatively designated by the venue statute.

It may be urged in answer to this analysis that if transfer is available as a matter of 'convenience' and 'justice' in every case in which the defendant consents to going forward in the transferee court, s 1404(a) will entail burdensome preliminary litigation and may, if improperly administered, prove vexatious to plaintiffs. Thus, even arbitrary limitations, such as the Court imposes, may be said to be warranted. In effect this argument against transfer in situations like the present implies distrust in the ability and character of district judges to hold the balance even, that is, to dispose quickly of frivolous contentions and to prevent transfer from proving unduly prejudicial to plaintiffs while according it its proper scope to deal with cases of real inconvenience.'Such apprehension implies a lack of discipline and of disinterestedness on the part of the lower courts, hardly a worthy or wise basis for fashioning rules of procedure. It reflects an attitude against which we were warned by Mr. Justice Holmes, speaking for the whole Court, likewise in regard to a question of procedure: 'Universal distrust creates universal incompetence.'*369 Graham v. United States, 231 U.S. 474, 480, 34 S.Ct. 148, 151, 58 L.Ed. 319.'Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co., 342 U.S. 180, 185, 72 S.Ct. 219, 222, 96 L.Ed. 200. As in that case, doubts here should be resolved in favor of the competence of the District Courts wisely to administer s 1404(a). Whatever salutary effect that section is to have must in any event depend upon due appreciation by district judges of the relevant considerations involved in ordering a transfer. Nothing is to be gained by parceling out the areas of their discretion mechanically, making distinctions which have no relevance to the manner in which venue provisions are ordinarily administered in the federal courts. I would therefore permit considerations of

'convenience' and 'justice' to be operative whenever the defendant consents to going forward in the transferee court on the same terms on which he was sued in the original forum. Against a rare abuse, there will always be available the corrective supervisory power of the Courts of Appeals, and ultimately of this Court.

U.S. 1960.

Hoffman v. Blaski

363 U.S. 335, 80 S.Ct. 1084, 1961 A.M.C. 285, 4 L.Ed.2d 1254, 125 U.S.P.Q. 553

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# Westlaw.

Slip Copy

Slip Copy, 2008 WL 1995128 (N.D.Fla.)

Page 1

Holton v. Florida
N.D.Fla.,2008.
Only the Westlaw citation is currently available.
United States District Court, N.D. Florida,
Panama City Division.
Rudolph HOLTON, Plaintiff,
v.
State of FLORIDA, et al, Defendants.
**No. 5:08cv52/RS-EMT.**

May 6, 2008.

Rudolph Holton, Chipley, FL, pro se.

### ORDER

RICHARD SMOAK, District Judge.
*1 Before me is the Magistrate Judge's Report and Recommendation (Doc. 8). Plaintiff has not filed objections.

**IT IS ORDERED:**

1. The Magistrate Judge's Report and Recommendation is approved and is incorporated in this Order.

2. This case is transferred to the United States District Court for the Middle District of Florida.

3. The clerk is directed to close the file.

**ORDERED.**

### *REPORT AND RECOMMENDATION*

ELIZABETH M. TIMOTHY, United States Magistrate Judge.
This matter is before the court on an amended complaint alleging civil rights violations pursuant to 42 U.S.C. § 1983 (Doc. 4). Upon review of the complaint, it is apparent that venue is not proper in the Northern District of Florida. Accordingly, this case should be transferred.

Plaintiff is an inmate currently housed at Washington Correctional Institution in Chipley, Florida. He names five Defendants in this matter: the State of Florida; the City of Tampa; the Tampa Police Department; John Doe # 1, a Tampa Police Detective employed by the Tampa Police Department; and John Doe # 2, a Tampa Police Detective employed by the Tampa Police Department (Doc. 4 at 5-6). Plaintiff complains that Defendants John Doe # 1 and John Doe # 2 withheld exculpatory evidence from his defense counsel during his murder trial in 1986 (*id.* at 8). Plaintiff also states that because the evidence was unlawfully withheld, he was convicted of murder and spent more than 16 years on death row (*id.*). He further states that on January 24, 2003, he was exonerated of the crime by DNA evidence and was released from prison (*id.* at 8-9). He additionally alleges that the City of Tampa is responsible for the overall operations of the Tampa Police Department, and the Tampa Police Department is responsible for the acts of its employees; therefore, Defendants City of Tampa and Tampa Police Department are liable (*id.* at 8). Finally, he alleges that the State of Florida owes him compensation for wrongful incarceration and that the "wrongful acts of all named and unnamed Defendants have violated [his] constituion[al] rights against cruel and uunusual punishment"(*id.* at 9). As relief, he seeks compensatory damages in the amount of $50,000.00 against each Defendant, jointly and severally, for each year he was wrongfully imprisoned, and punitive damages in the amount of $50,000.00 against each Defendant for each year he was wrongfully imprisoned, fees and costs associated with the litigation of this complaint, and nominal damages (*id.* at 10).

Venue for actions under 42 U.S.C. § 1983 is governed by 28 U.S.C. § 1391(b), which provides:

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

otherwise provided by law, be brought only in (1) a judicial district where any defendant resides if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

**\*2** *Id.* Furthermore, 28 U.S.C. § 1404 provides: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."28 U.S.C. § 1404(a). The decision to transfer an action pursuant to § 1404(a) is left to the "sound discretion of the district court and [is] reviewable only for an abuse of that discretion."*Roofing & Sheeting Metal Serv. v. La Quinta Motor Inns,* 689 F.2d 982, 985 (11th Cir.1982). Such transfers may be made sua sponte by the district court.*Mills v. Beech Aircraft Corp.,* 886 F.2d 758, 761 (5th Cir.1989); *Robinson v. Madison,* 752 F.Supp. 842, 846 (N.D.Ill.1990) ("A court's authority to transfer cases under § 1404(a) does not depend upon the motion, stipulation or consent of the parties to the litigation."); *Empire Gas Corp. v. True Value Gas of Florida, Inc.,* 702 F.Supp. 783, 784 (W.D.Mo.1989); *accord Roofing & Sheeting,* 689 F.2d at 991 n. 14.

In analyzing the issue of proper venue in the context of motions to dismiss under the federal doctrine of forum non conveniens, courts have looked to certain factors set forth by the United States Supreme Court relating to the private interest of the litigants and the public interest in the fair and efficient administration of justice. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508-09, 67 S.Ct. 839, 843, 91, L.Ed. 1055 (1988), *superseded by statute on other grounds as explained in American Dredging Co. v. Miller,* 510 U.S. 443, 449, n. 2, 114 S.Ct. 981, 986 n. 2, 127 L.Ed.2d 285 (1994); [FN1]*accord Cowan v. Ford Motor Co.,* 713 F.2d 100, 103 (5th

Cir.1983).[FN2] While forum non conveniens would not apply in a case such as this where there exists an alternative federal forum in which this case could have been brought and to which this case may be transferred, the factors enunciated in *Gilbert,* which provide the basis for a court's analysis of the relative fairness and convenience of two alternative forums, are helpful in determining whether to effect a change in venue under section 1404(a).

FN1. In *American Dredging,* the Court explained:

Gilbert held that it was permissible to dismiss an action brought in a District Court in New York by a Virginia plaintiff against a defendant doing business in Virginia for a fire that occurred in Virginia. Such a dismissal would be improper today because of the federal venue transfer statute, 28 U.S.C. § 1404(a): "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."By this statute, "[d]istrict courts were given more discretion to transfer ... than they had to dismiss on grounds of forum non conveniens."*Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 253, 102 S.Ct. 252, 264, 70 L.Ed.2d 419 (1981). As a consequence, the federal doctrine of forum non conveniens has continuing application only in cases where the alternative forum is abroad.

*American Dredging,* 510 U.S. at 449 n. 2.

FN2. In *Cowan,* the Fifth Circuit explained the proper applicability of the doctrine of forum non conveniens in light of the enactment of section 1404(a):

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Section 1404(a) superseded the common law doctrine of forum non conveniens insofar as transfer to another federal district court is possible. As the Supreme Court pointed out in *Norwood v. Kirkpatrick,* "the harshest result of the application of the old doctrine of forum non conveniens, dismissal of the action, was eliminated by the provision in § 1404(a) for transfer."349 U.S. 29, 32, 75 S.Ct. 544, 546, 99 L.Ed. 789 (1955).

*Cowan,* 713 F.2d at 103 (additional citations omitted).

The factors set forth in *Gilbert* are as follows:

[i]mportant considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all of the practical problems that make trial of a case easy, expeditious and inexpensive.... Factors of public interest also have [a] place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation....

*Gilbert,* 330 U.S. at 508-09.

In the instant case, the acts or occurrences forming the basis of the complaint occurred in Tampa, Florida, which is located in the Middle District of Florida. Thus, attendance of witnesses and availability of sources of proof favor a transfer there. Moreover, this community appears to have no relation to the litigation at issue. Neither the private interest of the litigants nor the public interest in the administration of justice is even minimally advanced by venue being maintained in this district.FN3 Therefore, in the interest of justice, this

action should be transferred to the Middle District.

FN3. Although Plaintiff's choice of forum is ordinarily given consideration, *Norwood v. Kirkpatrick,* 349 U.S. 29, 32, 75 S.Ct. 544, 99 L.Ed. 789 (1955), "where the operative facts underlying the cause of action did not occur within the forum chosen by Plaintiff, the choice of forum is entitled to less consideration."*Windmere Corp. v. Remington Products, Inc.,* 617 F.Supp. 8, 10 (S.D.Fla.1985) (citations omitted). In the instant case, however, Plaintiff has specifically stated that he "believes this case should be filed in the Tampa Division, Middle District of Florida" (*see* Doc. 4 at 1, n. 1).

**\*3** Accordingly, it is respectfully, **RECOMMENDED:**

1. That this case be transferred to the United States District Court for the Middle District of Florida.

2. That the Clerk be directed to close the file.

At Pensacola, Florida, this *4th* day of April 2008.

N.D.Fla.,2008.
Holton v. Florida
Slip Copy, 2008 WL 1995128 (N.D.Fla.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

67 S.Ct. 839                                                                    Page 1
330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055

►
GULF OIL CORPORATION v. GILBERT
U.S. 1947.

Supreme Court of the United States
GULF OIL CORPORATION
v.
GILBERT.
**No. 93.**

Argued Dec. 18, 19, 1946.
Decided March 10, 1947.

Action by Cornelius Gilbert, doing business under
the firm name and style of Gilbert Storage & Trans-
fer Company against Gulf Oil Corporation for dam-
ages allegedly resulting from negligence of the de-
fendant. A judgment dismissing the action on the
ground of forum non conveniens, 62 F.Supp. 291,
was reversed by the Circuit Court of Appeals, 153
F.2d 883, and the defendant brings certiorari.

Judgment of Circuit Court of Appeals reversed.

Mr. Justice REED, Mr. Justice BURTON, Mr.
Justice BLACK and Mr. Justice RUTLEDGE, dis-
senting.

On Writ of Certiorari to the United States Circuit
Court of Appeals for the Second Circuit.

West Headnotes

**|1| Federal Courts 170B** ⬅➡**45**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(B) Right to Decline Jurisdiction; Ab-
stention Doctrine
            170Bk45 k. Forum Non Conveniens. Most
Cited Cases
    (Formerly 106k260, 106k260.4)
The doctrine of forum non conveniens does not ap-
ply if there is either an absence of jurisdiction or a
mistake of venue.

**|2| Federal Courts 170B** ⬅➡**45**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(B) Right to Decline Jurisdiction; Ab-
stention Doctrine
            170Bk45 k. Forum Non Conveniens. Most
Cited Cases
    (Formerly 106k260, 106k260.4)
The doctrine of forum non conveniens presupposes
at least two forums in which the defendant is amen-
able to process and furnishes criteria for a choice
between them.

**|3| Federal Courts 170B** ⬅➡**45**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(B) Right to Decline Jurisdiction; Ab-
stention Doctrine
            170Bk45 k. Forum Non Conveniens. Most
Cited Cases
    (Formerly 106k260, 106k260.4)
The doctrine of "forum non conveniens" is that a
court may resist imposition upon its jurisdiction
even when jurisdiction is authorized by the letter of
a general venue statute.

**|4| Federal Courts 170B** ⬅➡**65**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(B) Right to Decline Jurisdiction; Ab-
stention Doctrine
            170Bk65 k. Procedure as to Abstention;
Reserving or Retaining Jurisdiction. Most Cited
Cases
    (Formerly 106k260, 106k260.4)
In determining whether the doctrine of forum non
conveniens should be applied, the court should con-
sider the private interests of the litigant, relative
ease of access to sources of proof, availability of
compulsory process for attendance of unwilling
witnesses, cost of obtaining attendance of willing

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

67 S.Ct. 839
330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055

witnesses, possibility of view of premises, if appropriate, relative advantages and obstacles to a fair trial and all other practical problems that make the trial of a case easy, expeditious and inexpensive, as well as the enforcibility of any judgment obtained, but unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.

[5] **Federal Courts 170B** ☞65

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(B) Right to Decline Jurisdiction; Abstention Doctrine
            170Bk65 k. Procedure as to Abstention; Reserving or Retaining Jurisdiction. Most Cited Cases
    (Formerly 106k260, 106k260.4)
In determining whether the doctrine of forum non conveniens should be applied, the court should also consider factors of public interest, such as relative administrative difficulties, burden of jury duty and appropriateness of forum for particular questions involved.

[6] **Federal Courts 170B** ☞45

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(B) Right to Decline Jurisdiction; Abstention Doctrine
            170Bk45 k. Forum Non Conveniens. Most Cited Cases
    (Formerly 106k260, 106k260.4)
That action by Virginia citizen against Pennsylvania corporation doing business in both Virginia and New York for negligence resulting in destruction of warehouse and contents in Virginia involved $400,000 and that plaintiff's attorney, who was employed by insurance companies interested, lived in New York, did not require that District Court sitting in New York retain jurisdiction of action based solely on diversity of citizenship.

[7] **Federal Civil Procedure 170A** ☞1741

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)2 Grounds in General
                170Ak1741 k. In General. Most Cited Cases
On motion to dismiss on ground of forum non conveniens, whether offer of litigant opposing motion to see that witnesses from without the jurisdiction are present at the trial should be accepted rests in the sound discretion of the trial court.

[8] **Federal Courts 170B** ☞45

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(B) Right to Decline Jurisdiction; Abstention Doctrine
            170Bk45 k. Forum Non Conveniens. Most Cited Cases
    (Formerly 106k260, 106k260.4)
Where action in Federal Court sitting in New York was by a citizen of Virginia against a Pennsylvania corporation doing business in both Virginia and New York for damages for negligence resulting in destruction of warehouse and its contents in Virginia, and 350 persons living in Virginia had goods stored when warehouse was destroyed, and defendant desired to implead alleged independent contractor residing in Virginia, and jurisdiction of the Federal Court in New York depended solely on diversity of citizenship, the court did not abuse its discretion in refusing jurisdiction on the ground of "forum non conveniens."

**840 *502** Messrs. Bernard A. Golding and Archie D. Gray, both of Houston, Tex., for petitioner.
Mr. Max J. Gwertzman, of New York City, for respondent.

Mr. Justice JACKSON delivered the opinion of the Court.
The questions are whether the United States District Court has inherent power to dismiss a suit pursuant to the doctrine of forum non conveniens and, if so, whether that power was abused in this case.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

67 S.Ct. 839
330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055

Page 3

The respondent-plaintiff brought this action in the Southern District of New York, but resides at Lynchburg, Virginia, where he operated a public warehouse. He alleges that the petitioner-defendant, in violation of the ordinances of Lynchburg, so carelessly handled a delivery of gasoline to his warehouse tanks and pumps as to cause *503 an explosion and fire which consumed the warehouse building to his damage of $41,889.10, destroyed merchandise and fixtures to his damage of $3,602.40, caused injury to his business and profits of $20,038.27, and burned the property of customers in his custody under warehousing agreements to the extent of $300,000. He asks judgment of $365,529.77 with costs and disbursements, and interest from the date of fire. The action clearly is one in tort.

The petitioner-defendant is a corporation organized under the laws of Pennsylvania, qualified to do business in both Virginia and New York, and it has designated officials of each state as agents to receive service of process. When sued in New York, the defendant, invoking the doctrine of forum non conveniens, claimed that the appropriate place for trial is Virginia where the plaintiff lives and defendant does business, where all events in litigation took place, where most of the witnesses reside, and where both state and federal courts are available to plaintiff and are able to obtain jurisdiction of the defendant.

The case, on its merits, involves no federal question and was brought in the United States District Court solely because of diversity in citizenship of the parties. Because of the character of its jurisdiction and the holdings of and under Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, the District Court considered that the law of New York as to forum non conveniens applied and that it required the case to be left to Virginia courts.[FN1] It therefore dismissed.

    FN1 Gilbert v. Gulf Oil Corp., D.C., 62 F.Supp. 291.

The Circuit Court of Appeals disagreed as to the applicability of New York law, took a restrictive view of the application of the entire doctrine in federal courts and, one judge dissenting, reversed.[FN2] The case is here on certiorari. 328 U.S. 830, 66 S.Ct. 1123.

    FN2 Gilbert v. Gulf Oil Corp., 2 Cir., 153 F.2d 883.

                    *504 I.

[1] It is conceded that the venue statutes of the United States permitted the **841 plaintiff to commence his action in the Southern District of New York and empower that court to entertain it.[FN3] But that does not settle the question whether it must do so. Indeed the doctrine of forum non conveniens can never apply if there is absence of jurisdiction or mistake of venue.

    FN3 See 28 U.S.C. s 112, 28 U.S.C.A. s 112; Neirbo Co. v. Bethlehem Shipbuilding Corp., Ltd., 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167, 128 A.L.R. 1437.

This Court, in one form of words or another, has repeatedly recognized the existence of the power to decline jurisdiction in exceptional circumstances. As formulated by Mr. Justice Brandeis the rule is: 'Obviously, the proposition that a court having jurisdiction must exercise it, is not universally true; else the admiralty court could never decline jurisdiction on the ground that the litigation is between foreigners. Nor is it true of courts administering other systems of our law. Courts of equity and of law also occasionally decline, in the interest of justice, to exercise jurisdiction, where the suit is between aliens or nonresidents, or where for kindred reasons the litigation can more appropriately be conducted in a foreign tribunal.' Canada Malting Co., Ltd., v. Paterson Steamships, Ltd., 285 U.S. 413 422, 423 52 S.Ct. 413, 415, 76 L.Ed. 837.

We later expressly said that a state court 'may in appropriate cases apply the doctrine of forum non

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

67 S.Ct. 839
330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055

Page 4

conveniens.'Broderick v. Rosner, 294 U.S. 629, 643, 55 S.Ct. 589, 592, 79 l.Ed. 1100, 100 A.L.R. 1133; Williams v. State of North Carolina, 317 U.S. 287, 294, n. 5, 63 S.Ct. 207, 87 L.Ed. 279, 143 A.L.R. 1273. Even where federal rights binding on state courts under the Constitution are sought to be adjudged, this Court has sustained state courts in a refusal to entertain a litigation between a nonresident and a foreign corporation or between two foreign corporations.Douglas v. New York, N.H. & H.R. Co., 279 U.S. 377, 49 S.Ct. 355, 73 L.Ed. 747;*505Anglo-American Provision Co. v. Davis Provision Co. No. 1, 191 U.S. 373, 24 S.Ct. 92, 48 L.Ed. 225. It has held the use of an inappropriate forum in one case an unconstitutional burden on interstate commerce.Davis v. Farmers' Co-operative Equity Co., 262 U.S. 312, 43 S.Ct. 556, 67 L.Ed. 996. On substantially forum non conveniens grounds we have required federal courts to relinquish decision of cases within their jurisdiction where the court would have to participate in the administrative policy of a state.Railroad Commission of Texas v. Rowan & Nichols Oil Co., 311 U.S. 570, 61 S.Ct. 343, 85 L.Ed. 358;Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424; but cf. Meredith v. Winter Haven, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9. And most recently we decided Williams v. Green Bay & Western R. Co., 326 U.S. 549, 66 S.Ct. 284. in which the Court, without questioning the validity of the doctrine held it had been applied in that case without justification.FN4

> FN4 The doctrine did not originate in federal but in state courts. This Court in recognizing and approving it by name has never indicated that it was rejecting application of the doctrine to law actions which had been an integral and necessary part of evolution of the doctrine. And cf. Slater v. Mexican National R. Co., 194 U.S. 120, 24 S.Ct. 581, 48 L.Ed. 900. Wherever it is applied in courts of other jurisdictions, its application does not depend on whether the action is at law, Collard v. Beach, 93 App.Div. 339, 87 N.Y.S. 884;Murnan v.

Wabash Ry. Co., 246 N.Y. 244, 158 N.E. 508, 54 A.L.R. 1522;Jackson & Sons v. Lumbermen's Mutual Casualty Co., 86 N.H. 341, 168 A. 895; or in equity, Langfelder v. Universal Laboratories, 293 N.Y. 200, 56 N.E.2d 550, 155 A.L.R. 1226; Egbert v. Short, 1907, 2 Ch. 250. See footnote 1 Koster v. (American) Lumbermens Mutual Casualty Co., 330 U.S. 518, 67 S.Ct. 828.

It is true that in cases under the Federal Employers' Liability Act, 45 U.S.C.A. s 51 et seq., we have held that plaintiff's choice of a forum cannot be defeated on the basis of forum non conveniens. But this was because the special venue act under which those cases are brought was believed to require it.Baltimore & Ohio R. Co. v. Kepner, 314 U.S. 44, 62 S.Ct. 6, 86 L.Ed. 28, 136 A.L.R. 1222;**842Miles v. Illinois Central R. Co., 315 U.S. 698, 62 S.Ct. 827, 86 L.Ed. 1129, 146 A.L.R. 1104. Those decisions do not purport to modify the doctrine as to other cases governed by the general venue statutes.

*506 [2] But the court below says that 'The Kepner case * * * warned against refusal of jurisdiction in a particular case controlled by congressional act; here the only difference is that congressional act, plus judicial interpretation (under the Neirbo case), spells out the result.'153 F.2d at page 885. The Federal Employers' Liability Act, however, which controlled decision in the Kepner case, specifically provides where venue may be had in any suit on a cause of action arising under that statute. What the court below refers to as 'congressional act, plus judicial interpretation,' is the general statute of venue in diversity suits, plus our decision that it gives the defendant 'a personal privilege respecting the venue, or place of suit, which he may assert, or may waive, at his election,'Neirbo Co. v. Bethlehem Shipbuilding Corp., Ltd., 308 U.S. 165, 168, 60 S.Ct. 153, 154, 84 L.Ed. 167, 128 A.L.R. 1437. The Federal Employers' Liability Act, as interpreted by Kepner, increases the number of places where the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

67 S.Ct. 839
330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055

defendant may be sued and makes him accept the plaintiff's choice. The Neirbo case is only a declaration that if the defendant, by filing consent to be sued, waives its privilege to be sued at its place of residence, it may be sued in the federal courts at the place where it has consented to be sued. But the general venue statute plus the Neirbo interpretation do not add up to a declaration that the court must respect the choice of the plaintiff, no matter what the type of suit or issues involved. The two taken together mean only that the defendant may consent to be sued, and it is proper for the federal court to take jurisdiction, not that the plaintiff's choice cannot be questioned. The defendant's consent to be sued extends only to give the court jurisdiction of the person; it assumes that the court, having the parties before it, will apply all the applicable law, including, in those cases where it is appropriate, its discretionary judgment as to whether the suit should be entertained. In all cases in which the doctrine of forum non conveniens comes into *507 play, it presupposes at least two forums in which the defendant is amenable to process; the doctrine furnishes criteria for choice between them.

## II.

[3] The principle of forum non conveniens is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute. These statutes are drawn with a necessary generality and usually give a plaintiff a choice of courts, so that he may be quite sure of some place in which to pursue his remedy. But the open door may admit those who seek not simply justice but perhaps justice blended with some harassment. A plaintiff sometimes is under temptation to resort to a strategy of forcing the trial at a most inconvenient place for an adversary, even at some inconvenience to himself.

Many of the states have met misuse of venue by investing courts with a discretion to change the place of trial on various grounds, such as the convenience of witnesses and the ends of justice.[FN5] The federal

law contains no such express criteria to guide the district court in exercising its power. But the problem is a very old one affecting the administration of the courts as well as the rights of litigants, and both in England and in this country the common law worked out techniques and criteria for dealing with it.[FN6]

FN5 See Foster, Place of Trial-Interstate Application of Intrastate Methods of Adjustment, 44 Harv.L.Rev. 41, 47, 62.

FN6 See Logan v. Bank of Scotland, (1906) 1 K.B. 141; cf. La Socie te du Gaz de Paris v. La Socie te Anonyme de Navigation 'Les Armateurs Francais.' (1926) Sess.Cas. (H.L.) 13.Collard v. Beach, 93 App.Div. 339, 87 N.Y.S. 884;Jackson & Sons v. Lumbermen's Mutual Casualty Co., 86 N.H. 341, 168 A. 895; see Pietraroia v. New Jersey & Hudson R.R. & Ferry Co., 197 N.Y. 434, 91 N.E. 120;Great Western Railway Co. of Canada v. Miller, 19 Mich. 305.

**843 *508 Wisely, it has not been attempted to catalogue the circumstances which will justify or require either grant or denial of remedy. The doctrine leaves much to the discretion of the court to which plaintiff resorts, and experience has not shown a judicial tendency to renounce one's own jurisdiction so strong as to result in many abuses.FN7

FN7 See Dainow, The Inappropriate Forum, 29 Ill.L.Rev. 867, 889.

[4] If the combination and weight of factors requisite to given results are difficult to forecast or state, those to be considered are not difficult to name. An interest to be considered, and the one likely to be most pressed, is the private interest of the litigant. Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibil-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

67 S.Ct. 839
330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055

Page 6

ity of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforcibility of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial. It is often said that the plaintiff may not, by choice of an inconvenient forum, 'vex,' 'harass,' or 'oppress' the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy.[FN8] But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.

> FN8 See Blair, The Doctrine of Forum Non Conveniens in Anglo-American Law, 29 Col.L.Rev. 1.

[5] Factors of public interest also have place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community *509 which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

The law of New York as to the discretion of a court to apply the doctrine of forum non conveniens, and as to the standards that guide discretion is, so far as here involved, the same as the federal rule.Murnan v. Wabash Ry. Co., 246 N.Y. 244, 158 N.E. 508, 54 A.L.R. 1522;Wedemann v. United States Trust Co. of New York, 258 N.Y. 315, 179 N.E. 712, 79 A.L.R. 1320; see Gregonis v. Philadelphia & Reading Coal & Iron Co., 235 N.Y. 152, 139 N.E. 223,

32 A.L.R. 1. It would not be profitable, therefore, to pursue inquiry as to the source from which our rule must flow.

### III.

Turning to the question whether this is one of those rather rare cases where the doctrine should be applied, we look first to the interests of the litigants.

The plaintiff himself is not a resident of New York, nor did any event connected with the case take place there, nor does any witness with the possible exception of experts live there. No one connected with that side of the case save counsel for the plaintiff resides there, and he has candidly told us that he was retained by insurance companies interested presumably because of subrogation. His affidavits and argument are devoted to controverting claims as to defendant's inconvenience rather than to showing that the present forum serves any convenience *510 of his own, with one exception. The only justification for trial in New York advanced here is one rejected by the district court and is set forth in the brief as follows: 'This Court can readily realize that an action of this type, involving as it does a claim for damages in an amount close to $400,000, **844 is one which may stagger the imagination of a local jury which is surely unaccustomed to dealing with amounts of such a nature. Furthermore, removed from Lynchburg, the respondent will have an opportunity to try this case free from local influences and preconceived notions which make it difficult to procure a jury which has no previous knowledge of any of the facts herein.'

[6] This unproven premise that jurors of New York live on terms of intimacy with $400,000 transactions is not an assumption we easily make. Nor can we assume that a jury from Lynchburg and vicinity would be 'staggered' by contemplating the value of a warehouse building that stood in their region, or of merchandise and fixtures such as were used there, nor are they likely to be staggered by the value of chattels which the people of that neighbor-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

hood put in storage. It is a strange argument on be-half of a Virginia plaintiff that the community which gave him patronage to make his business valuable is not capable of furnishing jurors who know the value of the goods they store, the building they are stored in, or the business their patronage creates. And there is no specification of any local influence, other than accurate knowledge of local conditiions, that would make a fair trial improb-able. The net of this is that we cannot say the Dis-trict Court was bound to entertain a provincial fear of the provincialism of a Virginia jury. That leaves the Virginia plaintiff without even a suggested reas-on for transporting this suit to New York.

*511 [7] Defendant points out that not only the plaintiff, but every person who participated in the acts charged to be negligent, resides in or near Lynchburg. It also claims a need to interplead an al-leged independent contractor which made the deliv-ery of the gasoline and which is a Virginia corpora-tion domiciled in Lynchburg, that it cannot inter-plead in New York. There also are approximately 350 persons residing in and around Lynchburg who stored with plaintiff the goods for the damage to which he seeks to recover. The extent to which they have left the community since the fire and the num-ber of them who will actually be needed is in dis-pute. The complaint alleges that defendant's con-duct violated Lynchburg ordinances. Conditions are said to require proof by firemen and by many oth-ers. The learned and experienced trial judge was not unaware that litigants generally manage to try their cases with fewer witnesses than they predict in such motions as this. But he was justified in concluding that this trial is likely to be long and to involve call-ing many witnesses, and that Lynchburg, some 400 miles from New York, is the source of all proofs for either side with possible exception of experts. Cer-tainly to fix the place of trial at a point where litig-ants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most lit-igants. Nor is it necessarily cured by the statement of plaintiff's counsel that he will see to getting

many of the witnesses to the trial and that some of them 'would be delighted to come to New York to testify.'There may be circumstances where such a proposal should be given weight. In others the offer may not turn out to be as generous as defendant or court might suppose it to be. Such matters are for the District Court to decide in exercise of a sound discretion.

The court likewise could well have concluded that the task of the trial court would be simplified by tri-al in Virginia.*512 If trial was in a state court, it could apply its own law to events occurring there. If in federal court by reason of diversity of citizenship, the court would apply the law of its own state in which it is likely to be experi-enced. The course of adjudication in New York federal court might be beset with conflict of laws problems all avoided if the case is litigated in Vir-ginia where it arose.

[8] We are convinced that the District Court did not exceed its powers or the bounds of its discretion in dismissing plaintiff's complaint and remitting him to the courts of his own community. The Circuit Court of Appeals took too restrictive a **845 view of the doctrine as approved by this Court. Its judg-ment is reversed.

Reversed.

Mr. Justice REED and Mr. Justice BURTON dis-sent. They do not set out the factual reasons for their dissent since the Court's affirmance of Koster v. (American) Lumbermens Mutual casualty Co., 330 U.S. 518, 67 S.Ct. 828, would control.
Mr. Justice BLACK (dissenting).
The defendant corporation is organized under the laws of Pennsylvania, but is qualified to do busi-ness and maintains an office in New York. Plaintiff is an individual residing and doing business in Vir-ginia. The accident in which plaintiff alleges to have been damaged occurred in Lynchburg, Virgin-ia. Plaintiff brought this action in the Federal Dis-trict Court in New York. Section 11 of the Judiciary Act of 1789, 1 Stat. 78, carried over into the Judi-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

cial Code, s 24, 28 U.S.C. s 41(1), 28 U.S.C.A. s 41(1), confers jurisdiction upon federal district courts of all actions at law between citizens of different states. The Court does not suggest that the federal district court in New York lacks jurisdiction under this statute or that the venue was improper in this case. 28 U.S.C. s 112, 28 U.S.C.A. s 112. Cf. *513Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167, 128 A.L.R. 1437. But it holds that a district court may abdicate its jurisdiction when a defendant shows to the satisfaction of a district court that it would be more convenient and less vexatious for the defendant if the trial were held in another jurisdiction. Neither the venue statute nor the statute which has governed jurisdiction since 1789 contains any indication or implication that a federal district court, once satisfied that jurisdiction and venue requirements have been met, may decline to exercise its jurisdiction. Except in relation to the exercise of the extraordinary admiralty and equity powers of district courts, this Court has never before held contrary to the general principle that 'the courts of the United States are bound to proceed to judgment and to afford redress to suitors before them in every case to which their jurisdiction extends. They cannot abdicate their authority or duty in any case in favor of another jurisdiction.'Hyde v. Stone, 20 How. 170, 175, 15 L.Ed. 874, quoted with approval in Chicot County v. Sherwood, 148 U.S. 529, 534, 13 S.Ct. 695, 697, 37 L.Ed. 546. See also Dennick v. Railroad Co., 103 U.S. 11, 26 L.Ed. 439;Baltimore & O.R. Co. v. Kepner, 314 U.S. 44, 62 S.Ct. 6, 86 L.Ed. 28, 136 A.L.R. 1222;Evey v. Mexican Cent. R. Co., 5 Cir., 81 F. 294.FN1 Never until today has this Court held, in actions for money damages for violations of common law or statutory rights, that a district court can abdicate its statutory duty to exercise its jurisdiction for the alleged convenience of the defendant to a lawsuit. Compare Slater v. Mexican National R. Co., 194 U.S. 120, 24 L.Ed. 581, 48 L.Ed. 900.

FN1 In Mondou v. New York, N.H. & H.R. Co., 223 U.S. 1, 58, 32 S.Ct. 169, 178, 56 L.Ed. 327, 38 L.R.A.,N.S., 44, it was stated that: 'The existence of the jurisdiction creates an implication of duty to exercise it, and that its exercise may be onerous does not militate against that implication.'Cf. Douglas v. New York, N.H. & H.R. Co., 279 U.S. 377, 388, 49 S.Ct. 355, 356, 73 L.Ed. 747.

For reasons peculiar to the special problems of admiralty and to the extraordinary remedies of equity, the courts exercising admiralty and equity powers have been permitted*514 at times to decline to exercise their jurisdiction.Canada Malting Co. v. Paterson S.S. Co., 285 U.S. 413, 52 S.Ct. 413, 76 L.Ed. 837;Rogers v. Guaranty Trust Co., 288 U.S. 123, 53 S.Ct. 295, 77 L.Ed. 652, 89 A.L.R. 720; cf. Williams v. Green Bay & W.R. Co., 326 U.S. 549, 66 S.Ct. 284. This exception is rooted in the kind of relief which these courts grant and the kinds of problems which they solve. See Meredith v. Winter Haven, 320 U.S. 228, 235, 64 S.Ct. 7, 11, 88 L.Ed. 9;Burford v. Sun Oil Co., 319 U.S. 315, 333 n. 29, 63 S.Ct. 1098, 1107, 87 L.Ed. 1424. Courts of equity developed to afford relief where **846 a money judgment in the common law courts provided no adequate remedy for an injured person.FN2From the beginning of equitable jurisdiction up to now, the chancery courts have generally granted or withheld their special remedies at their discretion; and 'courts of admiralty * * * act upon enlarged principles of equity.'O'Brien v. Miller, 168 U.S. 287, 297, 18 S.Ct. 140, 144, 42 L.Ed. 469. But this Court has, on many occasions, severely restricted the discretion of district courts to decline to grant even the extraordinary equitable remedies.Meredith v. Winter Haven, supra, and cases there cited, 320 U.S. at pages 234, 235, 64 S.Ct. at page 11, 88 L.Ed. 9. Previously federal courts have not generally been allowed the broad and indefinite discretion to dispose even of equity cases solely on a trial court's judgment of the relative convenience of the forum for the parties themselves. For a major factor in these equity decisions has been the relative ability of the forum to shape

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and execute its equitable remedy. Cf. Rogers v. Guaranty Trust Co., supra.

> FN2 Although the distinction between actions at law and suits in equity in federal courts has been abolished by the adoption of the single form of civil action, Rule 2, F.R.C.P., 28 U.S.C.A. following section 723c, see 1 Moore, Federal Practice (1938) c. 2, there remains to federal courts the same discretion, no more and no less, in the exercise of special equitable remedies as existed before the adoption of the federal rules. Neither the rules, the statutes, tradition, nor practical considerations justify application of equitable discretion to actions for money judgments based on common law or statutory rights.

*515 No such discretionary authority to decline to decide a case, however, has, before today, been vested in federal courts in actions for money judgments deriving from statutes or the common law.FN3To engraft the doctrine of forum non conveniens upon the statutes fixing jurisdiction and proper venue in the district courts in such actions, seems to me to be far more than the mere filling in of the interstices of those statutes.FN4

> FN3 This Court, whose jurisdiction is primarily appellate, has held that it need not exercise its constitutionally granted original jurisdiction even at common law where there is another suitable forum.State of Georgia v. Pennsylvania R. Co., 324 U.S. 439, 464, 465, 65 S.Ct. 716, 729, 89 L.Ed. 1051. But the Constitution, not Congress, fixes this Court's jurisdiction. And it was this Court's duty to interpret its constitutional jurisdiction. It is the duty of Congress to fix the jurisdiction of the district courts by statute. It did so. It is not the duty of this Court to amend that statute.

> FN4'I recognize without hesitation that judges do and must legislate, but they can

do so only interstitially; they are confined from molar to molecular motions.'Holmes, J., dissenting in Southern Pacific Co. v. Jensen, 244 U.S. 205, 218, 221, 37 S.Ct. 524, (530), 531.61 L.Ed. 1086, L.R.A.1918C. 451, Ann.Cas. 1917E, 900. See also dissenting opinion, State Tax Commission v. Aldrich, 316 U.S. 174, 185, 202, n. 23, 62 S.Ct. 1008, 1013, 1021, 86 L.Ed. 1358, 139 A.L.R. 1436, and authorities there collected.

It may be that a statute should be passed authorizing the federal district courts to decline to try so-called common law cases according to the convenience of the parties. But whether there should be such a statute, and determination of its scope and the safeguards which should surround it are, in my judgment, questions of policy which Congress should decide. There are strong arguments presented by the Court in its opinion why federal courts exercising their common law jurisdiction should have the discretionary powers which equity courts have always possessed in dispensing equitable relief. I think equally strong arguments could be advanced to show that they should not. For any individual or corporate defendant who does part of his business in states other than the one in which he *516 is sued will almost invariably be put to some inconvenience to defend himself. It will be a poorly represented multistate defendant who cannot produce substantial evidence and good reasons fitting the rule now adopted by this Court tending to establish that the forum of action against him is most inconvenient. The Court's new rule will thus clutter the very threshold of the federal courts with a preliminary trial of fact concerning**847 the relative convenience of forums. The preliminary disposition of this factual question will, I believe, produce the very kind of uncertainty, confusion, and hardship which stalled and handicapped persons seeking compensation for maritime injuries following this Court's decision in Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086, L.R.A. 1918C. 451, Ann.Cas. 1917E, 900. The broad and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

67 S.Ct. 839
330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055

indefinite discretion left to federal courts to decide the question of convenience from the welter of factors which are relevant to such a judgment, will inevitably produce a complex of close and indistinguishable decisions from which accurate prediction of the proper forum will become difficult, if not impossible. Yet plaintiffs will be asked 'to determine with certainty before bringing their actions that factual question over which courts regularly divide among themselves and within their own membership. As penalty for error, the injured individual may not only suffer serious financial loss through the delay and expense of litigation, but discover that his claim has been barred by the statute of limitations in the proper forum while he was erroneously pursuing it elsewhere.'Davis v. Department of Labor & Industries, 317 U.S. 249, 254, 63 S.Ct. 225, 228, 87 L.Ed. 246.

This very case illustrates the hazards of delay. It must be begun anew in another forum after the District Court, the Circuit Court of Appeals, and now this Court, have has their time-consuming say as to the relative convenience of the forum in which the plaintiff chose to seek redress. Whether the statute of limitations has run **517** against the plaintiff, we do not know. The convenience which the individual defendant will enjoy from the Court's new rule of forum non conveniens in law actions may be thought to justify its inherent delays, uncertainties, administrative complications and hardships. But in any event, Congress has not yet said so; and I do not think that this Court should, 150 years after the passage of the Judiciary Act, fill in what it thinks is a deficiency in the deliberate policy which Congress adopted.[FN5]Whether the doctrine of forum non conveniens is good or bad, I should wait for Congress to adopt it.

> FN5 The very law review articles which are relied upon to document this theory of a federal rule of forum non conveniens reveal that judicial adoption of this theory without a new act of Congress would be an unwarranted judicial innovation. Foster,

Place of Trial-Interstate Application of Intrastate Methods of Adjustment, 44 Harv.L.Rev. 41, 52; Blair, The Doctrine of Forum Non Conveniens in Anglo-American Law, 29 Col.L.Rev. 1, 18. For Instance, it is stated that 'No matter how little dispute there is as to the desirability of such legislation, there is comparatively little chance of overcoming legislative inertia and securing its passage unless some accident happens to focus attention upon it. The best hope is that the courts will feel free to take appropriate action without specific legislation authorizing them to do so.'Foster, supra at 52.

Mr. Justice RUTLEDGE joins in this opinion.

U.S. 1947.
Gulf Oil Corp. v. Gilbert
330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

886 F.Supp. 728
886 F.Supp. 728

Page 1

Engel v. CBS, Inc.
C.D.Cal.,1995.

United States District Court,C.D. California.
Donald S. ENGEL, Plaintiff,
v.
CBS, INC., et al., Defendants.
**No. CV-85-7198 JMI (JRx).**

May 18, 1995.

Defendant sought to transfer malicious prosecution action from the Central District of California to the Southern District of New York. The District Court, Ideman, J., held that: (1) defendants did not waive venue challenge; (2) proper venue was in New York; and (3) transfer was also appropriate for convenience of parties and witnesses, in the interest of justice.

Motion granted.

West Headnotes

**[1] Federal Courts 170B ☞4**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk3 Jurisdiction in General; Nature and Source
                170Bk4 k. Constitutional and Statutory Provisions. Most Cited Cases
The 1990 and 1992 amendments to statute governing venue in diversity case applies retroactively; amendments are procedural in nature and retroactive application does not result in manifest injustice. 28 U.S.C.A. § 1391(a).

**[2] Federal Courts 170B ☞319**

170B Federal Courts
    170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on

    170BIV(E) Objections, Waiver and Determination
        170Bk319 k. In General. Most Cited Cases
Even though case law of Court of Appeals for the District of Columbia, holding that 1990 and 1992 amendments to statute governing venue in diversity actions apply retroactively, was not binding on courts in the Ninth Circuit, it was more persuasive than three random district court opinions regarding retroactive application of amendments; therefore, defendants were not aware of retroactivity of amendments until decision of D.C. Circuit, which was after they date they had filed their motion to dismiss malicious prosecution action, and defendants therefore did not waive right to challenge venue when they omitted venue challenge in their motion to dismiss. 28 U.S.C.A. § 1391(a).

**[3] Federal Courts 170B ☞122**

170B Federal Courts
    170BII Venue
        170BII(B) Change of Venue
            170BII(B)2 Venue Laid in Wrong Forum
                170Bk122 k. Particular Determinations. Most Cited Cases
The Southern District of New York, rather than the Central District of California, was proper venue for malicious prosecution action against defendants who were subject to personal jurisdiction in New York arising out of filing and handling of New York lawsuit and, accordingly, action would be transferred. 28 U.S.C.A. §§ 1391(a), (a)(1, 2), 1406(a).

**[4] Federal Courts 170B ☞113**

170B Federal Courts
    170BII Venue
        170BII(B) Change of Venue
            170BII(B)1 In General; Venue Laid in Proper Forum
                170Bk106 Determination in Particular

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Transferable Actions
         170Bk113    k.   Torts   in   General.
Most Cited Cases
Transfer of malicious prosecution action from the
Central District of California to the Southern Dis-
trict of New York was appropriate for the conveni-
ence of parties and witnesses, in the interest of
justice; three defendants resided in New York, de-
fendants alleged that most of their witnesses
resided in New York, underlying lawsuit occurred
in New York, New York law governed action, and
plaintiff was licensed to practice in New York and
maintained an office there so New York was not an
inconvenient forum. 28 U.S.C.A. § 1404(a).

*728 Mark D. Passin and Steven M. Fogelson of
Engel & Engel, Los Angeles, CA, for plaintiff.
Wayne W. Smith and David A. Battaglia of Gibson,
Dunn & Crutcher, Los Angeles, CA, for defend- ants.

**\*729 ORDER GRANTING DEFENDANTS'
MOTION TO TRANSFER ACTION FOR IM-
PROPER VENUE AND FOR CONVENIENCE**

**ORDER TRANSFERRING ACTION TO
SOUTHERN DISTRICT OF NEW YORK**

IDEMAN, District Judge.
**IT IS HEREBY ORDERED:**

The above-entitled action was recently transferred
to this Court's docket from the docket of the Honor-
able A. Wallace Tashima. *See* Order of Transfer,
filed May 3, 1995. Upon reviewing the file in this
matter, the Court has decided to revisit Judge
Tashima's ruling denying defendants CBS, INC.
(hereinafter "CBS"), MOSES & SINGER, and
STANLEY      ROTHENBERG's      (hereinafter
"Rothenberg") Motion to Transfer Action to the
Southern District of New York for Improper Venue,
or, in the Alternative, to Transfer for Convenience,
filed September 17, 1993. *See* Minute Order, filed
November 8, 1993. After such reconsideration, the
Court hereby GRANTS defendants' motion and

TRANSFERS this action to the United States Dis-
trict Court for the Southern District of New York.

*BACKGROUND*

Plaintiff   DONALD   S.   ENGEL   (hereinafter
"Engel"), a Los Angeles entertainment attorney li-
censed to practice in California and New York, has
filed this malicious prosecution action against CBS,
Moses & Singer, a New York law firm that repres-
ents CBS, and Rothenberg, a New York attorney
and Moses & Singer partner. The action stems from
an action for breach of contract, copyright infringe-
ment, and injunctive relief that CBS filed against
Engel in the United States District Court for the
Southern District of New York in 1984. In February
1985, the court granted summary judgment for En-
gel in that action.

Engel filed this action in 1985. The case was ini-
tially stayed until the conclusion of an action in the
Southern District of New York involving Engel's
client that was related to the 1984 action involving
Engel. In 1991, after the stay had been lifted, Judge
Tashima granted summary judgment for CBS. The
Ninth Circuit reversed and remanded. *See Engel v.
CBS, Inc.,* 981 F.2d 1076 (9th Cir.1992). The court
ruled that Judge Tashima should have applied New
York law instead of California law. *Id.* at 1082.
Moreover, the court ordered Engel to file a second
amended complaint that stated a claim under New
York law. *Id.* at 1083. In particular, the court ad-
vised that the second amended complaint should es-
tablish "heightened injury" as required by New
York law. *Id.*

Engel and his firm, Engel & Engel, filed a second
amended complaint on February 26, 1993. Defend-
ants subsequently filed a motion to dismiss on
March 22, 1993. In August 1993, Judge Tashima
dismissed Engel & Engel as a plaintiff and dis-
missed the second cause of action for *prima facie*
tort. *See* Order on Motion to Dismiss, entered Au-
gust 4, 1993. Judge Tashima did not dismiss the
malicious prosecution claim, however, because he

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

found that Engel had stated a claim under New York law. *See* Order on Motion to Dismiss at 2.

Defendants filed answers to the second amended complaint in September 1993. Subsequently, they filed their motion to transfer the action to the Southern District of New York for improper venue and convenience. Defendants also filed a motion for leave to seek interlocutory appeal of the denial of their motion to dismiss. Judge Tashima denied both of these motions in November 1993. *See* Minute Order, filed November 8, 1993. At the time this case was transferred to this Court, Judge Tashima had not yet set a trial date but had scheduled a May 15, 1995 hearing on six motions in limine. In light of this Court's decision to transfer the case to the Southern District of New York, the Court hereby VACATES the hearing on these motions in limine.

## DISCUSSION

### I. Reconsideration of Venue Issues

The Ninth Circuit has upheld a court's authority to *sua sponte* raise the issue of improper venue. *Costlow v. Weeks,* 790 F.2d 1486, 1488 (9th Cir.1986). Moreover, the Ninth Circuit has acknowledged "the long-\***730** approved practice of permitting a court to transfer a case sua sponte under the doctrine of *forum non conveniens,* as codified at 28 U.S.C. § 1404(a), so long as the parties are first given the opportunity to present their views on the issue." *Id.* The Court is in receipt of the parties' 1993 motion to transfer, opposition, and reply, in which the parties fully briefed the venue issues. Moreover, the Court notes that as recently as June 1994, defendants raised these same venue issues. *See* Defendants' Contentions of Law and Fact Pursuant to Local Rule 9, ¶ 3. Thus, the Court has considered the parties' viewpoints and is justified in *sua sponte* revisiting Judge Tashima's ruling.

### II. Improper Venue

### A. *Waiver of Venue Challenge*

Pursuant to 28 U.S.C. § 1406(a), if a district court determines that venue is improper, it may "dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." In their motion, defendants contend that venue in California is improper and seek to have this case transferred to the Southern District of New York. Plaintiff responds that defendants' motion to transfer is untimely and that defendants have waived their right to challenge this case's venue.

Federal Rule of Civil Procedure 12(h)(1) provides, in pertinent part, that "[a] defense of ... improper venue ... is waived (A) if omitted from a motion in the circumstances described in [Federal Rule of Civil Procedure 12(g) ]." Rule 12(g) provides, in pertinent part, that "[i]f a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted." Engel points out that defendants did not raise a venue challenge in the motion to dismiss that they filed in March 1993, although defendants attempted to preserve their venue challenge in their answers. *See* Answer of CBS Inc. to the Second Amended Complaint for Malicious Prosecution (hereinafter "CBS' Answer"), ¶¶ 37, 38; Answer of Moses & Singer and Stanley Rothenberg to the Second Amended Complaint for Malicious Prosecution (hereinafter "Moses & Singer and Rothenberg's Answer"), ¶¶ 37, 38. Nevertheless, plaintiff contends that defendants waived their right to challenge venue by omitting a challenge from their motion to dismiss.

Defendants cannot be faulted for not having raised a defense that they did not know was available to them, however. In *Holzsager v. Valley Hospital,* 646 F.2d 792, 796 (2d Cir.1981), the court held that "a party cannot be deemed to have waived objections or defenses which were not known to be available at the time they could first have been made, es-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

pecially when it does raise the objections as soon as their cognizability is made apparent."

As discussed in more detail below, the issue of improper venue in this case revolves around the 1990 and 1992 amendments to the venue statute, 28 U.S.C. § 1391(a). Under the current statute, venue is not proper in the district where all plaintiffs reside, as it was when Engel filed this case in 1985. If the amended statute applies to this case, then venue is not proper in California on the basis that Engel is a resident of California. Thus, the Court must determine whether the amended statute applies retroactively. If the amended statute does apply retroactively, the Court must determine when defendants should have been aware of this application. If their awareness should be traced to a period prior to the filing of their motion to dismiss, then the Court may find that defendants should have raised the issue of improper venue in that motion. Because they did not, the Court could find that defendants waived their right to challenge venue. On the other hand, if the Court finds that defendants should not have been aware of this application until after they filed their motion to dismiss, then the Court may find, as the *Holzsager* court did, that "[t]he clairvoyance demanded by [defendants] ... is inconsistent with the doctrine of waiver." *Holzsager,* 646 F.2d at 796. Defendants would not have waived their right to challenge venue. Therefore, the Court will now address the retroactivity of the amendments.

**\*731 B.** *Retroactivity of Venue Amendments*

The D.C. Circuit has held that the venue amendments should be applied retroactively. *See Moore v. Agency for Int'l Development,* 994 F.2d 874 (D.C.Cir.1993). In *Moore,* the court distinguished between two lines of decisions addressing retroactivity. The line of cases following from *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), holds that changes in substantive law should not be applied retroactively. In contrast, the line of cases following from *Brad-*

*ley v. Richmond School Bd.,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), holds that changes in procedural law should be applied retroactively. *See Moore,* 994 F.2d at 878. Because the venue statute is a procedural statute, the court applied the *Bradley* line of cases and found that the venue amendments apply retroactively. *Id.* at 879.

[1] Similarly, in this case, the Court finds that the amended venue statute applies retroactively. Although the *Bradley* line of cases holds that changes to a procedural law should not be applied retroactively if a "manifest injustice" results, *see Bradley,* 416 U.S. at 711, 94 S.Ct. at 2016, the Court finds that no manifest injustice would result from applying the amended statute in this case. As discussed in more detail below, the amended statute provides plaintiff with an acceptable and appropriate forum for this litigation.

[2] Plaintiff cites *Paradis v. Dooley,* 774 F.Supp. 79 (D.R.I.1991), to support its contention that the venue amendments should not be applied retroactively. In that case, the court cursorily rejected an argument to apply the amended venue statute retroactively. *Id.* at 81. The court did not discuss the two lines of retroactivity cases. Moreover, the court found that venue would be proper in Rhode Island under both the old venue statute and the amended venue statute. *Id.* Based on the court's lack of analysis, this Court finds that *Moore's* approach to the retroactive application of the amended statute is more well-reasoned, and thus, more persuasive. Therefore, the Court finds that the amended statute applies retroactively.

The Court must now determine when defendants should have been aware of the retroactive application of the amended statute. *Moore* was decided June 15, 1993. *Moore,* 994 F.2d at 874. Defendants' motion to dismiss was filed in March 1993. Thus, at the time defendants filed their motion to dismiss, they did not have the *Moore* case to rely upon to challenge this case's venue in California.

Plaintiff points out, however, that there were three

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

886 F.Supp. 728
886 F.Supp. 728

Page 5

district court opinions issued prior to *Moore* that reached the same conclusion as to the retroactivity of the amended statute. These cases were cited in *Moore, see id.* at 879, and include *I DI Technologies v. Price,* 781 F.Supp. 85, 92-95 (D.N.H.1991), *Merchants Nat'l Bank v. Safrabank,* 776 F.Supp. 538, 540 (D.Kan.1991), and *L.P. v. A-1 Int'l Importing Enters., Ltd.,* 757 F.Supp. 545, 557 n. 18 (E.D.Pa.1991). The Court is not willing to hold that these three district court opinions should have made defendants aware of the retroactive application of the amended statute. While persuasive, these non-Ninth Circuit district court opinions were not binding on defendants, and they were contradicted by cases such as *Paradis* where the court rejected the retroactive application of the amended statute. *Moore* was the first Circuit opinion to uphold the retroactive application. Even though D.C. Circuit case law is not binding on courts in this Circuit, it is more persuasive than three random district court opinions. Therefore, the Court finds that the *Moore* opinion was the first opinion to put defendants on notice of the retroactive application of the amended venue statute. Defendants did not waive their right to challenge this case's venue in California. Their motion to transfer was instead timely filed.

### C. Proper Venue in New York

[3] The Court may now consider the merits of the venue challenge. The Court finds that venue in California is improper, and therefore, that the Court may transfer the action to the Southern District of New York.

When this action was filed in 1985, the venue statute provided that venue in a diversity*732 case was proper "where all plaintiffs or all defendants reside, or in which the claim arose." 28 U.S.C. § 1391(a) (1976). Because Engel resides in California, venue was proper in California at that time. In 1990 and 1992, however, the statute was amended, and the provision for venue in a district where all plaintiffs reside was removed from the statute. The statute currently provides, in pertinent part, that venue in a

diversity case is proper "in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, ... or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought." 28 U.S.C. § 1391(a).

The amended statute establishes that venue is proper in New York, not California. CBS, Moses & Singer, and Rothenberg all reside in New York. *See* Second Amended Complaint for Malicious Prosecution and *Prima Facie* Tort and Demand for Jury Trial (hereinafter "Second Amended Complaint"), ¶¶ 4, 5, 6; CBS' Answer, ¶ 4; Moses & Singer and Rothenberg's Answer, ¶¶ 5, 6. More specifically, they all reside in the Southern District of New York, and thus, venue in the Southern District of New York is proper pursuant to 28 U.S.C. § 1391(a)(1). Even under the old statute, venue was proper in the Southern District of New York.

Venue in the Southern District of New York is also proper pursuant to 28 U.S.C. § 1391(a)(2). CBS pursued the underlying action upon which this malicious prosecution is based in the Southern District of New York. Moreover, as the Ninth Circuit noted, the contract with CBS at issue in that litigation was a New York contract governed by New York law. Engel is licensed to practice in New York and represented another defendant in the underlying New York action. *See* Declaration of Donald S. Engel in Support of Memorandum of Points and Authorities in Opposition to Defendants' Motion to Transfer to the Southern District of New York for Improper Venue, or, to Transfer for Convenience (hereinafter "Engel Declaration"), ¶ 2. Thus, venue in the Southern District of New York also satisfies the requirements of 28 U.S.C. § 1391(a)(2). Because the Court has found venue to be proper in that district, it is unnecessary to analyze venue in that district pursuant to 28 U.S.C. § 1391(a)(3). The Court recognizes, however, that defendants are all subject

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

886 F.Supp. 728
886 F.Supp. 728

Page 6

to personal jurisdiction in the Southern District of New York, thereby rendering venue proper under that provision of the statute.

Plaintiff argues that venue is also proper in California pursuant to 28 U.S.C. § 1391(a)(2). According to plaintiff, CBS initiated the underlying action in New York because plaintiff was involved in contract negotiations with other record companies out of his office in California. Moreover, Engel, in pleading "heightened injury," has alleged that the New York lawsuit injured his California personal and property rights. *See* Second Amended Complaint, ¶¶ 27, 28. The Court does not find, however, that Engel's California contract negotiations and his alleged heightened injury constitute "a substantial part of the events or omissions giving rise to the claim." 28 U.S.C. § 1391(a)(2). The events giving rise to the claim for malicious prosecution involve the filing and handling of the New York lawsuit, a series of events occurring solely in New York. Thus, the Court finds that venue in California is not proper pursuant to 28 U.S.C. § 1391(a)(2). Therefore, the Court may transfer this action to the Southern District of New York pursuant to 28 U.S.C. § 1406(a).

III. *Forum Non Conveniens*

[4] The Court may also transfer this action to the Southern District of New York pursuant to 28 U.S.C. § 1404(a). Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The Court has already found that this action could have been brought in the Southern District of New York.

There is no question that venue in the Southern District of New York is more convenient*733 for defendants. The three defendants reside in New York, and defendants have alleged that most of their witnesses reside in New York. The underlying lawsuit, which this Court has already found is the substan-

tial event giving rise to the claim, occurred in New York. Moreover, the Ninth Circuit has ruled that New York law governs this action. The United States Supreme Court has held that "[t]here is an appropriateness ... in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems ... in law foreign to itself." *Van Dusen v. Barrack,* 376 U.S. 612, 645, 84 S.Ct. 805, 824, 11 L.Ed.2d 945 (1964) (citation omitted). Thus, a court in New York is in a considerably better position to handle this case, particularly because "heightened injury," a legally complex issue of New York law, is involved.

From plaintiff's perspective, New York is not an inconvenient forum. Engel is licensed to practice in New York and maintains an office there. *See* Engel Declaration, ¶¶ 2, 4. As is evident from the underlying facts of this case, Engel has considerable experience litigating in New York and is no stranger to the Southern District of New York. Moreover, plaintiff has failed to demonstrate that the majority of his witnesses reside in California nor that the transfer of relevant documents from California to New York would be unduly burdensome. Although this case was filed ten years ago in California, it was stayed for several years and only seriously became active in 1991. Moreover, the Ninth Circuit did not rule that New York law applied until 1993. Thus, the arguments in favor of transferring the case to New York became significantly stronger only in the last two years, and defendants should not be penalized for having brought a motion to transfer at this stage of the proceedings.

This case does not have strong roots in California, and the Court finds that New York provides a more convenient forum for this litigation. Therefore, the Court transfers this case to the Southern District of New York pursuant to 28 U.S.C. § 1404(a) as well.

IV. *Conclusion*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

886 F.Supp. 728
886 F.Supp. 728

Page 7

The Court grants defendants' motion to transfer
venue. Pursuant to both 28 U.S.C. § 1406(a) and 28
U.S.C. § 1404(a), the Court finds that venue is
proper in New York, not California. Therefore, the
Court hereby transfers this action for all further
proceedings to the United States District Court for
the Southern District of New York.

**IT IS SO ORDERED.**

C.D.Cal.,1995.
Engel v. CBS, Inc.
886 F.Supp. 728

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

724 F.Supp. 1580
724 F.Supp. 1580

Page 1

▷
Catalano v. BRI, Inc.
E.D.Mich.,1989.

United States District Court, E.D. Michigan, South-
ern Division.
Michael CATALANO and Angela Catalano,
Plaintiffs,
v.
BRI, INC. d/b/a El Rancho Hotel & Casino, and
American Airlines, d/b/a American Airlines Tours,
Jointly and Severally, Defendants.
**No. 89-CV-70832-DT.**

Aug. 21, 1989.

Michigan resident brought action against Las Vegas
hotel owner and airline to recover for personal in-
juries incurred while staying at hotel. On motions
to dismiss for lack of personal jurisdiction and for
change of venue or transfer, the District Court, Za-
tkoff, J., held that: (1) hotel had sufficient minim-
um contacts with Michigan to be subject to person-
al jurisdiction in Michigan under Michigan long-
arm statute, and (2) transfer of venue from
Michigan to Nevada was not warranted.

Motions denied.

West Headnotes

**[1] Federal Courts 170B ⟜82**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk77 Corporations, Actions by or
Against
                170Bk82 k. Agent Within District;
Parent and Subsidiary. Most Cited Cases
Las Vegas hotel had sufficient minimum contacts
with Michigan to be subject to personal jurisdiction
in Michigan under Michigan long-arm statute in ac-
tion arising when Michigan resident was struck by
falling ceiling plaster while staying at hotel; hotel

retained airline to act as its agent to reserve travel
packages which included rooms at hotel, and knew
or should have known that airline would conduct
business in Michigan. M.C.L.A. § 600.715(1);
U.S.C.A. Const.Amends. 5, 14.

**[2] Federal Courts 170B ⟜79**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk77 Corporations, Actions by or
Against
                170Bk79 k. Corporate Activities and
Contacts Within District; Doing Business in Gener-
al. Most Cited Cases
Michigan resident's injuries in Las Vegas hotel oc-
curring when ceiling plaster fell on him arose from
a Michigan transaction for purposes of Michigan's
long-arm statute; resident paid for and reserved
room in Michigan and would not have been in posi-
tion to have been injured if not for that transaction.
M.C.L.A. § 600.715(1); U.S.C.A. Const.Amends. 5,
14.

**[3] Constitutional Law 92 ⟜3965(5)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(E) Civil Actions and Proceedings
            92k3961 Jurisdiction and Venue
                92k3965 Particular Parties or Circum-
stances
                    92k3965(5) k. Services and Service
Providers. Most Cited Cases
    (Formerly 92k305(6))
Exercising personal jurisdiction over Las Vegas
hotel in Michigan personal injury action arising
when Michigan resident was struck by falling ceil-
ing plaster while staying at hotel did not violate due
process; hotel had set aside up to 30 rooms per
week to be sold by airline that regularly serviced
flights to and from Michigan and set rooms aside in
effort to sell rooms to persons who would not other-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

724 F.Supp. 1580
724 F.Supp. 1580

Page 2

wise have stayed at hotel. M.C.L.A. § 600.715(1); U.S.C.A. Const.Amends. 5, 14.

**[4] Federal Courts 170B ☞101**

170B Federal Courts
    170BII Venue
        170BII(B) Change of Venue
           170BII(B)1 In General; Venue Laid in Proper Forum
                170Bk101 k. In General; Convenience and Interest of Justice. Most Cited Cases
Failure to consolidate motion to dismiss for improper venue with motion to dismiss for lack of personal jurisdiction did not preclude district court from transferring venue based upon convenience of parties and witnesses. 28 U.S.C.A. § 1404; Fed.Rules Civ.Proc.Rule 12(g, h), 28 U.S.C.A.

**[5] Federal Courts 170B ☞113**

170B Federal Courts
    170BII Venue
        170BII(B) Change of Venue
           170BII(B)1 In General; Venue Laid in Proper Forum
                170Bk106 Determination in Particular Transferable Actions
                    170Bk113 k. Torts in General. Most Cited Cases
Transfer of venue from Michigan to Nevada was not warranted in personal injury action arising when Michigan resident was struck by falling ceiling plaster while staying in Las Vegas hotel, despite presence of numerous witnesses in Nevada; although testimony of repair personnel, architect and contractor who renovated hotel would be material to action, it would have been no more material than testimony of plaintiff and plaintiff's treating physician. 28 U.S.C.A. § 1404(a).

**\*1580** Michael H. Perry, and Mark R. Fox, Fraser Trebilcock Davis & Foster, P.C., Lansing, Mich., for plaintiffs.
Edward D. Plato, Farmington Hills, Mich., for defendant BRI, Inc., d/b/a El Rancho Hotel & Casino.

William L. Kiriazis, Detroit, Mich., for defendant American Airlines.

**\*1581** MEMORANDUM OPINION AND ORDER

ZATKOFF, District Judge.
Plaintiffs bring this tort action for injuries sustained while guests at defendant BRI, Inc.'s hotel (hereafter El Rancho). Plaintiffs purchased, from defendant American Airlines, a travel package to Las Vegas, Nevada, which included air and hotel accommodations and a rental car. American Airlines originally promised plaintiffs a room at the Tropicana Hotel. Subsequent to reserving the travel package, plaintiffs were informed there was no room available for them at the Tropicana but that plaintiffs could stay at the El Rancho. Plaintiffs went to Las Vegas to be married. Two hours before their scheduled wedding, plaintiff Michael Catalano was laying in the bathtub of his El Rancho hotel room when the ceiling plaster collapsed upon him, thereby causing plaintiffs' injury.

Three motions are currently before the Court: (1) defendant El Rancho's motion to dismiss for lack of personal jurisdiction; (2) defendant El Rancho's motion to join in a motion for change of venue or transfer; (3) defendant American Airline's motion for change of venue or transfer. The parties have responded to the above referenced motions. In addition, the Court has entertained oral argument. Pursuant to this Court's Order, the parties have supplemented their arguments with affidavits to support factual assertions made during oral argument. Having read the briefs and affidavits and also having considered the arguments made in open court, the Court is prepared to rule upon these motions. Each motion is addressed separately.

## I. BRI'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

This Court's jurisdiction over this matter is based upon diversity of citizenship. Thus, the determination of whether BRI is subject to personal jurisdic-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

724 F.Supp. 1580
724 F.Supp. 1580

Page 3

tion is governed by Michigan law. *Erie v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

The Michigan long-arm statute provides that personal jurisdiction exists over any party that "transacts any business within the state." M.C.L. § 600.715(1). The Sixth Circuit recently interpreted the meaning of the Michigan long-arm statute in *Lanier v. Am. Bd. of Endodontics*, 843 F.2d 901 (6th Cir.1988). The *Lanier* Court found two requirements to finding personal jurisdiction under the long-arm statute: (1) the transaction of any business in Michigan; and (2) that the cause of action "arose out of" the business transacted in Michigan. In addition, the *Lanier* Court noted that a finding of personal jurisdiction under the Michigan long-arm statute cannot violate the due process requirement that the defendant have minimum contacts with the forum state. Minimum contacts are established when defendant's contact with the forum state make it reasonable to subject the defendant to trial there. *E.g. Kulko v. Superior Court*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978).

A. *Have Plaintiffs Satisfied the Requirements of Michigan's Long-Arm Statute?*

1. Has the El Rancho transacted any business in Michigan?

[1] The Michigan Supreme Court has stated that the long-arm statute requires the transaction of *any* business. "The word 'any' means just what it says. It includes 'each' and 'every.' It comprehends the 'slightest.' " *Sifers v. Horen*, 385 Mich. 195, 188 N.W.2d 623 (1971). Relying on this language the *Lanier* Court held that:

if [a] defendant conducted even the slightest act of business in Michigan, the first statutory criterion for personal jurisdiction under [the Michigan long-arm statute] is satisfied.

*Lanier*, 843 F.2d at 906.

In the instant case, plaintiffs submit that they paid for their trip, including hotel accommodations, in Michigan and that American Airlines acted as an agent for defendant El Rancho by collecting for the hotel accommodations in advance in Michigan.*1582 Thus, plaintiffs conclude, the El Rancho transacted business in Michigan.

Defendant El Rancho responds that it did not advertise or avail itself in Michigan, as evidenced by the fact that plaintiffs believed they were purchasing a room at the Tropicana Hotel. The El Rancho submits it merely informed American Airlines that it had a room available for plaintiffs, in response to which, American Airlines purchased the room.

The *Lanier* definition of "transacting business" is very liberal. If American Airlines acted as an agent for the El Rancho, there is no question but that the El Rancho transacted business in Michigan. Conversely, if American Airlines overbooked the rooms it had available at the Tropicana and, in an effort to keep its customers satisfied, merely picked up the telephone and reserved and paid for a room at the El Rancho on behalf of plaintiffs, the El Rancho cannot be found to have transacted business in Michigan.[FN1]

> FN1. The question of whether the El Rancho transacted business in Michigan turns on whether American Airlines was acting as an agent for the El Rancho or for the plaintiffs. If the El Rancho had a pre-arranged program giving American Airlines authority to reserve rooms, then, without question, American Airlines would be an agent for the El Rancho. El Rancho would transact business in Michigan whenever American Airlines solicited in Michigan a sale of a room for the El Rancho. Conversely, if there was no pre-existing relationship between American Airlines and the El Rancho, and American, on its own initiative, contacted the reservation desk at the El Rancho and reserved a room and subsequently paid for a room all

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

724 F.Supp. 1580
724 F.Supp. 1580

on behalf of the plaintiffs, then American would be found to have transacted business in Nevada, on behalf of plaintiffs. Although the distinction is fine, it turns upon whether the El Rancho actively sought business beyond the Nevada border. Thus, traditional notions of fair play and the question of whether the defendant purposely availed itself to another jurisdiction factor into whether a defendant transacted business in the forum state. *Cf. Burger King v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

The affidavit submitted by John Snyder, manager of sales development for American Airlines, undoubtedly establishes that American Airlines acted as an agent on behalf of the El Rancho. The El Rancho and American Airlines had a contractual agreement wherein the El Rancho reserved 30 mid-week rooms and 20 weekend rooms for American Airlines to use in preparing tour packages. American Airlines prepared land/air accommodation packages in four cities, none of which are located in Michigan. American Airlines does, however, maintain sales offices within Michigan that may reserve travel packages which include rooms at the El Rancho Hotel. Such reservations may be made in Michigan, on behalf of Michigan residents.

Given the fact that the El Rancho purposely retained American Airlines to act as its agent, and further considering that the El Rancho knew, or should have known, that their agent would conduct business in Michigan, this Court finds that when plaintiff reserved and paid American Airlines for his travel package in the State of Michigan, defendant El Rancho was transacting business in Michigan.

### 2. Did the cause of action arise from the business transacted in Michigan?

[2] Having found that the El Rancho transacted business in Michigan, there is no question but that

the cause of action arose out of the business transaction. The Sixth Circuit has held that a claim "arises from" a transaction if it was made possible by the transaction. *In-Flight Devices Corp. v. Van Dusen Air, Inc.,* 466 F.2d 220, 231 (6th Cir.1972); *See also Lanier,* 843 F.2d at 909. Clearly, the cause of action alleged by plaintiffs arose from and was made possible by the transaction of business by El Rancho. But for reserving and paying for a room at the El Rancho, plaintiff would not have been in a position to have been injured.

### B. *Have Plaintiffs Satisfied the Requirements of Due Process: Minimum Contacts*

[3] The due process requirements of personal jurisdiction were recently discussed by the Supreme Court in *Burger King v. Rudzewicz,* 471 U.S. 462, 471-72, 105 S.Ct. 2174, 2181-82, 85 L.Ed.2d 528 (1985):

> **\*1583** [T]he due process clause protects an individual's liberty interest by requiring that the court exercise jurisdiction only over defendants with "contacts, ties, or relations" with the forum state sufficient to provide them with fair warning their activities may subject them to suit there. This "fair warning" requirement has been met when a defendant 'purposefully directed" his activities at residents of the forum....

Applying the *Burger King* standard to this case, the Court finds the El Rancho purposely directed its activities at Michigan residents and had fair warning that it would be subject to suit in this jurisdiction. The El Rancho set aside up to 30 rooms per week to be sold by American Airlines, a national air carrier that regularly services flights to and from Michigan. The El Rancho set these rooms aside in an effort to sell rooms to persons who would not otherwise stay at the El Rancho. Without question, the El Rancho gave American Airlines authority to act as its agent for the purpose of selling El Rancho hotel rooms to persons located in any area serviced by American Airlines.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

724 F.Supp. 1580
724 F.Supp. 1580

Page 5

For all the above stated reasons, this Court finds that defendant El Rancho Hotel is subject to this Court's jurisdiction pursuant to the Michigan long-arm statute. The Court further finds that due process is not offended by subjecting defendant El Rancho Hotel to a trial in this forum. Accordingly, the El Rancho's Motion to dismiss for lack of personal jurisdiction is DENIED.

## II. DEFENDANT EL RANCHO'S MOTION TO JOIN IN AMERICAN AIRLINES' MOTION FOR CHANGE OF VENUE OR TRANSFER PURSUANT TO 28 U.S.C. § 1404

[4] American Airlines concedes personal jurisdiction and, alternatively moves for a change of venue or transfer pursuant to 28 U.S.C. § 1404. Defendant El Rancho has moved to join in the motion for change of venue or transfer. Plaintiffs submit the El Rancho cannot join in the motion because it waived its right to a change of venue by not bringing it in their first motion. Rule 12(g) requires that motions for dismissal for improper venue and for dismissal for lack of personal jurisdiction be brought together. Failure to consolidate these motions results in a waiver of any subsequent right for dismissal due to improper venue or for lack of personal jurisdiction. Rule 12(h).

The Court may, however, find venue proper and nonetheless transfer a case based upon convenience of the parties and witnesses, 28 U.S.C. § 1404. Rule 12(g) makes no mention of a waiver of transfer based upon convenience of the parties and witnesses. The consolidation requirement of Rule 12(g) refers only to motions to dismiss for improper venue. Finding no procedural bar to preclude the El Rancho from joining in the motion to transfer, the Court GRANTS the El Rancho's motion.

## III. Defendants' Motion for Change of Venue or Transfer

[5] A transfer is warranted:

[f]or the convenience of parties and witnesses, in the interest of justice....

28 U.S.C. § 1404(a). The purposes of this statute are: (1) the prevention of waste of time, energy and money; and (2) to protect the litigants, witnesses and public against unnecessary inconvenience and expense. *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). Unless the balance of conveniences is strongly in favor of the defendants, plaintiffs' choice of forum should not be disturbed. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

A. *Conveniences of the Witnesses*

Defendants submit the only witnesses to the case who reside in Michigan are: plaintiffs; the American Airlines ticket agent who sold the package; and the physicians who treated plaintiff in Michigan. By contrast, defendants anticipate calling the following witnesses:

(1) The manager of the El Rancho;

(2) staff employees/cleaning personnel of the El Rancho;

**\*1584** (3) architects and contractors who performed work on the recent rennovation and repair of the hotel;

(4) maintenance and service employees of the hotel;

(5) the persons who repaired the ceiling following the accident;

(6) Las Vegas city inspectors who inspected the room where plaintiff was injured;

(7) emergency medical ambulance and hospital personnel who treated plaintiff.

All of the above witnesses reside in Nevada.

The number of prospective witnesses should not de-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

724 F.Supp. 1580
724 F.Supp. 1580

Page 6

termine whether a transfer is appropriate; rather, the materiality of the anticipated testimony should be considered. *Raymond E. Danto, Associates, Inc., v. Arthur D. Little, Inc.,* 316 F.Supp. 1350, 1357-58 (E.D.Mich.1970). Testimony via de benne esse deposition of any or all witnesses may be offered to the jury. Justice is best served, however, when the jury is permitted to view the most material witnesses. The jury may effectively assess the demeanor of witnesses only when they observe them on the witness stand and listen to their voices as they answer questions posed to them.

With this in mind, the Court notes that the majority of persons on defendants' list of witnesses shall offer testimony which is no more material than the testimony offered by the witnesses residing in Michigan. Although the testimony of repair personnel and the architect and contractor who renovated the hotel will be material, it will be no more material than the testimony of plaintiffs and plaintiff's treating physician. Considering all of the witnesses and their anticipated testimony, this Court does not find that the balancing of conveniences weighs substantially in favor of defendants.[FN2] Accordingly, defendants' motion for a 28 U.S.C. § 1404(a) transfer is DENIED.

> FN2. Defendants also argue that a view of the room is necessary for the jury to properly evaluate this case. Defendants' argument totally lacks any support and is rejected. Defendants also submit transfer is necessary because all supporting documentation is in Nevada. All documents, however, may easily be brought to Michigan for purposes of trial.

### CONCLUSION

For the reasons stated herein, the Court hereby DENIES defendant El Rancho's motion to dismiss; the Court further GRANTS El Rancho's motion to join in American Airlines' motion for change of venue or transfer, but DENIES defendants' motion for change of venue or transfer.

IT IS SO ORDERED.

E.D.Mich.,1989.
Catalano v. BRI, Inc.
724 F.Supp. 1580

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

421 F.3d 216                                                                                              Page 1
421 F.3d 216

C
Garcia v. Plaza Oldsmobile Ltd.
C.A.3 (Pa.),2005.

United States Court of Appeals,Third Circuit.
Rudolfo GARCIA; Maritza A. Espinal-Garcia
v.
PLAZA OLDSMOBILE LTD., d/b/a Plaza Toyota;
Toyota Motor North America, Inc.; Toyota Motor
Sales, U.S.A., Inc.; Toyota Motor Credit Corpora-
tion; Timothy Gladney Plaza Oldsmobile, Ltd, d/b/a
Plaza Toyota, Appellant.
**No. 04-4332.**

Argued July 12, 2005.
Sept. 2, 2005.

**Background:** Pennsylvania driver who was in-
jured in motor vehicle accident in Pennsylvania
brought diversity action against New York driver
and New York company that rented automobile to
New York driver. Pennsylvania driver's wife asser-
ted claim for loss of consortium. Parties filed cross
motions for partial summary judgment on issue of
which state's law would apply. The United States
District Court for the Middle District of
Pennsylvania, Richard P. Conaboy, J., granted
plaintiff's motion to apply New York law and gran-
ted certification of order for appeal.

**Holding:** After granting company's petition for
permission to appeal, the Court of Appeals, Green-
berg, Circuit Judge, held that as matter of first im-
pression, New York law applied, as alleged conflict
between Pennsylvania and New York law was
"false conflict."

Affirmed and remanded.

West Headnotes

**[1] Federal Courts 170B ☞763.1**

170B Federal Courts
    170BVIII Courts of Appeals

170BVIII(K) Scope, Standards, and Extent
    170BVIII(K)1 In General
        170Bk763 Extent of Review Depend-
ent on Nature of Decision Appealed from
            170Bk763.1 k. In General. Most
Cited Cases
Court of Appeals would exercise plenary review
over choice-of-law question in action seeking re-
covery for injuries sustained in automobile acci- dent.

**[2] Federal Courts 170B ☞409.1**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk409 Conflict of Laws
                170Bk409.1 k. In General. Most Cited
Cases
In a diversity of citizenship action, Court of Ap-
peals determines which state's substantive law gov-
erns by applying the choice-of-law rules of the jur-
isdiction in which the district court sits.

**[3] Action 13 ☞17**

13 Action
    13II Nature and Form
        13k17 k. What Law Governs. Most Cited
Cases
Under Pennsylvania choice-of-law analysis, before
assessing the governmental interests of the jurisdic-
tions whose law may control and examining their
contacts with the dispute, court must determine
what type of conflict, if any, exists between the
purported competing bodies of law; court begins
with an interest analysis of the policies of all inter-
ested states and then, based on the result of that
analysis, determines whether the case involves a
true or false conflict or whether it is unprovided for.

**[4] Action 13 ☞17**

13 Action

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

13II Nature and Form
    13k17 k. What Law Governs. Most Cited
Cases
Under Pennsylvania choice-of-law analysis, there is
a "true conflict" between the laws of multiple
states, as would call for application of the law of
the state having the most significant contacts or re-
lationships with the particular issue, when the gov-
ernmental interests of both jurisdictions would be
impaired if their law were not applied.

[5] Action 13 🔗17

13 Action
    13II Nature and Form
    13k17 k. What Law Governs. Most Cited
Cases
Under Pennsylvania choice-of-law analysis, there is
a "false conflict" between the laws of multiple
states if only one jurisdiction's governmental in-
terests would be impaired by the application of the
other jurisdiction's law, and, if false conflict exists,
court applies the law of the only interested jurisdic-
tion.

[6] Action 13 🔗17

13 Action
    13II Nature and Form
    13k17 k. What Law Governs. Most Cited
Cases

Torts 379 🔗103

379 Torts
    379I In General
    379k103 k. What Law Governs. Most Cited
Cases
Under Pennsylvania choice-of-law analysis, un-
provided-for cases are those in which neither poten-
tially interested jurisdiction's interests would be im-
paired if its laws are not applied, and, under prin-
ciple of "lex loci delicti," the law of the place of the
wrong supplies the substantive law to be applied in
such cases.

[7] Automobiles 48A 🔗192(1)

48A Automobiles
    48AV Injuries from Operation, or Use of High-
way
        48AV(A) Nature and Grounds of Liability
            48Ak183 Persons Liable
                48Ak192 Owner's Liability for Acts of
Third Person in General
                    48Ak192(1) k. In General. Most
Cited Cases
Under New York law, provision of New York's
Vehicle and Traffic Law stating that owners of
vehicles used or operated in that state would be li-
able and responsible for death or injuries resulting
from negligence in use or operation of such
vehicles by authorized users has extraterritorial ap-
plication. N.Y.McKinney's Vehicle and Traffic Law
§ 388(1).

[8] Automobiles 48A 🔗229.5

48A Automobiles
    48AV Injuries from Operation, or Use of High-
way
        48AV(B) Actions
            48Ak229.5 k. What Law Governs. Most
Cited Cases

Automobiles 48A 🔗391

48A Automobiles
    48AVIII Garage Keepers, Repairmen, Auto Liv-
erymen, and Filling Stations
        48Ak386 Renting Out of Vehicle by Auto
Liverymen
            48Ak391 k. Injuries to Third Persons.
Most Cited Cases
Alleged conflict between New York law, which im-
posed vicarious liability on vehicle owners for neg-
ligence of authorized vehicle users, without regard
to whether owner by its negligence contributed to
the accident at issue, and Pennsylvania law, which
did not permit such liability, was "false conflict,"
and thus, under Pennsylvania choice-of-law analys-
is, law of New York, the only interested jurisdic-
tion, would apply to Pennsylvania driver's action,
for injuries arising from accident, against New

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

421 F.3d 216
421 F.3d 216

York driver and New York automobile rental company; New York's interest in protecting persons injured by New York vehicles would be impaired by application of Pennsylvania law, while application of New York law would not undermine Pennsylvania's interest in providing for recovery of Pennsylvania citizen. N.Y.McKinney's Vehicle and Traffic Law § 388(1).

West Codenotes
Validity Called into DoubtMcKinney's Vehicle and Traffic Law § 388(1)
**\*218** Andrew D. Bigda (argued), Rosenn, Jenkins and Greenwald, Wilkes-Barre, PA, for Appellees.
John J. McGrath (argued), McKissock & Hoffman, Haddonfield, N.J., for Appellant.

Before ALITO, BECKER, and GREENBERG, Circuit Judges.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. FACTUAL AND PROCEDURAL HISTORY

This appeal requires us to answer a conflicts-of-laws question. The case arises from a motor vehicle accident in Pennsylvania on February 25, 2002, involving plaintiff-appellee Rodolfo Garcia (hereinafter "Garcia"), a Pennsylvania citizen, and defendant Timothy Gladney (hereinafter "Gladney"), a New York citizen and New York licensed driver. Garcia was driving a Dodge truck registered and insured in Pennsylvania. Gladney was driving a Toyota automobile that he had rented earlier that day in Brooklyn, New York, from defendant-appellant Plaza Oldsmobile (hereinafter "Plaza"), a New York corporation with its principal place of business in that state. Garcia alleged that he suffered permanent and disabling injuries as a result of the accident and that Plaza, as owner of the vehicle, was liable to him for his injuries. Consequently, he brought this diversity of citizenship action, in which the district court had jurisdiction

under 28 U.S.C. § 1332, against Gladney and Plaza as well as certain other defendants not involved in this appeal.[FN1] Garcia's wife, plaintiff-appellee Maritza Espinal-Garcia, has joined in the action asserting a claim for loss of consortium but as a matter of convenience we will refer to Garcia as the plaintiff-appellee in the singular. As of the time that Plaza filed this appeal, there had not been a trial on liability for the accident, even as between Garcia and Gladney, and damages had not been determined, and, as far as we are aware, there still has not been a trial in the district court.

> FN1. Pursuant to a stipulation among the parties, the claims against all defendants except Plaza and Gladney were dismissed voluntarily.

In the district court, Plaza and Garcia filed cross motions for partial summary judgment seeking a determination of whether the court should ascertain Plaza's potential liability by application of Pennsylvania's common law or section 388(1) of New York's Vehicle and Traffic Law.The distinction is likely to be critical because under Pennsylvania common law, which is predicated on traditional agency principles, regardless of Gladney's culpability Plaza could not be liable to Garcia whereas, under New York law, if Gladney is determined to be liable to Garcia, Plaza also would be liable to him as New York imposes vicarious liability on a vehicle owner for injuries arising from the negligence of anyone using or operating its vehicle with permission.[FN2] *Compare Fried v. Seippel,* 80 N.Y.2d 32, 587 N.Y.S.2d 247, 599 N.E.2d 651 (1992), *with Ferry v. Fisher,* 709 A.2d 399 (1998).[FN3] As would be expected, Garcia asserted that New York statutory law applied**\*219** whereas Plaza contended that Pennsylvania common law applied. Surprisingly, the parties have not been able to direct our attention to any published opinion of any state or federal court in Pennsylvania directly addressing the conflicts-of-laws issue here.[FN4] The district court concluded that there was a false conflict between New York and Pennsylvania law, and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

that New York law applied and thus on June 4, 2004, granted Garcia's motion insofar as he requested the court to apply New York law. We will explain below what circumstances give rise to a false conflict.

> FN2. Actually we are assuming in this opinion that Plaza would be liable to Garcia for Gladney's negligence under New York law but not under Pennsylvania law. Of course, in view of our result we will never know if this assumption is correct as Garcia will have no reason to attempt to establish that Plaza would be liable under Pennsylvania law which, from a plaintiff's point of view, is more onerous than New York law.

> FN3. Section 10208 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005, a provision of the recently enacted 2005 federal Transportation Equity Act, provides as follows:

>> (a) In General-An owner of a motor vehicle that rents or leases the vehicle to a person (or an affiliate of the owner) shall not be liable under the law of any State or political subdivision thereof, by reason of being the owner of the vehicle (or an affiliate of the owner), for harm to persons or property that results or arises out of the use, operation, or possession of the vehicle during the period of the rental or lease, if-

>> (1) the owner (or an affiliate of the owner) is engaged in the trade or business of renting or leasing motor vehicles; and

>> (2) there is no negligence or criminal wrongdoing on the part of the owner (or an affiliate of the owner).

> With respect to the effective date the act provides that:

>> (c) Applicability and Effective Date-Notwithstanding any other provision of law, this section shall apply with respect to any action commenced on or after the date of enactment of this section without regard to whether the harm that is the subject of the action, or the conduct that caused the harm, occurred before such date of enactment.

>> In view of the circumstance that the act does not have retroactive effect with respect to pending litigation it is not material on this appeal though undoubtedly the act prospectively largely will eliminate the circumstances in which section 388(1) will be applied.

> FN4. The district court noted that the "precise issue [in this case] has not been addressed by any state or federal court sitting in Pennsylvania." Op. at 1.

Plaza then moved for certification of the June 4, 2004 order pursuant to 28 U.S.C. § 1292(b) so that it could seek leave from this court to appeal from that order and it moved, in the alternative, for reconsideration of the order. By order dated August 17, 2004, the district court granted Plaza's motion for certification under 28 U.S.C. § 1292(b) but denied its motion for reconsideration. We granted Plaza's petition for permission to appeal on November 4, 2004.

## II. DISCUSSION

[1] As we have indicated the sole question presented on appeal is a narrow conflicts-of-law issue: whether the court should use Pennsylvania common law or New York's statutory law to determine if Plaza can be liable. We exercise plenary review over the choice of law question raised by this appeal. *See* *Simon v. United States,* 341 F.3d 193, 199 (3d Cir.2003); *Shuder v. McDonald's Corp.,* 859 F.2d 266, 269 (3d Cir.1988).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

421 F.3d 216
421 F.3d 216

[2] In a diversity of citizenship action, we determine which state's substantive law governs by applying the choice-of-law rules of the jurisdiction in which the district court sits, here Pennsylvania. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Petrella v. Kashlan,* 826 F.2d 1340, 1343 (3d Cir.1987); *Melville v. American Home Assur. Co.,* 584 F.2d 1306, 1308 (3d Cir.1978). *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964), is Pennsylvania's leading conflicts-of-laws case. In that case, the Pennsylvania Supreme Court abandoned the traditional *lex loci delicti* conflicts rule in which the law of the place of the wrong governed the substantive rights and liabilities of the parties and substituted "a more flexible rule *220 which permits analysis of the policies and interests underlying the particular issue before the court." *Id.* at 805. We have indicated that this methodology has evolved into a hybrid approach that "combines the approaches of both Restatement [Second] of Conflict of Laws] (contacts establishing significant relationships) and 'interest analysis' (qualitative appraisal of the relevant States' policies with respect to the controversy)." *Melville,* 584 F.2d at 1311.

[3] Under Pennsylvania law, before assessing the governmental interests of the jurisdictions whose law may control and examining their contacts with the dispute, we must determine what type of "conflict," if any, exists between the purported competing bodies of law. *SeeKuchinic v. McCrory,* 422 Pa. 620, 222 A.2d 897, 899-900 (1966). We begin with an "interest analysis" of the policies of all interested states and then-based on the result of that analysis-determine whether the case involves a true or false conflict or whether it is unprovided for. *Budget Rent-A-Car Sys., Inc. v. Chappell,* 407 F.3d 166, 169-70 (3d Cir.2005); *see alsoLeJeune v. Bliss-Salem, Inc.,* 85 F.3d 1069, 1071 (3d Cir.1996).

[4][5][6] There is a true conflict "when the governmental interests of *both* jurisdictions would be im-

paired if their law were not applied." *Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 187 & n. 15 (3d Cir.1991) (emphasis in original). If a case presents a true conflict, Pennsylvania choice-of-law rules "call for the application of the law of the state having the most significant contacts or relationships with the particular issue." *In re Estate of Agostini,* 311 Pa.Super. 233, 457 A.2d 861, 871 (1983). But there is a false conflict "if only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law." *Lacey,* 932 F.2d at 187. If there is a false conflict, we apply the law of the only interested jurisdiction. *See,e.g.,Kuchinic v. McCrory,* 222 A.2d at 899-900. Finally, there are unprovided-for cases in which neither jurisdiction's interests would be impaired if its laws are not applied.[FN5] The principle of *lex loci delicti,* the law of the place of the wrong, supplies the substantive law to be applied in unprovided-for cases. *SeeMiller v. Gay,* 323 Pa.Super. 466, 470 A.2d 1353, 1355-56 (1983).[FN6]

> FN5. While we use the term "neither" thus suggesting that, as here, only two jurisdictions can be involved, we are well aware that in some cases a court must choose among the law of multiple jurisdictions.

> FN6. Actually there is no conflict at all in cases of false conflict or in unprovided-for cases so that to be precise a court probably should refer to a "conflicts" question only when there is a true conflict and should refer to the other two situations as raising "choice" questions. We notice, however, that the courts do not seem to draw this distinction in their language usage and thus we, too, will not be concerned with this semantic distinction.

[7] In our conflicts-of-law analysis the first issue that we must address is whether New York's Vehicle and Traffic Law with respect to the issue at hand has extraterritorial application, and, accordingly, whether that law by its terms can be applied to determine liability for the Pennsylvania accident

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

421 F.3d 216
421 F.3d 216

Page 6

underlying this appeal. Section 388(1) of New York's Vehicle and Traffic Law provides that "[e]very owner of a vehicle used or operated in this state shall be liable and responsible for death or injuries ... resulting from negligence in the use or operation of such vehicle ... by any person using or operating the same with the permission, express or implied, of such owner." N.Y. Veh. & Traf. Law § 388(1) (McKinney 2002). As we noted above, the *221 statute imposes vicarious liability on vehicle owners for the negligence of anyone using or operating their vehicles with their permission, without regard to whether the owner by its negligence contributed to the accident.

Even though the wording of section 388(1) suggests that it could not apply to an accident without New York State as the section refers to vehicles "used or operated in this state," meaning New York, the New York Court of Appeals, the court of last resort in New York State, consistently has interpreted section 388(1) as having extraterritorial application.FN7 See e.g., Sentry Ins. Co. v. Amsel, 36 N.Y.2d 291, 367 N.Y.S.2d 480, 327 N.E.2d 635, 637 (1975); Farber v. Smolack, 20 N.Y.2d 198, 282 N.Y.S.2d 248, 229 N.E.2d 36, 38-39 (1967). Obviously those decisions settle that issue for us.

FN7. The Court of Appeals in Farber v. Smolack, 20 N.Y.2d 198, 282 N.Y.S.2d 248, 229 N.E.2d 36, 39 (1967), addressed the rationale behind the phrase's inclusion:

Nor should we place undue emphasis on the term to which reference has been made 'in this state' in the statute. It is clear that in adding the words 'in this state' to the predecessor of subdivision 1 of section 388 (§ 59) in 1958 (L.1958, ch. 577), the Legislature was not concerned with extraterritorial effect. It was substituting 'in this state' for the former words 'upon a public highway' in order to cover the situation of an accident on private roadways and parking lots (1958 Report of N.Y. Law Rev. Comm. [N.Y.

Legis. Doc., 1958, No. 65], pp. 589-590).

We recognized the extraterritorial application of the provision in Budget Rent-A-Car Sys., 407 F.3d at 170 ("[I]t is beyond dispute that § 388(1) has extraterritorial scope, that is, it can apply to accidents occurring beyond New York's borders.").

Moreover, the extraterritorial reach of the statute becomes evident when one looks to the manner in which the New York Legislature has meshed section 388 to its insurance laws. All owners of motor vehicles registered in New York State are required to carry at least the minimum insurance laid down by statute. N.Y. Veh. & Traf. Law §§ 311, 312 (McKinney 1996). Furthermore, that insurance must extend to claims arising out of the ownership, use, or operation of a vehicle "within the state of New York, or elsewhere in the United States in North America or the Dominion of Canada." N.Y. Veh. & Traf. Law § 311.4(a). The New York courts have interpreted this section to show a "commendable concern not only for residents of [New York], but residents of other States who may be injured as a result of the activities of New York residents." Tooker v. Lopez, 24 N.Y.2d 569, 301 N.Y.S.2d 519, 249 N.E.2d 394, 399 (1969).

The court in Fried, 80 N.Y.2d 32, 587 N.Y.S.2d 247, 599 N.E.2d 651, specifically addressed the scope of section 388 and held that "the provision applies unless the accident vehicle 'ha[s] never been registered, used, operated or intended for use within [New York.]' "Budget Rent-A-Car Sys., 407 F.3d at 174 (quoting Fried ) (emphasis in Budget Rent-A-Car Sys.). There is no dispute that the vehicle in the present matter was rented and driven in New York. See appellant's br. at 3. We recognize, therefore, that as a matter of New York law, section 388(1) can be applicable in this case and thus consider it in our choice-of-law analysis.

[8] After having reached that conclusion, we agree

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

with the district court that this case presents a "false conflict" and therefore the district court correctly determined that the law of the only interested jurisdiction, New York, must be applied. In our analysis we first examine New York's interest in having its law applied. The New York legislature in enacting section 388 furthered its dual policy of (1) *222 providing injured plaintiffs with a financially responsible defendant, and (2) imposing a high degree of responsibility on owners who allow others to operate their vehicles, by enacting an all-embracing mandatory insurance scheme. See N.Y. Veh. & Traf. Law § 310(2) (McKinney 1996). In *Budget Rent-A-Car Sys.* we noted that section 388(1) "was enacted to ensure access by injured persons to a financially responsible [party] against whom to recover for injuries and to change th[e] common-law rule and to impose liability upon the owner of a vehicle for the negligence of a person legally operating the car with the permission, express or implied, of the owner." 407 F.3d at 177 (quoting *Hassan v. Montuori,* 99 N.Y.2d 348, 756 N.Y.S.2d 126, 786 N.E.2d 25, 27 (2003)).

It is clear that New York's interest in protecting persons injured by New York vehicles, whether injured or harmed within or without New York State, would be impaired by the application of Pennsylvania's less expansive liability law which in this case would free Plaza from liability. Moreover, it is difficult to conceive of any case in which a person injured in Pennsylvania or, indeed, in any common law state, would be better off by the application of local as opposed to New York law.[FN8] In short, a failure to apply section 388 would impair New York's interest in ensuring that entities such as Plaza share in New York's goal of protecting the victims of tortfeasors, as well as demanding responsibility of owners who allow others to operate their vehicles.[FN9] Furthermore, New York's interest in having its law applied to an owner in the position of Plaza clearly would be undermined by the application of Pennsylvania common law in a case such as this, in which the vehicle's operator and owner did not have an agency relationship, so

that vicarious liability would not be imposed on the owner.

> FN8. While we will not discuss the possible approach of New York courts if for some reason section 388(1) did not apply when the owner was not the driver at the time of an accident as, for example, if the owner of the vehicle negligently had allowed the vehicle to be stolen, but nevertheless might be liable for damages attributable to the ensuing accident, it is possible that in such a situation they would apply common law principles in ascertaining the owner's liability.

> FN9. New York law, at least in theory, should require diligence on the owner of a vehicle with respect to the driver of its vehicle beyond the duty imposed by negligent entrustment principles.

We realize that New York's interest in having its law applied here is somewhat diminished by the circumstance that Garcia is a Pennsylvania citizen. After all, in *Budget Rent-A-Car Sys.,* in applying section 388(1) to a Pennsylvania accident, we emphasized that the injured plaintiff was a "New York resident receiving treatment and care from medical providers in New York with the aid of New York-administered welfare programs." 407 F.3d at 177. But that determination is offset by the circumstances that Gladney rented the vehicle in New York and is a resident of New York. Moreover, the New York Court of Appeals in *Tooker* pointed out that the New York legislature has shown a "commendable concern" for residents of other states injured as a result of the activities of New York residents. That situation is involved here and we think that the legislature also has such concern for residents of other states injured by a vehicle leased in New York. In view of *Tooker* we reject Plaza's contention that Garcia offers "no authority to support a proposition that New York has a state interest in ensuring compensation to non-residents who are injured outside its border." Appellant's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

reply br. at 2.

**\*223** We next analyze Pennsylvania's interest in the application of its common law. As the state of Garcia's domicile, Pennsylvania has an interest in providing for his recovery if Gladney is liable in order to make him whole. Yet it is clear that the application of New York's vicarious liability law cannot undermine the advancement of that interest. Simply put Plaza is unable to demonstrate how the application of New York's more plaintiff friendly provision would undermine Pennsylvania's interest in ensuring that its injured residents are compensated fully. We therefore agree with the district court that, "[e]ven if we were to consider Pennsylvania's adherence to the common law on the issue of owner liability as expressing an interest in establishing the scope of a vehicle owner's liability, this interest is not diminished where another state has statutorily imposed greater liability on its own citizens." Op. at 13.

In fact, we believe that the application of Pennsylvania law on the liability issue here, which would preclude Garcia from recovering from Plaza, does not further Pennsylvania's interest in protecting its residents and providing adequate recovery for its injured citizens. Moreover, as we explained above, we cannot conceive how the application of the common law as opposed to the New York statute to determine an owner's liability ever can be advantageous to a plaintiff and thus further the goal of providing full compensation for a plaintiff's injuries. Thus, we do not reach our result on a fact-specific basis to aid a single litigant. See *Allwein v. Donegal Mut. Ins. Co.*, 448 Pa.Super. 364, 671 A.2d 744, 750 (1996).

We also point out that while Pennsylvania law protects the owner of the vehicle from liability in a way that New York law does not, we cannot understand why Pennsylvania would have an interest in an owner of a vehicle from another state being shielded from vicarious liability imposed under the law of that state attributable to the negligence of a driver operating the vehicle with the owner's consent. This conclusion has particular force in a situation such as that here in which the entrustment of the vehicle was in the foreign state rather than in Pennsylvania.[FN10] We conclude, therefore, that no matter how we view this case Pennsylvania does not have a policy or interest that the application of New York law in this case would impair.

> FN10. Obviously our result might be different if Gladney's lease had been executed in Pennsylvania and the vehicle had been delivered to him in Pennsylvania and if Gladney had not used the vehicle in New York, but Garcia nevertheless attempted to have the court apply New York law on a theory that prior to the accident the vehicle had been used or operated in New York State in a way completely unrelated to the accident involved here by a prior lessee with no connection to Gladney. In fact, notwithstanding rather broad language in some opinions, see *Budget Rent-A-Car Sys.*, it might be that as a matter of New York law section 388 would not be applicable in such a situation. We however, do not need to explore this point and thus do not do so.

In summary, applying New York Law to impose liability on Plaza does not impair the interests of Pennsylvania, while on the contrary, the application of Pennsylvania law would impair New York's interest in providing injured plaintiffs with a financially responsible defendant, and imposing a high degree of responsibility on the owners of vehicles. See *Lacey*, 932 F.2d at 187. Therefore, this case presents a false conflict, and the district court should apply the law of the only interested jurisdiction, New York. Accordingly, the district court correctly granted summary judgment inasmuch as the judgment provided for the application of New York's Vehicle and Traffic Law § 388(1) in this case.

**\*224** III. CONCLUSION

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

421 F.3d 216
421 F.3d 216

Page 9

For the foregoing reasons, we will affirm the order
of June 4, 2004, and remand the case to the district
court for further proceedings.

C.A.3 (Pa.),2005.
Garcia v. Plaza Oldsmobile Ltd.
421 F.3d 216

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

61 S.Ct. 1020                                                                        Page 1
313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, 49 U.S.P.Q. 515

KLAXON CO. v. STENTOR ELECTRIC MFG. CO.
U.S. 1941.

Supreme Court of the United States
KLAXON CO.
v.
STENTOR ELECTRIC MFG. CO., Inc.
No. 741.

Argued May 1, 2, 1941.
Decided June 2, 1941.

On Writ of Certiorari to the United States Circuit Court of Appeals for the Third Circuit.

Action by the Stentor Electric Manufacturing Company against the Klaxon Company for breach of a contract under seal. Judgment for plaintiff, 30 F.Supp. 425, was affirmed by the Circuit Court of Appeals, 115 F.2d 268, and defendant brings certiorari.

Reversed and case remanded to the Circuit Court of Appeals.

West Headnotes

**[1] Federal Courts 170B ⟲410**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk409 Conflict of Laws
                170Bk410 k. Particular Questions.
Most Cited Cases
    (Formerly 106k359)
Where federal court's jurisdiction of action brought in Delaware for breach of contract executed in New York was based on diversity of citizenship, the court was not free to determine applicability of New York interest statute in accordance with its own conception of the better view of the law, but was bound to follow the conflict of laws rules pre-

vailing in Delaware's state courts. Civil Practice Act N.Y. § 480; 28 U.S.C.A. § 1961.

**[2] Federal Courts 170B ⟲409.1**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk409 Conflict of Laws
                170Bk409.1 k. In General. Most Cited Cases
    (Formerly 170Bk409, 106k359)
The federal courts may not, by enforcing an independent "general law" of conflict of laws, thwart local policies pursued by a state within limits permitted by the Constitution.

**[3] Courts 106 ⟲8**

106 Courts
    106I Nature, Extent, and Exercise of Jurisdiction in General
        106k3 Jurisdiction of Cause of Action
            106k8 k. Actions Under Laws of Other State. Most Cited Cases
The state of Delaware is free to determine whether a given matter is to be governed by law of the forum or some other law, subject only to review by the Supreme Court on any federal question that may arise.

**[4] Federal Courts 170B ⟲409.1**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk409 Conflict of Laws
                170Bk409.1 k. In General. Most Cited Cases
    (Formerly 170Bk409, 106k359)
Where jurisdiction of Delaware federal court was based on diversity of citizenship, the Supreme Court's views were not the decisive factor in determining the applicable conflicts rule, and proper function of Delaware federal court was to ascertain

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

61 S.Ct. 1020
313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, 49 U.S.P.Q. 515

what the state law was, not what it ought to be.

**[5] Courts 106 ⟶8**

106 Courts
　　106I Nature, Extent, and Exercise of Jurisdiction in General
　　　　106k3 Jurisdiction of Cause of Action
　　　　　　106k8 k. Actions Under Laws of Other State. Most Cited Cases
　　(Formerly 106k363)
The Constitution does not insure unlimited extraterritorial recognition of all statutes, or of any statute under all circumstances. U.S.C.A. Const. art. 4, § 1.

**[6] Courts 106 ⟶8**

106 Courts
　　106I Nature, Extent, and Exercise of Jurisdiction in General
　　　　106k3 Jurisdiction of Cause of Action
　　　　　　106k8 k. Actions Under Laws of Other State. Most Cited Cases
The "full faith and credit" clause would not require the state of Delaware to apply, in connection with agreement executed in New York, the New York statute directing that in contract actions interest be added to the principal sum, if such application would interfere with its local policy. Civil Practice Act N.Y. § 480; U.S.C.A. Const. art. 4, § 1.

**\*\*1020 \*488** Messrs. John Thomas Smith, of New York City, and James D. Carpenter, Jr., of Jersey City, N.J., for petitioner.
**\*490** Mr. Murray C. Bernays, of New York City, for respondent.

**\*494** Mr. Justice REED delivered the opinion of the Court.
The principal question in this case is whether in diversity cases the federal courts must follow conflict of laws rules prevailing in the states in which they sit. We left this open in Ruhlin v. New York Life Insurance Company, 304 U.S. 202, 208, note 2, 58 S.Ct. 860, 862, 82 L.Ed. 1290. The frequent recurrence of the problem, as well as the conflict of ap-

proach to the problem between the Third Circuit's opinion here and that of the First Circuit in Sampson v. Channell, 110 F.2d 754, 759-762, 128 A.L.R. 394. led us to grant certiorari.

In 1918 respondent, a New York corporation, transferred its entire business to petitioner, a Delaware corporation. Petitioner contracted to use its best efforts to further the manufacture and sale of certain patented devices covered by the agreement, and respondent was to have a share of petitioner's profits. The agreement was executed**\*\*1021** in New York, the assets were transferred there, and petitioner began performance there although later it moved its operations to other states. Respondent was voluntarily dissolved under New York law in 1919. Ten years later it instituted this action in the United States District Court for the District of Delaware, alleging that petitioner had failed to perform its agreement to use its best efforts. Jurisdiction rested on diversity of citizenship. In 1939 respondent recovered a jury verdict of $100,000, upon which judgment was entered. Respondent then moved to correct the judgment by adding interest**\*495** at the rate of six percent from June 1, 1929, the date the action had been brought. The basis of the motion was the provision in section 480 of the New York Civil Practice Act directing that in contract actions interest be added to the principal sum 'whether theretofore liquidated or unliquidated.'[FN1] The District Court granted the motion, taking the view that the rights of the parties were governed by New York law and that under New York law the addition of such interest was mandatory.30 F.Supp. 425, 431. The Circuit Court of Appeals affirmed, 3 Cir., 115 F.2d 268. 275, and we granted certiorari, limited to the question whether section 480 of the New York Civil Practice Act is applicable to an action in the federal court in Delaware.312 U.S. 674, 61 S.Ct. 734, 85 L.Ed. 1115.

> FN1 Section 480, New York Civil Practice Act: 'Interest to be included in recovery. Where in any action, except as provided in section four hundred eighty-a, final judg-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

61 S.Ct. 1020
313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, 49 U.S.P.Q. 515

ment is rendered for a sum of money awarded by a verdict, report or decision, interest upon the total amount awarded, from the time when the verdict was rendered or the report or decision was made to the time of entering judgment, must be computed by the clerk, added to the total amount awarded, and included in the amount of the judgment. In every action wherein any sum of money shall be awarded by verdict, report or decision upon a cause of action for the enforcement of or based upon breach of performance of a contract, express or implied, interest shall be recovered upon the principal sum whether theretofore liquidated or unliquidated and shall be added to and be a part of the total sum awarded.'

The Circuit Court of Appeals was of the view that under New York law the right to interest before verdict under section 480 went to the substance of the obligation, and that proper construction of the contract in suit fixed New York as the place of performance. It then concluded that section 480 was applicable to the case because 'it is clear by what we think is undoubtedly the better view of the law that the rules for ascertaining the measure of damages are not a matter of procedure at all, but are *496 matters of substance which should be settled by reference to the law of the appropriate state according to the type of case being tried in the forum. The measure of damages for breach of a contract is determined by the law of the place of performance; Restatement, Conflict of Laws s 413.'The court referred also to section 418 of the Restatement, which makes interest part of the damages to be determined by the law of the place of performance. Application of the New York statute apparently followed from the court's independent determination of the 'better view' without regard to Delaware law, for no Delaware decision or statute was cited or discussed.

[1][2][3][4] We are of opinion that the prohibition declared in Erie Railroad v. Tompkins. 304 U.S. 64,

58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, against such independent determinations by the federal courts extends to the field of conflict of laws. The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts.[FN2] Otherwise the accident of diversity of citizenship would constantly disturb equal administration of justice in co-ordinate state and federal courts sitting side by side. See Erie Railroad v. Tompkins, supra, 304 U.S. at 74-77, 58 S.Ct. at 820-822, 82 L.Ed. 1188, 114 A.L.R. 1487. Any other ruling would do violence **1022 to the principle of uniformity within a state upon which the Tompkins decision is based. Whatever lack of uniformity this may produce between federal courts in different states is attributable to our federal system, which leaves to a state, within the limits permitted by the Constitution, the right to pursue local policies diverging from those of its neighbors. It is not for the federal courts to thwart such local policies by enforcing an independent 'general law' of conflict of laws. Subject only to review by this Court *497 on any federal question that may arise, Delaware is free to determine whether a given matter is to be governed by the law of the forum or some other law. Cf. Milwaukee County v. White Co., 296 U.S. 268, 272, 56 S.Ct. 229, 231, 80 L.Ed. 220. This Court's views are not the decisive factor in determining the applicable conflicts rule. Cf. Funkhouser v. J. B. Preston Co., 290 U.S. 163, 54 S.Ct. 134, 78 L.Ed. 243. And the proper function of the Delaware federal court is to ascertain what the state law is, not what it ought to be.

> FN2 An opinion in Sampson v. Channell, 1 Cir., 110 F.2d 754, 759-762, 128 A.L.R. 394, reaches the same conclusion, as does an opinion of the Third Circuit handed down subsequent to the case at bar, Waggaman v. General Finance Co., 116 F.2d 254, 257. See, also, Goodrich, Conflict of Laws, s 12.

Besides these general considerations, the traditional

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

61 S.Ct. 1020
313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, 49 U.S.P.Q. 515

treatment of interest in diversity cases brought in the federal courts points to the same conclusion. Section 966 of the Revised Statutes, 28 U.S.C. s 811, 28 U.S.C.A. s 811, relating to interest on judgments, provides that it be calculated from the date of judgment at such rate as is allowed by law on judgments recovered in the courts of the state in which the court is held. In *Massachusetts Benefit Association v. Miles*, 137 U.S. 689, page 691,11 S.Ct. 234, page 235,34 L.Ed. 834, this Court held that section 966 did not exclude the allowance of interest on verdicts as well as judgments, and the opinion observed that 'the courts of the state and the federal courts sitting within the state should be in harmony upon this point'.

Looking then to the Delaware cases, petitioner relies on one group to support his contention that the Delaware state courts would refuse to apply section 480 of the New York Civil Practice Act, and respondent on another to prove the contrary. We make no analysis of these Delaware decisions, but leave this for the Circuit Court of Appeals when the case is remanded.

[5][6] Respondent makes the further argument that the judgment must be affirmed because, under the full faith and credit clause of the Constitution, Art. 4, s 1, the state courts of Delaware would be obliged to give effect to the New York statute. The argument rests mainly on the decision of this Court in *498John Hancock Mutual Life Insurance Company v. Yates*, 299 U.S. 178, 57 S.Ct. 129, 81 L.Ed. 106, where a New York statute was held such an integral part of a contract of insurance that Georgia was compelled to sustain the contract under the full faith and credit clause. Here, however, section 480 of the New York Civil Practice Act is in no way related to the validity of the contract in suit, but merely to an incidental item of damages, interest, with respect to which courts at the forum have commonly been free to apply their own or some other law as they see fit. Nothing in the Constitution ensures unlimited extraterritorial recognition of all statutes or of any statute under all

*Pacific Employers Insurance Co. v. Industrial Accident Comm.*, 306 U.S. 493, 59 S.Ct. 629, 83 L.Ed. 940;*Kryger v. Wilson*, 242 U.S. 171, 37 S.Ct. 34, 61 L.Ed. 229.The full faith and credit clause does not go so far as to compel Delaware to apply section 480 if such application would interfere with its local policy.

Accordingly, the judgment is reversed and the case remanded to the Circuit Court of Appeals for decision in conformity with the law of Delaware.

Reversed and remanded.

U.S. 1941.
Klaxon Co. v. Stentor Electric Mfg. Co.
313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, 49 U.S.P.Q. 515

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Electronic reproduction of 2005−06 Wis. Stats. database, updated and current through June 30, 2008 and 2007 Wis. Act 242.

**1    Updated 05−06 Wis. Stats. Database**
*Not certified under s. 35.18 (2), stats.*

**RULES OF THE ROAD**

# CHAPTER 346

# RULES OF THE ROAD

SUBCHAPTER I
GENERAL PROVISIONS
346.01    Words and phrases defined.
346.02    Applicability of chapter.
346.03    Applicability of rules of the road to authorized emergency vehicles.
346.04    Obedience to traffic officers, signs and signals; fleeing from officer.
SUBCHAPTER II
DRIVING, MEETING, OVERTAKING AND PASSING
346.05    Vehicles to be driven on right side of roadway; exceptions.
346.06    Meeting of vehicles.
346.07    Overtaking and passing on the left.
346.072   Passing stopped emergency vehicles, tow trucks and highway machinery equipment.
346.075   Overtaking and passing bicycles, electric personal assistive mobility devices, and motor buses.
346.08    When overtaking and passing on the right permitted.
346.09    Limitations on overtaking on left or driving on left side of roadway.
346.10    When passing at a railroad crossing, intersection, bridge, viaduct or tunnel prohibited.
346.11    Passing or meeting frightened animal.
346.12    Driving through safety zones prohibited.
346.13    Driving on roadways laned for traffic.
346.14    Distance between vehicles.
346.15    Driving on divided highway.
346.16    Use of controlled−access highways, expressways and freeways.
346.17    Penalty for violating sections 346.04 to 346.16.
346.175   Vehicle owner's liability for fleeing a traffic officer.
346.177   Railroad crossing improvement surcharge for vehicles illegally passing at railroad crossings.
SUBCHAPTER III
RIGHT−OF−WAY
346.18    General rules of right−of−way.
346.19    What to do on approach of emergency vehicle.
346.195   Owner's liability for vehicle failing to yield the right−of−way to an authorized emergency vehicle.
346.20    Right−of−way of funeral processions and military convoys.
346.205   Owner's liability for vehicle failing to yield the right−of−way to a funeral procession.
346.21    Right−of−way of livestock.
346.22    Penalty for violating sections 346.18 to 346.21.
SUBCHAPTER IV
RESPECTIVE RIGHTS AND DUTIES OF DRIVERS, PEDESTRIANS, BICYCLISTS, AND RIDERS OF ELECTRIC PERSONAL ASSISTIVE MOBILITY DEVICES
346.23    Crossing controlled intersection or crosswalk.
346.24    Crossing at uncontrolled intersection or crosswalk.
346.25    Crossing at place other than crosswalk.
346.26    Blind pedestrian on highway.
346.27    Persons working on highway.
346.28    Pedestrians to walk on left side of highway; pedestrians, bicyclists, and riders of electric personal assistive mobility devices on sidewalks.
346.29    When standing or loitering in roadway or highway prohibited.
346.30    Penalty for violating sections 346.23 to 346.29.
SUBCHAPTER V
TURNING AND STOPPING AND REQUIRED SIGNALS
346.31    Required position and method of turning at intersections.
346.32    Required position for turning into private road or driveway.
346.33    Where turns prohibited, exception.
346.34    Turning movements and required signals on turning and stopping.
346.35    Method of giving signals on turning and stopping.
346.36    Penalty for violating sections 346.31 to 346.35.
SUBCHAPTER VI
TRAFFIC SIGNS, SIGNALS AND MARKINGS
346.37    Traffic−control signal legend.
346.38    Pedestrian control signals.
346.39    Flashing signals.
346.40    Whistle signals.
346.41    Display of unauthorized signs and signals prohibited.
346.42    Interference with signs and signals prohibited.
346.43    Penalty for violating sections 346.37 to 346.42.
SUBCHAPTER VII
REQUIRED STOPS
346.44    All vehicles to stop at signal indicating approach of train.
346.45    Certain vehicles to stop at railroad crossings.
346.452   Owner's liability for vehicle illegally crossing at a railroad crossing.
346.455   Vehicles to stop at fire station.
346.457   Owner's liability for vehicle illegally passing fire truck.
346.46    Vehicles to stop at stop signs and school crossings.

346.465   Owner's liability for vehicle illegally crossing controlled school crossing.
346.47    When vehicles using alley or nonhighway access to stop.
346.475   Human service vehicles; loading or unloading children with disabilities.
346.48    Vehicles to stop for school buses displaying flashing lights.
346.485   Owner's liability for vehicle illegally passing school bus.
346.49    Penalty for violating ss. 346.44 to 346.485.
346.495   Railroad crossing improvement surcharge.
SUBCHAPTER VIII
RESTRICTIONS ON STOPPING AND PARKING
346.50    Exceptions to stopping and parking restrictions.
346.503   Parking spaces for vehicles displaying special registration plates or special identification cards.
346.505   Stopping, standing or parking prohibited in parking spaces reserved for vehicles displaying special registration plates or special identification cards.
346.51    Stopping, standing or parking outside of business or residence districts.
346.52    Stopping prohibited in certain specified places.
346.53    Parking prohibited in certain specified places.
346.54    How to park and stop on streets.
346.55    Other restrictions on parking and stopping.
346.56    Penalty for violating sections 346.503 to 346.55.
SUBCHAPTER IX
SPEED RESTRICTIONS
346.57    Speed restrictions.
346.58    Special speed restrictions for certain vehicles.
346.59    Minimum speed regulations.
346.595   Motorcycles and mopeds.
346.60    Penalty for violating sections 346.57 to 346.595.
SUBCHAPTER X
RECKLESS AND DRUNKEN DRIVING
346.61    Applicability of sections relating to reckless and drunken driving.
346.62    Reckless driving.
346.63    Operating under influence of intoxicant or other drug.
346.635   Report arrest or out−of−service order to department.
346.637   Driver awareness program.
346.64    Employment of drunken operators.
346.65    Penalty for violating sections 346.62 to 346.64.
346.655   Driver improvement surcharge.
SUBCHAPTER XI
ACCIDENTS AND ACCIDENT REPORTS
346.66    Applicability of sections relating to accidents and accident reporting.
346.665   Definition.
346.67    Duty upon striking person or attended or occupied vehicle.
346.675   Vehicle owner's liability for failing to stop at the scene of an accident.
346.68    Duty upon striking unattended vehicle.
346.69    Duty upon striking property on or adjacent to highway.
346.70    Duty to report accident.
346.71    Coroners or medical examiners to report; require blood specimen.
346.72    Garages to keep record of repairs of accident damage.
346.73    Accident reports not to be used in trial.
346.74    Penalty for violating sections 346.67 to 346.73.
SUBCHAPTER XII
BICYCLES, ELECTRIC PERSONAL ASSISTIVE MOBILITY DEVICES, AND PLAY VEHICLES
346.77    Responsibility of parent or guardian for violation of bicycle and play vehicle regulations.
346.78    Play vehicles not to be used on roadway.
346.79    Special rules applicable to bicycles.
346.80    Riding bicycle or electric personal assistive mobility device on roadway.
346.803   Riding bicycle or electric personal assistive mobility device on bicycle way.
346.804   Riding bicycle on sidewalk.
346.805   Riding electric personal assistive mobility device on sidewalk.
346.82    Penalty for violating sections 346.77 to 346.805.
SUBCHAPTER XIII
MISCELLANEOUS RULES
346.87    Limitations on backing.
346.88    Obstruction of operator's view or driving mechanism.
346.89    Inattentive driving.
346.90    Following emergency vehicle.
346.91    Crossing fire hose.
346.915   Following snowplows.
346.92    Illegal riding.
346.922   Transporting children in cargo areas of motor trucks.
346.923   Human service vehicles; minimum operator qualifications.
346.924   Transporting buildings on highways.
346.925   Operation of agricultural machinery by youthful operators.
346.93    Intoxicants in vehicle; underage persons.

**RULES OF THE ROAD**

346.935  Intoxicants in motor vehicles.
346.94   Miscellaneous prohibited acts.
346.945  Vehicle owner's liability for radios or other electric sound amplification

devices.
346.95   Penalty for violating sections 346.87 to 346.94.

---

SUBCHAPTER I

GENERAL PROVISIONS

**346.01 Words and phrases defined. (1)** Words and phrases defined in s. 340.01 are used in the same sense in this chapter unless a different definition is specifically provided.

**(2)** In this chapter, notwithstanding s. 340.01 (42), "owner" means, with respect to a vehicle that is registered, or is required to be registered, by a lessee of the vehicle under ch. 341, the lessee of the vehicle for purposes of vehicle owner liability under ss. 346.175, 346.195, 346.205, 346.452, 346.457, 346.465, 346.485, 346.505 (3), 346.675, and 346.945.

**History:** 1997 a. 27; 2003 a. 209; 2005 a. 411.

**346.02 Applicability of chapter. (1)** APPLIES PRIMARILY UPON HIGHWAYS. This chapter applies exclusively upon highways except as otherwise expressly provided in this chapter.

**(2)** APPLICABILITY TO PERSONS RIDING OR DRIVING ANIMALS OR PROPELLING PUSH CARTS. Every person riding an animal or driving any animal-drawn vehicle or propelling any push cart upon a roadway is granted all the rights and is subject to all the duties which this chapter grants or applies to the operator of a vehicle, except those provisions of this chapter which by their very nature would have no application.

**(4)** APPLICABILITY TO PERSONS RIDING BICYCLES AND MOTOR BICYCLES. (a) Subject to the special provisions applicable to bicycles, every person riding a bicycle upon a roadway or shoulder of a highway is granted all the rights and is subject to all the duties which this chapter grants or applies to the operator of a vehicle, except those provisions which by their express terms apply only to motor vehicles or which by their very nature would have no application to bicycles. For purposes of this chapter, provisions which apply to bicycles also apply to motor bicycles, except as otherwise expressly provided.

(b) Provisions which apply to the operation of bicycles in crosswalks under ss. 346.23, 346.24, 346.37 (1) (a) 2., (c) 2 and (d) 2. and 346.38 do not apply to motor bicycles.

**(5)** APPLICABILITY TO PUBLIC OFFICERS AND EMPLOYEES. The provisions of this chapter applicable to operators of vehicles apply also to operators of vehicles owned by or operated by or for any governmental agency, including the United States government, subject to the specific exceptions set forth in this section and s. 346.03.

**(6)** APPLICABILITY TO PERSONS WORKING ON HIGHWAYS. This chapter applies to persons, teams, motor vehicles and road machinery while traveling to or from highway construction or maintenance work but the provisions of ss. 346.05 (3), 346.06 to 346.17, 346.28, 346.29 (2), 346.31 to 346.36, 346.52 to 346.56 and 346.59 do not apply to persons, teams, motor vehicles or road machinery when actually engaged in maintenance or construction work upon a highway.

**(7)** APPLICABILITY OF PROVISIONS REQUIRING SIGNPOSTING. No provision of this chapter for which signs are required shall be enforced against an alleged violator if at the time and place of the alleged violation an official sign is not in proper position and sufficiently legible to be seen by an ordinarily observant person. Whenever a particular section does not state that signs are required, such section is effective even though no signs are erected or in place.

**(8)** APPLICABILITY TO PEDESTRIAN WAYS. (a) All of the applicable provisions of this chapter pertaining to highways, streets, alleys, roadways and sidewalks also apply to pedestrian ways. A

pedestrian way means a walk designated for the use of pedestrian travel.

(b) Public utilities may be installed either above or below a pedestrian way, and assessments may be made therefor as if such pedestrian way were a highway, street, alley, roadway or sidewalk.

**(9)** APPLICABILITY TO URBAN MASS TRANSIT SYSTEMS. Every person operating an urban mass transportation vehicle or using related facilities is granted all the rights and is subject to all the duties which this chapter grants or applies to such persons, except those provisions of this chapter which by their very nature would have no application.

**(10)** APPLICABILITY TO SNOWMOBILES. The operator of a snowmobile upon a roadway shall in addition to the provisions of ch. 350 be subject to ss. 346.04, 346.06, 346.11, 346.14 (1), 346.18, 346.19, 346.20, 346.21, 346.26, 346.27, 346.33, 346.35, 346.37, 346.39, 346.40, 346.44, 346.46, 346.47, 346.48, 346.50 (1) (b), 346.51, 346.52, 346.53, 346.54, 346.55, 346.87, 346.88, 346.89, 346.90, 346.91, 346.92 (1) and 346.94 (1) and (9).

**(11)** APPLICABILITY TO ALL-TERRAIN VEHICLES. The operator of an all-terrain vehicle on a roadway is subject to ss. 346.04, 346.06, 346.11, 346.14 (1), 346.18, 346.19, 346.20, 346.21, 346.26, 346.27, 346.33, 346.35, 346.37, 346.39, 346.40, 346.44, 346.46, 346.47, 346.48, 346.50 (1) (b), 346.51, 346.52, 346.53, 346.54, 346.55, 346.71, 346.87, 346.88, 346.89, 346.90, 346.91, 346.92 (1) and 346.94 (1) and (9) but is not subject to any other provision of this chapter.

**(12)** APPLICABILITY TO ELECTRIC PERSONAL ASSISTIVE MOBILITY DEVICES. An electric personal assistive mobility device shall be considered a vehicle for purposes of ss. 346.04 to 346.10, 346.12, 346.13, 346.15, 346.16, 346.18, 346.19, 346.20, 346.23 to 346.28, 346.31 to 346.35, 346.37 to 346.40, 346.44, 346.46, 346.47, 346.48, 346.50 to 346.55, 346.57, 346.59, 346.62, 346.65 (5m), 346.67 to 346.70, 346.78, 346.80, 346.87, 346.88, 346.90, 346.91, and 346.94 (4), (5), (9), and (10), except those provisions which by their express terms apply only to motor vehicles or which by their very nature would have no application to electric personal assistive mobility devices.

**History:** 1971 c. 125, 277; 1981 c. 390 s. 252; 1983 a. 243; 1985 a. 29, 69; 1989 a. 56 s. 259; 1989 a. 333 s. 89; 1995 a. 138; 2001 a. 90.

State, county, and tribal jurisdiction to regulate traffic on streets in housing projects that have been built and are maintained by the Winnebago Tribe on tribal lands is discussed. 78 Atty. Gen. 122.

**346.03 Applicability of rules of the road to authorized emergency vehicles. (1)** The operator of an authorized emergency vehicle, when responding to an emergency call or when in the pursuit of an actual or suspected violator of the law, when responding to but not upon returning from a fire alarm, when transporting an organ for human transplantation, or when transporting medical personnel for the purpose of performing human organ harvesting or transplantation immediately after the transportation, may exercise the privileges set forth in this section, but subject to the conditions stated in subs. (2) to (5m).

**(2)** The operator of an authorized emergency vehicle may:

(a) Stop, stand or park, irrespective of the provisions of this chapter;

(b) Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;

(c) Exceed the speed limit;

(d) Disregard regulations governing direction of movement or turning in specified directions.

**(3)** The exemption granted the operator of an authorized emergency vehicle by sub. (2) (a) applies only when the operator of the vehicle is giving visual signal by means of at least one flash-